1  Michael L. Kirby (50895)
      mkirby@knlh.com
2  Julianne Hull (246719)
      jhull@knlh.com
3  KIRBY NOONAN LANCE & HOGE LLP
   350 Tenth Avenue, Suite 1300
4  San Diego, California 92101-8700
   Telephone (619) 231-8666
5  Facsimile (619) 231-9593

6  Edward A. Pennington
   HANIFY & KING, P.C.
7  1875 K Street, N.W., Suite 707
   Washington, D.C. 20006
8  (202) 403-210
   eap@hanify.com
9
   Theodore J. Folkman
10 Christopher M. Morrison )
   David C. Kravitz
11 HANIFY & KING, P.C.
   One Beacon Street
12 Boston, MA 02108
   (617) 423-0400
13 tjf(@hanify.com, cmm@hanify.com, dck@hanifyi.com

14 Li Westerlund (SBN 222716)
   BAVARIAN NORDIC, INC.
15 2900 K Street, N.W., Suite 501
   Washington, D.C. 20007
16 (202) 536-1581
   li.westerlund@bavarian-nordic.com
17
18 Attorneys for Plaintiff Bavarian Nordic A/S

19            UNITED STATES DISTRICT COURT

20           SOUTHERN DISTRICT OF CALIFORNIA

21 BAVARIAN NORDIC A/S,                    | CASE NO. 08cv1156-L-RBB

22            Plaintiff,                    | **PLAINTIFF BAVARIAN NORDIC A/S'
                                            | EX PARTE MOTION FOR LEAVE TO
23       vs.                                | CONDUCT DISCOVERY RELATED TO
                                            | DEFENDANTS' MOTIONS TO DISMISS**
24 OXFORD BIOMEDICA PLC, an English        |
   public limited company; BIOMEDICA,      | Judge: Hon. Ruben B. Brooks
25 INC., a Delaware corporation; and       |
   OXFORD BIOMEDICA (UK) LTD., an          |
26 English private limited company         | Action Filed: June 30, 2008

27            Defendants

28
   KNLH\542167.1

1   Plaintiff Bavarian Nordic A/S ("Bavarian Nordic") hereby moves this Court for

2   an order allowing Bavarian Nordic to commence discovery immediately on issues

3   relevant to the motions to dismiss filed by the defendants, including the taking of the

4   depositions of Peter Nolan and Jill Martin, who provided declarations in support of

5   defendants' motions to dismiss, and for leave to serve a request for production of

6   documents that requires production of responsive documents within fifteen days of

7   the date of its service.  As discussed in further detail in the accompanying

8   memorandum of points and authorities, good cause exists to grant Bavarian Nordic's

9   motion because defendants' motions to dismiss raise issues outside of the pleadings.

10  Thus, Bavarian Nordic should be permitted to commence discovery on such issues

11  before having to respond to the Rule 12(b)(1) motions brought by defendants.

12      This ex parte motion is based on this Motion, the Memorandum of Points and

13  Authorities in Support of the Motion, the supporting declarations of Theodore J.

14  Folkman and Michael L. Kirby, the papers and pleadings on file in this action, and on

15  such other and further matters that the Court chooses to consider.

16  DATED:  September 4, 2008          KIRBY NOONAN LANCE & HOGE LLP

17

18

19                                     By:  /s/Michael L. Kirby
                                            Michael L. Kirby

20

21                                     HANIFY & KING, P.C.

22

23                                     By:  /s/Edward A. Pennington
                                            Edward A. Pennington
24                                          Theodore J. Folkman
                                            Christopher M. Morrison
25                                          David C. Kravitz

26
                                       Attorneys for Plaintiff
27

28

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California  92101-8700

KNLH\542167.1

-2-

1   Michael L. Kirby (50895)
        mkirby@knlh.com
2   Julianne Hull (246719)
        jhull@knlh.com
3   KIRBY NOONAN LANCE & HOGE LLP
    350 Tenth Avenue, Suite 1300
4   San Diego, California  92101-8700
    Telephone (619) 231-8666
5   Facsimile (619) 231-9593

6   Edward A. Pennington
    HANIFY & KING, P.C.
7   1875 K Street, N.W., Suite 707
    Washington, D.C. 20006
8   (202) 403-2101
    eap@hanify.com
9
    Theodore J. Folkman
10  Christopher M. Morrison
    David C. Kravitz
11  HANIFY & KING, P.C.
    One Beacon Street
12  Boston, MA 02108
    (617) 423-0400
13  tjf@hanify.com, cmm@hanify.com, dck@hanify.com

14  Li Westerlund (SBN 222716)
    BAVARIAN NORDIC, INC.
15  2900 K Street, N.W., Suite 501
    Washington, D.C. 20007
16  (202) 536-1581
    li.westerlund@bavarian-nordic.com

17
    Attorneys for Plaintiff Bavarian Nordic A/S
18

19              **UNITED STATES DISTRICT COURT**

20            **SOUTHERN DISTRICT OF CALIFORNIA**

21  BAVARIAN NORDIC A/S,                    CASE NO. 08cv1156-L-RBB

22              Plaintiff,                  **PLAINTIFF BAVARIAN NORDIC A/S'**
                                            **MEMORANDUM OF POINTS AND**
23      vs.                                 **AUTHORITIES IN SUPPORT OF ITS**
                                            **EX PARTE MOTION FOR LEAVE TO**
24  OXFORD BIOMEDICA PLC, an English        **CONDUCT DISCOVERY RELATED TO**
    public limited company; BIOMEDICA,      **DEFENDANTS' MOTIONS TO DISMISS**
25  INC., a Delaware corporation; and
    OXFORD BIOMEDICA (UK) LTD., an          Judge:  Hon. Ruben B. Brooks
26  English private limited company

27              Defendants.                 Action Filed:  June 30, 2008

28

KNLH\542233.1

1    **I. <u>MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF</u>**

2    **<u>PLAINTIFF'S EX PARTE MOTION FOR LEAVE TO TAKE DISCOVERY</u>**

3    **<u>ON ISSUES RELEVANT TO THE MOTIONS TO DISMISS</u>**

4    In this patent infringement case, the Defendants (collectively "Oxford

5    BioMedica") have moved to dismiss for failure to state a claim upon which relief can

6    be granted and have submitted evidence outside the pleadings in support of their

7    motions, *i.e.,* two sworn Declarations of employees of Oxford BioMedica.  In order to

8    preserve its right to present evidence relevant to Oxford BioMedica's motions, the

9    plaintiff, Bavarian Nordic A/S ("Bavarian Nordic" or "Plaintiff"), respectfully requests

10   leave of this Court to begin taking discovery on those matters relevant to the motions

11   immediately in order to avoid delaying the November 3, 2008 hearing date on

12   Defendants' motions.  Bavarian Nordic further requests permission to serve a

13   document request that requires production of the responsive documents in fifteen (15)

14   days from the date of service.

15   **II. <u>BACKGROUND</u>**

16   Bavarian Nordic owns several U.S. Patents relating to the modified vaccinia

17   Ankara ("MVA") virus. Its MVA-BN technology underlies Bavarian Nordic's

18   IMVAMUNE smallpox vaccine, which Bavarian Nordic supplies to the U.S.

19   Government under a major contract. MVA-BN also holds promise as a vector for

20   delivering recombinant vaccines for diseases such as HIV/AIDS, childhood diseases,

21   and various forms of cancer.

22   The Defendants in this patent infringement case are Oxford BioMedica plc, a

23   British biotechnology firm, and its U.S. and U.K. subsidiaries. Oxford BioMedica has

24   been conducting clinical trials of TroVax, an experimental drug for use in treating a

25   variety of cancers. TroVax consists of an MVA virus used as a vector to deliver a

26   particular gene. Oxford BioMedica has commercialized TroVax in ways that,

27   according to press releases, have yielded large payments from sanofi-aventis, a

28   company located in France, under the agreement between them for the development

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California  92101-8700

1  and commercialization of TroVax. The claim in the case is that the MVA virus used in

2  TroVax infringes on Bavarian Nordic's patents.

### III. __ARGUMENT__

4  __A.__    __The Court Should Allow Bavarian Nordic To Take Discovery On The__

5  __Issues Raised In Oxford BioMedica's Motions To Dismiss.__

6          In their motions to dismiss, Defendants have raised two defenses which they

7  allege is common to all three of them. First, they say that the safe harbor provision of

8  the Hatch-Waxman Act, 35 U.S.C. § 271(e), is a defense to the claim of patent

9  infringement, because Defendants allege they have only used TroVax in clinical trials,

10  and their sole purpose, they claim, is to obtain FDA approval for the drug. Second,

11  Defendants say that the Court lacks subject matter jurisdiction because the FDA has

12  not yet approved TroVax and the dispute is accordingly not yet sufficiently concrete to

13  satisfy the Cases and Controversies Clause, U.S. Const., art. III, § 2, cl. 1. Defendant

14  BioMedica, Inc. (the "US Subsidiary") has also raised a defense particular to itself,

15  namely that the Complaint does not state a claim against it that meets the standards

16  of Rule 8, Fed. R. Civ. P.

17          In support of their motions, Defendants have submitted two Declarations: the

18  Declaration of Peter J. Nolan ("Nolan Declaration"), Executive Director and Senior

19  Vice President, Commercial Development of the Oxford BioMedica plc (the "Parent

20  Company"), and the Declaration of Jill D. Martin ("Martin Declaration"), Vice

21  President, Intellectual Property—US of the US Subsidiary.

22          In general terms, the Nolan Declaration contains averments about the dealings

23  between Oxford BioMedica and the French pharmaceutical firm, sanofi-aventis, and

24  about the dealings between Oxford BioMedica and the FDA relating to TroVax.

25  Specifically, Mr. Nolan avers that neither the Parent Company nor Oxford BioMedica

26  (UK) Ltd. (the "UK Subsidiary") "has commercially sold or offered to sell the TroVax

27

28

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1 vaccine to sanofi-aventis or to any other person or entity." (Nolan Decl. ¶ 5).[1]  The

2 Nolan Declaration clearly raises evidentiary matters and goes well beyond, and seeks

3 to contradict, the allegations in the Complaint.

4        The Nolan Declaration is, however, silent about the terms of the alliance

5 between Oxford BioMedica and sanofi-aventis. According to the Parent Company's

6 2007 Annual Report, Oxford BioMedica has already received from sanofi-aventis

7 initial payments and milestone payments totaling € 48 million—approximately U.S.

8 $71.5 million at current exchange rates. (See Declaration of Theodore J. Folkman,

9 "Folkman Decl.") Ex. 1 at p. 26).  It stands to receive hundreds of millions of Euros in

10 additional payments (Id.), but the triggers for the payments, and the terms of the

11 alliance more generally, are not publicly available.  Moreover, it is unclear whether

12 sanofi-aventis's contract is with the Parent Company or the UK Subsidiary, or to

13 which Oxford BioMedica entity the substantial funds from sanofi-aventis flow.

14        The Nolan Declaration also avers, tracking 35 U.S.C. § 271(e), that the TroVax

15 clinical trials "are being conducted for the sole purpose of determining the safety and

16 efficacy of the drug." (Nolan Decl. ¶ 6). Of course, information about the Defendants'

17 purpose or intent is, for the moment, within the exclusive control of the Defendants

18 themselves.  Discovery is needed to determine what has occurred with sanofi-aventis,

19 and to discover all of the actual and intended purposes of Defendants' uses of

20 Plaintiff's patented technology.

21        Finally, the Nolan Declaration references a Special Protocol Assessment

22 agreement between an unspecified Oxford BioMedica entity and the FDA concerning

23 a phase III trial of TroVax for renal cell carcinoma (the "TRIST Study").  According to

24 the Nolan Declaration (¶ 5), the FDA "agreed to and influenced the design, conduct,

25 _____

26        [1] It is unclear whether Mr. Nolan means to deny that the Parent Company and
the UK Subsidiary have made no sales whatsoever of TroVax, including *non-*
27 *commercial* sales.

28

*Kirby Noonan Lance & Hoge LLP*
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1  analysis, and endpoints of this clinical trial," but beyond Mr. Nolan's hearsay say-so,

2  Bavarian Nordic knows of no publicly available information about the details of the

3  dealings between Oxford BioMedica and the FDA.  Defendants cannot ask the Court

4  to accept their version of those events without Plaintiff having the opportunity for

5  meaningful discovery on these issues.

6      The Nolan Declaration conspicuously avoids addressing the pertinent

7  circumstances and facts that negate the application of the Hatch-Waxman safe

8  harbor defense in this case.  The archetypal Hatch-Waxman case involves a

9  manufacturer who seeks to market a generic version of a drug after the relevant

10  patent expires.  But as is apparent in the Declarations, Defendants apparently view

11  the safe harbor of the Act as reaching far beyond the generic drug context.  Although

12  the safe harbor defense is not strictly confined to generics, this case concerns a

13  completely different set of facts than those addressed by the Nolan Declaration.  For

14  instance, TroVax is not a drug developed to be launched in the market once the

15  patents have expired but rather years before that.  Moreover, one major claim in this

16  case, as set forth in the Complaint, is also that the Defendants have infringed

17  Plaintiff's patents by commercializing the patented technology in ways that, according

18  to Defendants' own press releases[2], have yielded large payments from sanofi-aventis

19  under the agreement between them for the development and commercialization of

20  TroVax.  The Nolan Declaration is silent on all these circumstances and facts, among

21  others, of this particular case.

22      The Martin Declaration focuses more narrowly on what Ms. Martin claims to be

23  the US Subsidiary's lack of involvement in the TroVax studies. For example, Ms.

24

25      [2] A true and correct copy of Defendants' press releases discussing the wrongful

26  commercialization of Plaintiff's patented technology yielding large payments from

27  sanofi-aventis are collectively attached as Exhibit 1 to the supporting declaration of
Michael L. Kirby ("Kirby Decl.").

28

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California  92101-8700

1  Martin avers that the US Subsidiary's job is to "manage[] the US patent portfolio of
2  [the UK Subsidiary], providing primarily patent prosecution services." (Martin Decl. ¶
3  5). Ms. Martin goes on to deny that the US Subsidiary has anything whatsoever to do
4  with TroVax (Id. ¶¶ 6-10). However, there is reason to think that the US Subsidiary
5  has some role or interest in TroVax, as evidenced by the fact that Ms. Martin was
6  copied on a series of letters from the UK Subsidiary to Bavarian Nordic that led up to
7  this litigation. (Folkman Decl. Ex. 2 - 8). Moreover, the Oxford BioMedica Annual
8  Report indicates that the US Subsidiary at one time conducted laboratory work for
9  Oxford BioMedica. (Folkman Decl. Ex. 1 at 76). Ms. Martin's Declaration is silent as
10 to whether that work had anything to do with TroVax or the TroVax studies. Plaintiff is
11 entitled to get answers to these relevant questions in her deposition and from
12 Defendants' documents.

**B.    If The Court Decides To Consider Oxford BioMedica's Declarations,**
   **Bavarian Nordic Is Entitled To A Reasonable Opportunity To Do**
   **Discovery And Present Contrary Evidence.**

16     Two of the three arguments Oxford BioMedica presses in its motions (the safe
17 harbor argument and the US Subsidiary's argument that the Complaint does not
18 sufficiently allege a tie between it and the infringement) are arguments that the
19 Complaint should be dismissed for failure to state a claim upon which relief can be
20 granted, *see* Fed. R. Civ. P. 12(b)(6). Although such a motion tests the sufficiency of
21 the Complaint rather than the merits of the claim, *see Cervantes v. City of San Diego,*
22 5 F.3d 1273, 1274 (9th Cir. 1993), Oxford BioMedica has submitted two detailed and
23 substantive Declarations, discussed above.

24     The procedure to be followed when the defendant submits matters outside the
25 pleadings on a motion under Rule 12(b)(6) is both clear and mandatory:

26          If, on a motion under Rule 12(b)(6) … matters outside the
            pleadings are presented to and not excluded by the court,
27          the motion must be treated as one for summary judgment
            under Rule 56. All parties must be given a reasonable
28          opportunity to present all the material that is pertinent to the

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California  92101-8700

1  motion.

2  Fed. R. Civ. P. 12(d).

3

4  Despite the clear language of the rule, there are cases in which the Court may consider limited matters outside the pleadings on a motion to dismiss. *See, e.g.,*

5  *United States v. 14.02 Acres of Land More or Less in Fresno County,* 530 F.3d 883,

6  894 (9th Cir. 2008) (matters of which the court could take judicial notice); *Vinion v.*

7  *Amgen Inc.,* 272 Fed. Appx. 582, 854 (9th Cir. 2008) (contract referenced in the

8  complaint, the authenticity of which was undisputed). But the substantive

9  Declarations which Oxford BioMedica has submitted, which go far beyond the

10  pleadings, do not come within any of these exceptions. Indeed, the Declarations

11  address precisely the kinds of matters that are not amenable to judgment on the

12  pleadings, let alone summary judgment: Oxford BioMedica's intent or purpose in

13  conducting the clinical trials, for example, or the terms of the relationship between the

14  UK defendants and a third party, matters within the exclusive knowledge of Oxford

15  BioMedica. The Court, therefore, has two choices under Rule 12(d)—it can disregard

16  the Declarations when ruling on the motions to dismiss, or it can convert the motions

17  to motions for summary judgment and give Bavarian Nordic a reasonable opportunity

18  to present the pertinent evidentiary material. Under either approach, the objective of

19  fairness and keeping this case moving expeditiously dictate that Plaintiff should be

20  permitted to conduct the requested discovery.

21  **C.     Bavarian Nordic Will Not Have A Reasonable Opportunity To**

22  **Present Evidence Unless It Is Permitted To Begin Discovery On The**

23  **Safe Harbor Issue Immediately.**

24  Under the current schedule, Bavarian Nordic is required to serve its opposition

25  to Defendants' pending motions to dismiss on October 20, 2008. Even if Bavarian

26

27

28

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California  92101-8700

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California  92101-8700

1   Nordic served discovery requests today,[3] obtaining the necessary discovery relating

2   to the safe harbor issue in time to meet that deadline will be difficult or impossible.

3   Bavarian Nordic would receive documents from Oxford BioMedica in thirty days at the

4   earliest, *see* Fed. R. Civ. P. 34(b)(2)(A), assuming Oxford BioMedica interposed no

5   objections requiring motion practice under Rule 37. Thirty days from today is October

6   2. There is almost certainly not sufficient time to take the necessary depositions—at

7   the very least, the depositions of the two declarants—and oppose the motion within

8   the current schedule.  (For this reason, Bavarian Nordic seeks leave to serve a

9   document request that requires production of documents in fifteen days rather than

10  service of a response within thirty days, as provided in Rule 34).

11      Thus if the Court is determined to consider the Declarations and treat the

12  defendants' motions as motions for summary judgment,[4] Bavarian Nordic will likely

13  have to seek a continuance of the hearing date to take discovery or other relief under

14  Fed. R. Civ. P. 56(f).  But because there is no assurance that the Court will

15  necessarily grant such relief, *see Chance v. Pac-Tel Teletrac Inc.,* 242 F.3d 1151,

16  1161 n.6 (9th Cir. 2001) (decision whether to grant motion for continuance under Rule

17  56(f) is within the District Court's discretion),[5] Bavarian Nordic ought at least to be

18  _____

19      [3] Bavarian Nordic previously served discovery requests in the hope that the

20  defendants would consent to respond to the limited discovery sought without the need
    for this ex parte motion practice.  As demonstrated in the Kirby Declaration, Plaintiff

21  sought to avoid this hearing and met and conferred to obtain Defendants' consent to
    conduct the requested discovery.  *See* Kirby Decl., Ex. 2.  Defendants have refused

22  to agree to any discovery related to their motions to dismiss.  *See* Kirby Decl., Ex. 3.

23  Because Bavarian Nordic has been unable to obtain the defendants' consent,
    Bavarian Nordic intends to re-serve its discovery requests once the Court grants this

24  ex parte application.

25      [4] Bavarian Nordic reserves the right to ask the Court to disregard the
    Declarations, but it would be imprudent to assume that the Court will do so, as the

26  question is within the Court's discretion. *See* 5C Charles A. Wright *et al., Federal*

27  *Practice and Procedure* § 1366 n.17.

        [5] Ninth Circuit law rather than the law of the Federal Circuit applies to this

28  (footnote continued)

1 permitted to begin discovery on the safe harbor issue now.  This will permit Bavarian

2 Nordic to do as much as possible to obtain the necessary evidence in case it should

3 be required to oppose Defendants' motions on a summary judgment basis on October

4 20.

5    **D.    The Discovery Bavarian Nordic Proposes To Take Is Targeted At**

6        **The Safe Harbor Issue And At The US Subsidiary's Contentions In**

7        **Its Declaration**

8        Bavarian Nordic proposes to take discovery only on the safe harbor issue and

9 on the role of the US Subsidiary.  In particular, Bavarian Nordic proposes to take the

10 following discovery, which, it submits, is necessary before it can respond to the

11 motions to dismiss if they are converted into motions for summary judgment:

12        1.    Depositions of Peter Nolan and Jill Martin.  These are the two

13 declarants.  Bavarian Nordic needs, and should be entitled, to take discovery from the

14 two witnesses on whose averments Defendants' motions to dismiss rely, particularly

15 because many of the facts stated in the Declarations are within the Defendants'

16 exclusive knowledge.[6]

17        2.    Request for the Production of Documents.  Bavarian Nordic's request for

18 documents, attached to this Memorandum as Exhibit 1, is targeted at the issues at

19 stake on the motions to dismiss.  In addition to broad requests for documents relating

20 to the Defendants' contentions on their motions to dismiss, Bavarian Nordic seeks

21 documents relating to shipments of TroVax into the United States, payments received

22 from sanofi-aventis and potentially from others, including the initial payment of € 29

23 million from sanofi-aventis in 2007 and subsequent milestone payments, contracts

24

25 question. *See Serdarevic v. Advanced Med. Optics, Inc.,* 532 F.3d 1352, 1363 (Fed. Cir. 2008).

26    [6] Bavarian Nordic is willing to conduct Mr. Nolan's deposition in Washington,

27 D.C., and Ms. Martin's deposition in San Diego, CA, their respective locations of business and/or residence, or at a location designated by the Court.

28

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California  92101-8700

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1  regarding the commercialization of TroVax, documents showing the intent to enter the
2  market prior to expiration of Bavarian Nordic's patents, documents regarding non-
3  infringing substitutes of the vector, and legal opinions regarding the safe harbor
4  defense as to which the Defendants have waived any attorney-client privilege by
5  providing such legal opinions to sanofi-aventis.  All these requests refer to
6  circumstances and facts of this particular case that negate the application of the
7  Hatch-Waxman safe harbor defense.

8      **E.**    **Bavarian Nordic Should Also Be Allowed To Take Discovery On**
9              **The Issue of Subject Matter Jurisdiction Raised In The Defendants'**
10             **Motions**

11         Rule 12(d) does not apply to motions to dismiss for lack of subject matter
12  jurisdiction under Rule 12(b)(1).  Thus the foregoing discussion, which relates to the
13  procedures to be followed if the Court decides to consider the Declarations when
14  ruling on the motions to dismiss under Rule 12(b)(6), is not technically applicable.
15  Under Rule 12(b)(1), though, the result is the same: the Court should give the plaintiff
16  an opportunity to take discovery if "pertinent facts bearing on the question of
17  jurisdiction are controverted or where a more satisfactory showing of the facts is
18  necessary."  *Laub v. United States Dept. of the Interior,* 342 F.3d 1080, 1093 (9th Cir.
19  2003) (citation and internal quotation marks omitted).

20         Here, the motion on subject matter jurisdiction relies on facts well outside the
21  Complaint, including the supposed details of the dealings between the FDA and
22  Oxford BioMedica and the course of the TroVax studies.  While Bavarian Nordic
23  believes that the Defendants' motion plainly fails as a matter of law, there are factual
24  issues that will, after discovery is taken, help to clarify the merit or lack of merit in
25  Oxford BioMedica's argument regarding the state of the TroVax trials, e.g., the
26  number of cases in which TroVax has already been administered to patients, and the
27  aspects of TroVax that may be modified in order to satisfy the FDA and win approval
28  of the drug.  Bavarian Nordic should be permitted to take discovery on such issues

1   before having to respond to the Rule 12(b)(1) motions the Defendants have made.

2                       **IV. <u>CONCLUSION</u>**

3        For the foregoing reasons, Bavarian Nordic respectfully requests that the Court

4   grant leave to begin taking discovery immediately on factual matters and issues

5   relating to the Defendants' motions to dismiss, including all issues relevant to the lack

6   of merit of the safe harbor defense in this particular case.

7

8   DATED:  September 4, 2008         KIRBY NOONAN LANCE & HOGE LLP

9

10

11                         By:  /s/Michael L. Kirby
                                 Michael L. Kirby

12

13                         HANIFY & KING, P.C.

14

15                         By:  /s/Edward A. Pennington

16                                Edward A. Pennington
                               Theodore J. Folkman

17                                Christopher M. Morrison
                               David C. Kravitz

18

19                         Attorneys for Plaintiff

20

21

22

23

24

25

26

27

28

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

# EXHIBIT 1

1   Michael L. Kirby (50895)
       mkirby@knlh.com
2   Julianne Hull (246719)
       jhull@knlh.com
3   KIRBY NOONAN LANCE & HOGE LLP
    350 Tenth Avenue, Suite 1300
4   San Diego, California  92101-8700
    Telephone (619) 231-8666
5   Facsimile (619) 231-9593

6   Edward A. Pennington
    HANIFY & KING, P.C.
7   1875 K Street, N.W., Suite 707
    Washington, D.C. 20006
8   (202) 403-210
    eap@hanify.com

9
    Theodore J. Folkman
10  Christopher M. Morrison )
    David C. Kravitz
11  HANIFY & KING, P.C.
    One Beacon Street
12  Boston, MA 02108
    (617) 423-0400
13  tjf(@hanify.com, cmm@hanify.com, dck@hanify.com

14  Li Westerlund (SBN 222716)
    BAVARIAN NORDIC, INC.
15  2900 K Street, N.W., Suite 501
    Washington, D.C. 20007
16  (202) 536-1581
    li.westerlund@bavarian-nordic.com

17
    Attorneys for Plaintiff Bavarian Nordic A/S
18

19              **UNITED STATES DISTRICT COURT**

20              **SOUTHERN DISTRICT OF CALIFORNIA**

21  BAVARIAN NORDIC A/S,                    CASE NO. 08cv1156-L-RBB

22              Plaintiff,                  **PLAINTIFF BAVARIAN NORDIC A/S'
                                            FIRST SET OF REQUEST FOR
23          vs.                             PRODUCTION OF DOCUMENTS TO
                                            DEFENDANT OXFORD BIOMEDICA
24  OXFORD BIOMEDICA PLC, an English        PLC**
    public limited company; BIOMEDICA,
25  INC., a Delaware corporation; and       Judge:  The Hon. M. James Lorenz
    OXFORD BIOMEDICA (UK) LTD., an          Courtroom:  14
26  English private limited company
                                            Action Filed:  June 30, 2008
27              Defendants.

28

KNLH\540059.1              Exhibit 1 - 1 of 11              08cv1156-L-RBB
                                Page 1

| PROPOUNDING PARTY: | **PLAINTIFF BAVARIAN NORDIC A/S** |
|---|---|
| RESPONDING PARTY: | **DEFENDANTS OXFORD BIOMEDICA PLC, and** |
| | **OXFORD BIOMEDICA LTD.** |
| SET NO.: | **ONE** |

Pursuant to Federal Rule of Civil Procedure Rule 34 and the Court's order of

_____, 2008, Plaintiff Bavarian Nordic A/S ("Bavarian Nordic") hereby

requests that Defendants Oxford Biomedica PLC and Oxford Biomedica Ltd.

(collectively, "Oxford" or "Defendant") separately, fully, in writing and under oath,

respond to the Plaintiff's Requests for Production of Documents and produce and

permit counsel for Plaintiff to inspect and copy each of the documents and tangible

things covered by this Request as set forth below, and that the responses be signed

by the person(s) making them and served upon counsel for Defendant within fifteen

(15) days after service hereof to the law offices of Hanify & King, P.C., 1875 K Street,

N.W., Suite 707, Washington, D.C.   20006, or at such time and place as may be

agreed upon by counsel.

## **INSTRUCTIONS**

1.      These instructions and definitions should be construed to require

responses based upon information available to Defendant as well as Defendant's

attorneys, representatives, investigators, and others acting on Defendant's behalf.

2.      If Defendant is unable to produce a document or property requested,

state in writing why Defendant cannot produce the document or the property and, if

Defendant's inability to produce the document or the property is because it is not in

Defendant's possession or the possession of a person from whom Defendant could

obtain it, state the name, address, and telephone number of any person Defendant

believes may have the original or a copy of any such document or property.

3.      If Defendant objects to a portion or an aspect of any Request, state the

grounds of Defendant's objection with specificity and respond to the remainder of the

Request.

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California  92101-8700

Exhibit 1 - 2 of 11

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California  92101-8700

4.    If, in answering these Requests, Defendant encounters any ambiguities when construing a request, instruction, or definition, your response shall set forth the matter deemed ambiguous and the construction used in responding.  Where a claim of privilege is asserted in responding or objecting to any discovery requested in these Requests and information is not provided on the basis of such assertion, you shall, in your response or objection, identify the nature of the privilege (including work product) which is being claimed.  When any privilege is claimed, you shall indicate, as to the information requested, whether (a) any documents exist, or (b) any communications took place, and (c) also provide the following information for each such document in a "privileged documents log" or similar format:

(a) the type of document;

(b) the general subject matter of the document;

(c) the date of the document

(d) the author(s) of the document;

(e) the addressee(s) and any other recipient(s) of the document; and

(f)  the custodian of the document, where applicable.

5.    If the requested documents are maintained in a  file, the file folder is included in the request for production of those documents.

## DEFINITIONS

Notwithstanding any definition below, each word, term, or phrase used in these Requests is intended to have the broadest meaning permitted under the Federal Rules of Civil Procedure.

1.    The term "Oxford," "Defendant," "you," or "yours" means Oxford Biomedica PLC, Oxford Biomedica, Inc., and their respective employees, agents, attorneys, consultants, representatives, officers, and all other persons acting or purporting to act on their behalf.

2.    The term "Bavarian Nordic" or "PLAINTIFF" as used herein shall mean and refer to Bavarian Nordic A/S and all agents, attorneys, employees,

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California  92101-8700

1  representatives, accountants, subsidiaries, or anyone else acting on or purporting to

2  act on its behalf.

3      3.    The term "Sanofi-Aventis" as used herein shall mean and refer to Sanofi-

4  Aventis, its subsidiaries, including without limitation Sanofi Pasteur and Sanofi-

5  Aventis U.S. LLC, their employees, agents, attorneys, consultants, representatives,

6  officers, and all other persons acting or purporting to act on Sanof-Aventis's behalf.

7      4.    The term "TroVax" means any product and/or construct consisting of

8  MVA used as a vector having the tumor associated antigen 5T4 cloned into its

9  genome, which thus delivers the gene for 5T4.

10     5.    The term "MVA" means any variety of viruses, or viral products, derived

11  from the modified vaccinia Ankara strain, often further identified by a passage

12  number.

13     6.    The term "person" is defined as any natural person or any business,

14  legal or governmental entity or association.

15     7.    The term "communication" means the transmittal of information by any

16  means.

17     8.    The terms "document" and "documents are synonymous in meaning and

18  equal in scope and include, without limitation, any written material, whether typed,

19  handwritten, printed or otherwise, and whether in draft or final form, of any kind or

20  nature, or any photograph, photostat, microfilm or other reproduction thereof,

21  including, without limitation, each note, memorandum, letter, telegram, telex, circular,

22  release, article, report, prospectus, memorandum of any telephone or in-person

23  conversation, any financial statement, analysis, drawing, graph, chart, account, book

24  notebook, draft, summary, diary, transcript, computer data base, computer printout or

25  other computer generated matter, contract or order, technical report, laboratory report

26  or notebook, engineering report, patent, registration or mark, application for a

27  copyright, trademark or patent, patent appraisal, infringement search or study, and all

28  mechanical and electronic audio and video recordings or transcripts thereof, and

other data compilations from which information can be obtained and translated. Electronic mail or "e-mail" is included within the definition of the terms "document" or "documents." A draft or non-identical copy is a separate document within the meaning of the term.

9.   The term "relating" (or "relate") shall mean: pertaining, describing, referring, evidencing, reflecting, discussing, showing, supporting, contradicting, refuting, constituting, embodying, containing, concerning, identifying, or in any way logically or factually connected with the matter discussed.

10.   The words "or" and "and" shall be read in the conjunctive and not in the disjunctive wherever they appear, and neither of these words shall be interpreted to limit the scope of a request. The use of a verb in any tense shall be construed as the use of the verb in all other tenses and the singular form shall be deemed to include the plural, and vice-versa. The singular form of any noun shall be deemed to include the plural, and vice-versa.

11.   "All" means "any and all;" "any" means "any and all." "Including" means "including but not limited to." "And" and "or" encompass both "and" and "or." Words in the masculine, feminine or neuter form shall include each of the other genders.

12.   "This matter" or "this Litigation" shall refer to the litigation titled *Bavarian Nordic A/S v.*, *Oxford Biomedica PLC; Biomedica, Inc., and Oxford Biomedica (UK) LTD, Case No.* 08cv1156-L-RBB, filed in the United States District Court, Southern District of California.

## REQUESTS FOR DOCUMENTS

### REQUEST NO. 1:

All documents relating to your contention that Defendant's activities fall within the "safe harbor" provisions of the United States Patent Statute.

### REQUEST NO. 2:

All documents relating to your contention that this Court lacks jurisdiction in this Litigation.

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

**REQUEST NO. 3**:

All documents sufficient to identify every dose, package or quantity of TroVax that was offered for sale, sold, tested, shipped to, or distributed in the United States, and documents sufficient to identify the recipients, purchasers or users thereof.

**REQUEST NO. 4**:

All documents reflecting communications between Defendant and Sanofi-Aventis and relating in any way to TroVAx, MVA or MVA-related technology, including but not limited to documents relating to, referring to, or reflecting any payments by Sanofi-Aventis to Defendant.

**REQUEST NO. 5**:

All documents that identify the source, purpose or reasons for any payments identified in Request No. 4.

**REQUEST NO. 6**:

All documents relating to, referring to, or containing any contracts or agreements between Defendants and any other party involving the licensing in, or out, of any technology in connection with the manufacture, testing, or use of TroVax.

**REQUEST NO. 7**:

All documents relating to, referring to or containing any discussions, negotiations or contracts to engage any third party to represent Defendant's interests before the FDA or any foreign government regulatory authority, or any Committee or subcommittee thereof, concerning TroVax, including, but not limited to, retainer agreements or consultant agreements.

**REQUEST NO. 8**:

All documents relating to, referring to or containing any pre-clinical studies or testing of TroVax, including, but not limited to, test protocols, data compilations, laboratory notebooks, summaries of results, drafts of reports, interim reports, final reports, published articles, financial remuneration, engagement of consultants/investigators, internal memoranda and submissions of data to the FDA or any Foreign Government Regulatory Authorities.

**REQUEST NO. 9**:

All documents relating to, referring to or containing any clinical studies or testing regarding TroVax, including, but not limited to, names and addresses of each person or entity performing the studies or testing, test protocols, data compilations, laboratory

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1  notebooks, summaries of results, drafts of reports, interim reports, final reports,
2  published articles, financial remuneration, engagement of investigators, internal
   memoranda and submissions of data to the FDA or any Foreign Government
3  Regulatory Authorities.

4  **REQUEST NO. 10**:

5  All clinical trial investigator protocols provided by the Defendant or any contractor firm
6  to physicians, clinical investigators, etc. for clinical trials for TroVax and all
   contracts/agreements, including the names and addresses of each person or entity
7  performing the studies or testing, with clinical trial investigators for these clinical trials.

8  **REQUEST NO. 11**:

9  All documents that relates to, refers to or contains any communication, report or
10  inquiry between Defendant and the National Institutes of Health concerning MVA or
11  TroVax.

12  **REQUEST NO. 12**:

13  All documents relating or referring to revenue, sales, profits, and costs for TroVax.

14  **REQUEST NO. 13**:

15  All documents relating to, referencing, or evidencing communication between
16  Defendant and Sanofi-Aventis that have as their subject matter, in whole or in part,
   Bavarian Nordic, this Litigation, or the patents involved in this Litigation.
17

18  **REQUEST NO. 14**:

19  All documents relating to, referring to, evidencing, or containing any financial
   relationship and/or contract between Defendants and any physician, clinic, hospital or
20  other healthcare provider involving medical care or treatment for cancer, whether for
21  clinical trials or not, where a biological product containing MVA is or was used.

22  **REQUEST NO. 15**:

23  All documents relating to, referring to, evidencing, or containing any financial
24  relationship and/or contract between Defendants and Sanofi Aventis.

25  **REQUEST NO. 16**:

26  All documents relating to, referring to, evidencing, or containing submissions to any
27  U.S. federal agency in connection with any products made, sold, used, or licensed for
   use by Defendants that contain MVA.
28

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1
2

**REQUEST NO. 17**:

3
4
5
6

All documents, including internal Oxford Biomedica communications and communications with third parties, concerning or evidencing any legal opinion relating to the intellectual property rights of Bavarian Nordic or the so-called safe harbor provision in 35 U.S.C. § 271, executed for and/or on behalf of Oxford Biomedica, including the legal opinion as such, provided to or otherwise shared with a third party, including but not limited to Sanofi-Aventis.

7

**REQUEST NO. 18**:

8
9
10

All documents, including internal Oxford Biomedica communications and communications with third parties, concerning the decision to use MVA as a vector for delivering the 5T4 antigen in TroVax® rather than any other viral vectors.

11

**REQUEST NO. 19**:

12
13
14

All documents, including internal Oxford Biomedica communications and communications with third parties, concerning the decision to replace the TroVax® construct used in preclinical studies, having the 5T4 antigen inserted into deletion site two of the MVA genome, with a new construct, having the 5T4 antigen inserted into deletion site 3 of the MVA genome.

15
16

**REQUEST NO. 20**:

17
18
19
20

All documents, including internal Oxford Biomedica communications and communications with third parties, concerning the starting material used for the initial TroVax construct used in preclinical studies, having the 5T4 antigen inserted into deletion site two of the MVA genome, and the starting material used for the new construct, having the 5T4 antigen inserted into deletion site 3 of the MVA genome, including, but not limited to, the source of the starting material.

21

**REQUEST NO. 21**:

22
23
24
25

All documents, including but not limited to internal Oxford Biomedica communications and communications with third parties concerning the biological characteristics of the starting materials referred to supra, including, but not limited to, any experimental, pre-clinical and clinical *in vitro* and *in vivo* replication data for said starting materials, including data generated when said materials have been used as control.

26

**REQUEST NO. 22**:

27
28

All documents, including but not limited to internal Oxford Biomedica communications and communications with third parties, concerning the biological characteristics of the

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California  92101-8700

1   initial TroVax® construct used in preclinical studies, having the 5T4 antigen inserted
2   into deletion site two of the MVA basic genome, and the new construct, having the
    5T4 antigen inserted into deletion site 3 of the MVA basic genome, including, but not
3   limited to any experimental, pre-clinical and clinical *in vitro* and *in vivo* replication data
    for said constructs.
4
    **REQUEST NO. 23**:
5
6   All documents, including internal Oxford Biomedica communications and
    communications with third parties, including but not limited to Sanofi-Aventis, market
7   analysts and investors, concerning prognosis of relevant time frame for filing BLA
    (NDA) with the U.S. Food and Drug Administration (FDA) and planned market entry in
8   the United States as the status may have been each of the following years 2000-
9   2008, including the announced estimate for product registration for TroVax® in the
    United States in 2009.
10
11  **REQUEST NO. 24**:
12
13  All documents, including internal Oxford Biomedica communications and
    communications with third parties, including Sanofi-Aventis, concerning the terms and
    conditions of the global licensing agreement with Sanofi-Aventis announced on or
14  about March 28, 2007 and any subsequent amendments or agreements.
15
16  **REQUEST NO. 25**:
17
18  All documents and financial data, including internal Oxford Biomedica
    communications and communications with third parties, including Sanofi-Aventis,
19  concerning the financial terms and conditions of the global licensing agreement with
    Sanofi-Aventis announced on or about March 28, 2007, including but not limited to
    the announced initial cash payment of EUR 29 million, the milestone payment of EUR
20  9 million referenced in the release of September 11, 2007, as well as the referenced
21  EUR 518 million in initial and milestone payments.
22
23  **REQUEST NO. 26**:
24  All documents and financial data, including internal Oxford Biomedica
    communications and communications with third parties, including Sanofi-Aventis,
25  concerning the financial accounting, internal and external, of the global licensing
    agreement with Sanofi-Aventis announced on or about March 28, 2007, including but
26  not limited to the initial cash payment of EUR 29 million, the milestone payment of
27  EUR 9 million referenced in the release of September 11, 2007, as well as the
    referenced EUR 518 million in initial and milestone payments.
28

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1  **REQUEST NO. 27**:

2
3  All documents, including internal Oxford Biomedica communications and
communications with third parties, including Sanofi-Aventis in the context of the global
licensing agreement with Sanofi-Aventis, announced on or about March 28, 2007,
4  concerning the intellectual property rights owned by or exclusively licensed to
Bavarian Nordic regarding any MVA strain, including MVA-BN and recombinant MVA-
5  based vaccines.

6

7  **REQUEST NO. 28**:

8
All documents, including internal Oxford Biomedica communications and
9  communications with third parties, including but not limited to, Sanofi-Aventis,
concerning the estimated worldwide cancer vaccine revenues of $6 billion by 2010
10 and the announced target market for TroVax® to currently exceed $8 billion.

11

12

13

14

15 DATED:  August 25 , 2008          KIRBY NOONAN LANCE & HOGE LLP

16

17

18                                  By:  _____
                                        Michael L. Kirby
19

20                                  HANIFY & KING, P.C.

21

22

23                                  By:  _____
                                        Edward A. Pennington
24                                      Theodore J. Folkman
                                        Christopher M. Morrison
25                                      David C. Kravitz

26                                      Attorneys for Plaintiff, Bavarian Nordic A/S

27

28

1

## CERTIFICATE OF SERVICE

2

I hereby certify that the foregoing document was served via facsimile, electronic mail, and
3   Federal Express upon the following counsel this 25th day of August, 2008:

4   Edgar H. Haug, Esq.
Fromer Lawrence & Haug LLP
5   745 Fifth Avenue
New York, NY 10151
6

7   ehaug@flhlaw.com

8   FACSIMILE No. (212) 588-0500

9

10   _____

11   Edward A. Pennington
Hanify & King
12   1875 K Street, NW
Suite 707
13   Washington, DC  20006
(202) 403-2101 (direct)
14   (202) 403-4380 (fax)
eap@hanify.com
15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Kirby Noonan Lance & Hoge LLP**
350 Tenth Avenue, Suite 1300 San Diego, California  92101-8700

KNLH\540059.1

1   Michael L. Kirby (50895)
      mkirby@knlh.com
2   Julianne Hull (246719)
      jhull@knlh.com
3   KIRBY NOONAN LANCE & HOGE LLP
    350 Tenth Avenue, Suite 1300
4   San Diego, California  92101-8700
    Telephone (619) 231-8666
5   Facsimile (619) 231-9593

6   Edward A. Pennington
    HANIFY & KING, PC.
7   1875 K Street, N.W., Suite 707
    Washington, D.C. 20006
8   (202) 403-210
    eap@hanify.com
9
    Theodore J. Folkman
10  Christopher M. Morrison )
    David C. Kravitz
11  HANIFY & KING, P.C.
    One Beacon Street
12  Boston, MA 02108
    (617) 423-0400
13  tjf(@hanify.com, cmm@hanify.com, dck@hanifyi.com

14  Li Westerlund (SBN 222716)
    BAVARIAN NORDIC, INC.
15  2900 K Street, N.W., Suite 501
    Washington, D.C. 20007
16  (202) 536-1581
    li.westerlund@bavarian-nordic.com
17
    Attorneys for Plaintiff Bavarian Nordic A/S
18

19              UNITED STATES DISTRICT COURT

20            SOUTHERN DISTRICT OF CALIFORNIA

21  BAVARIAN NORDIC A/S,              CASE NO. 08cv1156-L-RBB

22          Plaintiff,               **DECLARATION OF MICHAEL L.
                                     KIRBY IN SUPPORT OF PLAINTIFF
23      vs.                          BAVARIAN NORDIC A/S' EX PARTE
                                     MOTION FOR LEAVE TO CONDUCT
24  OXFORD BIOMEDICA PLC, an English  DISCOVERY RELATED TO
    public limited company; BIOMEDICA, DEFENDANTS' MOTIONS TO DISMISS**
25  INC., a Delaware corporation; and
    OXFORD BIOMEDICA (UK) LTD., an   Judge:  Hon. Ruben B. Brooks
26  English private limited company

27          Defendants.              Action Filed:  June 30, 2008

28  KNLH\542302.1                              Case No. 08-CV-1156-L-RBB
                                     MICHAEL L . KIRBY DECLARATION IN SUPPORT
                                         OF PLAINTIFF'S EX PARTE MOTION FOR
                                                               DISCOVERY

1

2     I, MICHAEL L. KIRBY, declare as follows:

3         1.     I am an attorney duly licensed to practice in all of the courts of the State

4     of California and am a partner with the firm KIRBY NOONAN LANCE & HOGE LLP,

5     attorneys of record for Plaintiff Bavarian Nordic A/S ("Bavarian Nordic") herein.  The

6     facts set forth in this declaration are true and correct of my own personal knowledge

7     and, if called upon to testify, I could and would do so competently.

8         2.     A true and correct copy of Defendants' press releases discussing the

9     wrongful commercialization of Bavarian Nordic's patented technology yielding large

10    payments from sanofi-aventis are collectively attached as Exhibit 1.

11        3.     On August 25, 2008 Edward Pennington, counsel for Bavarian Nordic,

12    wrote a letter to Edgar Haug, counsel for Defendants, requesting Defendants'

13    cooperation in early discovery related to Defendants' motions to dismiss.  A true and

14    correct copy of Mr. Pennington's letter is attached hereto as Exhibit 2.

15        4.     On August 29, 2008 Mr. Haug responded to Mr. Pennington via letter

16    refusing to cooperate in early discovery related to Defendants' motions to dismiss.  A

17    true and correct copy of Mr. Haug's letter is attached hereto as Exhibit 3.

18        I declare under penalty of perjury that the foregoing is true and correct and that

19    this declaration is executed this 4 day of September 2008, at San Diego, California.

20

21                                   /s/Michael L. Kirby
                                     Michael L. Kirby

22

23

24

25

26

27

28    KNLH\542302.1

-2-

Case No. 08-CV-1156-L-RBB
MICHAEL L . KIRBY DECLARATION IN SUPPORT
OF PLAINTIFF'S EX PARTE MOTION FOR
DISCOVERY

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California  92101-8700

1

## **TABLE OF CONTENTS**

2

3    Exhibit 1      August 29, 2008 Oxford BioMedica plc Unaudited Interim Results for

4                      the Six Months Ended 30 June 2008

5    Exhibit 2      Letter dated August 25, 2008 from Edward Pennington to Edgar

6                      Haug

7

8    Exhibit 3      Letter dated August 29, 2008 from Edgar Haug to Edward

                      Pennington

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

# EXHIBIT 1



bioMedica

About Us    Clinical Trials    Products    Technology    Collaborations    Investors    News    Conta

**News** 29 August 2008

2008/OB/28

# OXFORD BIOMEDICA PLC UNAUDITED INTERIM RESULTS FOR THE SIX MONTHS ENDED 30 JUNE 2008

**Oxford, UK - 29 August 2008:** Oxford BioMedica (LSE: OXB), a leading gene therapy company, announced today its unaudited interim financial results for the six months ended 30 June 2008. Year to date highlights:

**Operational**
TroVax® (multiple cancers)



- Milestone payment of €10 million from sanofi-aventis
- Encouraging Phase II results in renal cancer and colorectal cancer published
- Completed recruitment of 733 patients in Phase III TRIST study
- DSMB stated that TRIST study would not meet primary endpoint but should be continued without further vaccinations
- FDA meeting scheduled in October 2008 to discuss TRIST data and study amendments
- Sanofi-aventis expected to start Phase III trials in colorectal cancer, pending outcome of FDA meeting
- QUASAR group committed to 3,000-patient study in adjuvant colorectal cancer

ProSavin® (Parkinson's disease)

- Treatment is safe and well tolerated in first cohort of patients in Phase I/II trial
- Preparing for Phase III development

RetinoStat® (age-related macular degeneration)

- Preparing regulatory submission to start Phase I/II trial

Other

- Secured rights to therapeutic use of Nobel Prize-winning RNAi technology

**Board changes**

- Dr Alex Lewis appointed as Non-Executive Director
- Professor Alan Kingsman succeeded Dr Peter Johnson as Chairman
- Dr Stuart Naylor succeeded Dr Susan Kingsman as Chief Scientific

Exhibit 1 - 1 of 5

Page 1

9/4/2008



Officer
- Nick Woolf appointed to new position of Chief Business Officer
- Dr Mike McDonald, Chief Executive Officer, left the Board
- John Dawson, Non-Executive Director, appointed as Acting Chief Executive Officer

**Strategic restructuring**

- Cost savings estimated to extend cash for operations through first half of 2010
- Focusing development on three projects with greatest potential for near-term success

**Financial**

- Net loss of £1.1 million (H1 2007: £9.3 million)
- Revenue of £13.4 million (H1 2007: £2.0 million)
- Research and development costs of £12.9 million (H1 2007: £10.8 million)
- Net cash burn[1] of £11.8 million (H1 2007: cash generated[1] £10.4 million)
- Net cash[2] at 30 June of £27.0 million (30 June 2007: £42.5 million)

1. Net cash used in/generated by operating activities plus sales and purchases of non-current assets
2. Cash, cash equivalents and current financial assets

Commenting on the interim results, Oxford BioMedica's Chairman, Professor Alan Kingsman, said: *"Following the DSMB's review of our Phase III TRIST study of TroVax in renal cancer in July, we are evaluating the interim data with our partner, sanofi-aventis. Our preliminary analysis suggests that the DSMB's recommendation to stop further dosing leaves open the possibility that a positive survival advantage may be demonstrated in the overall TRIST population or in a subset of patients. We eagerly await the maturing data and we believe they will be important in defining the clinical development and regulatory path for TroVax."*

*"Our Phase I/II trial of ProSavin in Parkinson's disease is progressing to plan. ProSavin has been well tolerated in the first three patients. In September the study's DSMB will review the data from these patients and determine whether to approve raising the dose level for the next three patients before entering the double-blinded, sham-controlled stage of the study. Preparation for a subsequent Phase III study and commercialisation of ProSavin is also progressing well. In addition, preclinical studies to support clinical evaluation of RetinoStat in age-related macular degeneration in 2009 are on track and we have begun discussions with major regulatory authorities in preparation for a Phase I/II study."*

*"We ended the first half of 2008 in a strong financial position with net cash of £27 million, but we recognise the need to prioritise our resources. I firmly believe that the management team, under the interim leadership of John Dawson, has the experience to deliver operational success and secure future growth opportunities for Oxford BioMedica."*

**Analyst meeting:**
An analyst briefing will be held at 10:00 am today at the offices of Buchanan Communications, 45 Moorfields, London EC2Y 9AE.

**Web cast:**
Simultaneously to the analyst briefing at 10.00 am, there will be a live audio web cast of the results presentation. To connect to the web cast facility, please go here approximately 10 minutes (09:50 am) before the start of the briefing. This will also be available for replay shortly after the presentation here.

Click here to view the Chairman's report

- ends -

Return to the News

---

**Notes**

1.    **Oxford BioMedica plc**
Oxford BioMedica (LSE: OXB) is a biopharmaceutical company specialising in cancer immunotherapy and gene-based therapies. The Company was established in 1995, as a spin-out from Oxford University, and is listed on the London Stock Exchange.

The Company has a platform of gene delivery technologies, which are based on highly engineered viral systems. Oxford BioMedica also has in-house clinical, regulatory and manufacturing know-how. TroVax® is the Company's therapeutic vaccine, which is in clinical development for multiple solid cancers. The product is licensed to sanofi-aventis for global development and commercialisation. Oxford BioMedica has three other products in clinical development, including ProSavin®, a novel gene-based treatment for Parkinson's disease, in a Phase I/II trial. The Company is underpinned by over 80 patent families, which represent one of the broadest patent estates in the field. Oxford BioMedica has collaborations with sanofi-aventis, Wyeth, Sigma-Aldrich, MolMed and Virxsys. Technology licensees include Biogen Idec, Merck & Co, GlaxoSmithKline and Pfizer.

Further information is available at www.oxfordbiomedica.co.uk

### For further information please contact:

| | |
|---|---|
| **Oxford BioMedica plc** <br> John Dawson, Acting Chief Executive Officer <br> Nick Woolf, Chief Business Officer | Tel: +44 (0)1865 783 000 |
| **JPMorgan Cazenove Limited** <br> James Mitford/Gina Gibson | Tel: +44 (0)20 7588 2828 |
| **NM Rothschild & Sons:** <br> Lynn Drummond/ Christopher Bath | Tel: +44 (0)20 7280 5000 |
| **City/Financial Enquiries** <br> Lisa Baderoon/Mark Court/Mary-Jane Johnson <br> Buchanan Communications | Tel: +44 (0)20 7466 5000 |
| **Scientific/Trade Press Enquiries** <br> Holly Griffiths/Katja Stout | Tel: +44 (0)20 7457 2020 |
| **US Enquiries** <br> Thomas Fechtner <br> The Trout Group LLC | Tel: +1 646 378 2900 |

Top of page

Website by College Hill - Life Sciences

Exhibit 1 - 3 of 5
Page 3

/4/2008



bioMedica    About Us    Clinical Trials    Products    Technology    Collaborations    Investors    News    Conta

**News / 20 February 2008**

2008/OB/04

# OXFORD BIOMEDICA ANNOUNCES DATA SAFETY MONITORING BOARD RECOMMENDATION TO CONTINUE TROVAX® PHASE III TRIST STUDY

## ACHIEVEMENT TRIGGERS €10 MILLION MILESTONE PAYMENT FROM SANOFI-AVENTIS



**Oxford, UK - 20 February 2008:** Oxford BioMedica (LSE: OXB), a leading gene therapy company, announced today that the independent Data Safety Monitoring Board (DSMB) for the Phase III TRIST study of TroVax in renal cancer has completed its third planned interim analysis and recommended that the study continue without modification. TroVax is Oxford BioMedica's novel cancer immunotherapy product, which is being developed in collaboration with sanofi-aventis. The continuation of the trial following this interim analysis triggers a milestone payment to Oxford BioMedica of €10 million.

The role of the DSMB is to evaluate data from the ongoing trial to determine whether there are safety issues or efficacy issues that would warrant modification of the protocol or early termination of the study. The DSMB is independent of Oxford BioMedica and sanofi-aventis and provides no information beyond its recommendation.



TRIST (TroVax Renal Immunotherapy Survival Trial) is a Phase III trial of TroVax in patients with locally advanced or metastatic clear cell renal carcinoma. The trial is a randomised, placebo-controlled, two-arm study comparing TroVax in combination with standard of care to placebo with standard of care. TRIST is being conducted under a Special Protocol Assessment (SPA) agreement from the US Food and Drug Administration (FDA) and was initiated in November 2006. To date, over 600 patients have been randomised and more than 100 sites in the USA, European Union and Eastern Europe are recruiting patients.

Professor Alan Kingsman, Chief Executive of Oxford BioMedica, said: *"The DSMB's recommendation to continue the TRIST study is another important step in the Phase III development of TroVax, which is recognised in our collaboration with sanofi-aventis by a milestone payment. The trial is on track to complete patient enrolment before the end of this quarter and we anticipate final results in 2009. In addition to further progress of the TRIST study in renal cancer, future events will include sanofi-aventis commencing its planned Phase III trial of TroVax in patients with metastatic colorectal cancer."*



- ends -



Return to the News

_____

**Notes**

1.  **Oxford BioMedica plc**
    Oxford BioMedica (LSE: OXB) is a biopharmaceutical company specialising in cancer immunotherapy and gene-based therapies. The Company was established in 1995, as a spin-out from Oxford University, and is listed on the London Stock Exchange.

    The Company has a platform of gene delivery technologies, which are based on highly engineered viral systems. Oxford BioMedica also has in-house clinical, regulatory and manufacturing know-how. The lead product candidate is TroVax®, an immunotherapy for multiple solid cancers, which is licensed to sanofi-aventis for global development and commercialisation. TroVax is in Phase III development. Oxford BioMedica has three other products in clinical development, including ProSavin®, a novel gene-based treatment for Parkinson's disease, in a Phase I/II trial. The Company is underpinned by over 80 patent families, which represent one of the broadest patent estates in the field. The Company has a staff of approximately 85. Oxford BioMedica has collaborations with sanofi-aventis, Wyeth, Sigma-Aldrich, MolMed and Virxsys. Technology licensees include Biogen Idec, Merck & Co, GlaxoSmithKline and Pfizer.

2.  **TroVax®**
    TroVax is Oxford BioMedica's novel cancer immunotherapy product, which is being developed in collaboration with sanofi-aventis. It is designed specifically to stimulate an anti-cancer immune response and has potential application in most solid tumour types. TroVax targets the tumour antigen 5T4, which is broadly distributed throughout a wide range of solid tumours. The presence of 5T4 is correlated with poor prognosis. The product consists of a Modified Vaccinia Ankara vector, which delivers the gene for 5T4 and stimulates a patient's body to produce an anti-5T4 immune response. This immune response destroys tumour cells carrying the 5T4.

## For further information please contact:

| | |
|---|---|
| **Oxford BioMedica plc**<br>Professor Alan Kingsman, Chief Executive | Tel: +44 (0)1865 783 000 |
| **JPMorgan Cazenove Limited**<br>James Mitford/Gina Gibson | Tel: +44 (0)20 7588 2828 |
| **City/Financial Enquiries**<br>Lisa Baderoon/Mark Court/Mary-Jane Johnson<br>Buchanan Communications | Tel: +44 (0)20 7466 5000 |
| **Scientific/Trade Press Enquiries**<br>Gemma Price/Holly Griffiths/Katja Stout<br>College Hill | Tel: +44 (0)20 7457 2020 |
| **US Enquiries**<br>Thomas Fechtner<br>The Trout Group LLC | Tel: +1 646 378 2900 |

Top of page

Website by College Hill - Life Sciences

# EXHIBIT 2

HK | Hanify&King

**EDWARD A. PENNINGTON**
Email: eap@hanify.com

August 25, 2008

VIA FACSIMILE (212) 588-0500
EMAIL ehaug@flhlaw.com, and FEDERAL EXPRESS
Edgar H. Haug, Esq.
Fromer Lawrence & Haug LLP
745 Fifth Avenue
New York, NY 10151

Re:   *Bavarian Nordic A/S. v. Oxford Biomedica PLC et al.,*
      Civil Action No. 08-1156-L (RBB)

Dear Mr. Haug:

We are in receipt of your various motions to dismiss and the accompanying memoranda and declarations of multiple witnesses in the above-referenced matter, on behalf of the three defendants you represent. While we obviously disagree on the merits of your pleadings, it is clear that they raise material factual issues and are based on evidentiary declarations going well beyond the Complaint itself. These factual issues must be resolved before the Court passes on the substance of your defenses.

In light of the fact that you have marked your motions for a hearing on November 3, 2008, we believe an accelerated schedule in which to conduct discovery tailored to the issues raised by your paper is appropriate. We therefore enclose the following discovery requests which we are sure you will agree focus on the factual issues presented by your pending motions:

- Plaintiff's First Request for Production of Documents; and
- Deposition Notices for Jill D. Martin and Peter J. Nolan.

We also enclose a description of the technical requirements for the production of documents, in an effort to facilitate a smooth document production on your end and a timely analysis in advance of the hearing.

Professional Corporation
Counsellors at Law

www.hanify.com

One Beacon Street
Boston, Massachusetts 02108-3107
Tel: 617-423-0400
Fax: 617-423-0498

1875 K Street, N.W., Suite 707
Washington, D.C. 20006-1253
Tel: 202-403-2100
Fax: 202-429-4380

Exhibit 2 - 1 of 2

**HK** **Hanify&King**

Edgard H. Haug
August 25, 2008
Page 2 of 2

In addition to the foregoing, we expect to take discovery from various third-party witnesses located in Europe. As you know, initiating such discovery is usually costly and time-consuming. In order to ensure that these efforts do not delay the disposition of your motions or the entire case, we hope you will stipulate to such discovery being commenced now. In addition, we propose that the third-party depositions in Europe cover all subjects and issues, rather than limiting those depositions to just the issues raised by your motions. That will avoid the expense of making two trips to Europe to depose the same witness. Specifically, we expect to ask the Court to approve and process discovery directed to Sanofi-Aventis, whom we understand has a commercial relationship with your clients relating to the products at issue that we believe will bear on your clients' "safe harbor" defense.

We are anxious to avoid needless motion practice respecting discovery, and therefore request that you notify us know immediately if you object to any of the enclosed discovery. In the event that you have any concerns, we would be pleased to schedule a conference pursuant to Local Rule 26.1(a). We are available at 1:00 p.m. EST on each of August 26-28, but are willing to accommodate other times within the next five business days if none of these are convenient for you. I look forward to talking with you soon.

Sincerely,

Edward A. Pennington

EAP/ahj

Enclosures

cc: Dr. Li Westerlund
    Michael L. Kirby, Esq.
    Theodore J. Folkman, Esq.
    Christopher M. Morrison, Esq.

Exhibit 2 - 2 of 2

# EXHIBIT 3

**FLH FROMMER LAWRENCE & HAUG** LLP

New York
745 Fifth Avenue
New York, NY 10151
Telephone: (212) 588-0800
Fax: (212) 588-0500

www.flhlaw.com

Washington, DC

Tokyo

August 29, 2008

Edgar H. Haug
EHaug@flhlaw.com

**VIA FACSIMILE AND E-MAIL**

Edward A. Pennington, Esq.
HANIFY & KING, PC
1875 K Street, NW, Suite 707
Washington, DC 20006

Re:   *Bavarian Nordic A/S v. Oxford BioMedica plc et al.,*
      Civil Action No. 08-1156-L (RBB)

Dear Edward:

This letter is in response to your August 25, 2008 letter and the improper discovery demands you purport to have served. We disagree with your mischaracterization of the motion papers, and we object to the discovery you propose.

Your August 25, 2008 letter asserts that the motion papers "raise material factual issues" based on "evidentiary declarations going well beyond the Complaint itself." A correct reading of the motion papers, including the declarations, reveals that no material factual issues have been raised. The facts provided in the declarations restate the allegations of facts provided in the Complaint concerning the parties. The motions to dismiss clearly rely on those alleged facts, and the Court can readily decide the motions based on the pleadings in the Complaint. Any additional information provided in the declarations provides clarity and emphasis, and provides a sworn statement that no infringing acts have taken place that would give rise to subject-matter jurisdiction. Your client has the legal burden to establish jurisdiction and to demonstrate a good-faith basis for the allegations made in the Complaint. Pleading on information and belief is not sufficient. In our view, your client cannot satisfy either requirement, and we reserve the right to seek appropriate sanctions.

Moreover, the discovery requests included with your August 25, 2008 letter are procedurally and substantively flawed. Apart from being untimely and served in violation of the Federal Rules of Civil Procedure and the Local Rules of the Court, they go well beyond the scope of the motions to dismiss, in clear contradiction to your statement that they "focus on the factual issues presented by [the] pending motions." Most of the discovery requested is simply irrelevant to the determination of the motions to dismiss.

Exhibit 3 - 1 of 2
Page 8

Edward A. Pennington, Esq.
August 29, 2008
Page 2


We also note that you sent me notices to take depositions of the Declarants, but from the arcane form you used it looks like you are trying to subpoena them under Rule 45. Have you served the subpoenas and tendered payment for expenses to attend? You also improperly notice the depositions for Washington, D.C., and you unilaterally picked a 15 day response time for documents. Given the patently obvious disregard for the Federal Rules, we can only conclude that it is your client's intent to further harass our clients.

We look forward to receiving your client's responses to our clients' motions.

Very truly yours,

Edgar H. Haug


cc:    Michael J. Kirby, Esq.
       Li Westerlund, Esq.
       Richard T. Mulloy, Esq.


Exhibit 3 - 2 of 2
Page 9

1  Michael L. Kirby (50895)
     mkirby@knlh.com
2  Julianne Hull (246719)
     jhull@knlh.com
3  KIRBY NOONAN LANCE & HOGE LLP
   350 Tenth Avenue, Suite 1300
4  San Diego, California  92101-8700
   Telephone (619) 231-8666
5  Facsimile (619) 231-9593

6  Edward A. Pennington
   HANIFY & KING, P.C.
7  1875 K Street, N.W., Suite 707
   Washington, D.C. 20006
8  (202) 403-210
   eap@hanify.com
9
   Theodore J. Folkman
10 Christopher M. Morrison )
   David C. Kravitz
11 HANIFY & KING, P.C.
   One Beacon Street
12 Boston, MA 02108
   (617) 423-0400
13 tjf(@hanify.com, cmm@hanify.com, dck@hanifyi.com

14 Li Westerlund (SBN 222716)
   BAVARIAN NORDIC, INC.
15 2900 K Street, N.W., Suite 501
   Washington, D.C. 20007
16 (202) 536-1581
   li.westerlund@bavarian-nordic.com
17
   Attorneys for Plaintiff Bavarian Nordic A/S

18

## UNITED STATES DISTRICT COURT

19

## SOUTHERN DISTRICT OF CALIFORNIA

20

| | |
|---|---|
| BAVARIAN NORDIC A/S, | CASE NO. 08cv1156-L-RBB |
| Plaintiff, | **DECLARATION OF THEODORE J. FOLKMAN IN SUPPORT OF BAVARIAN NORDIC A/S' EX PARTE MOTION FOR LEAVE TO CONDUCT DISCOVERY RELATED TO DEFENDANTS' MOTIONS TO DISMISS** |
| vs. | |
| OXFORD BIOMEDICA PLC, an English public limited company; BIOMEDICA, INC., a Delaware corporation; and OXFORD BIOMEDICA (UK) LTD., an English private limited company | Judge:  The Hon. M. James Lorenz |
| | Courtroom:  14 |
| Defendants. | Action Filed:  June 30, 2008 |

21

22

23

24

25

26

27

28

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

## DECLARATION OF THEODORE J. FOLKMAN

1.    I am a lawyer admitted to the bar of Massachusetts in 2001 and admitted *pro hac vice* in this action. With Michael L. Kirby, Julianne Hull, Edward A. Pennington, Christopher M. Morrison, and David C. Kravitz, I represent the plaintiff, Bavarian Nordic A/S.

2.    Attached to this Declaration as Exhibit 1 is a true copy of the 2007 Annual Report of Oxford BioMedica plc, which I obtained on August 15, 2008 using the following URL: "http://www.oxfordbiomedica.co.uk/pdfs/OXB_AR_2007.pdf."

3.    Attached to this Declaration as Exhibit 2 is a true copy of a letter dated January 8, 2007 from Peter J. Nolan to Li Westerlund.

4.    Attached to this Declaration as Exhibit 3 is a true copy of a letter dated February 12, 2007 from Peter J. Nolan to Li Westerlund.

5.    Attached to this Declaration as Exhibit 4 is a true copy of a letter dated August 9, 2007 from Peter J. Nolan to Li Westerlund.

6.    Attached to this Declaration as Exhibit 5 is a true copy of a letter dated October 10, 2007 from Peter Nolan to Li Westerlund.

7.    Attached to this Declaration as Exhibit 6 is a true copy of a letter dated November 26, 2007 from Peter J. Nolan to Li Westerlund.

8.    Attached to this Declaration as Exhibit 7 is a true copy of a letter dated December 20, 2007 from Peter Nolan to Li Westerlund.

9.    Attached to this Declaration as Exhibit 8 is a true copy of a letter dated January 24, 2008 from Peter Nolan to Li Westerlund.

/ / /

KNLH\542175.1

1    I declare under penalty of perjury that the foregoing is true and correct. Executed

2  on September 2, 2008.

3                                               s/Theodore J. Folkman
4                                               Theodore J. Folkman

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KNLH\542175.1

Case No. 08-CV-1156-L-RBB
THEODORE J. FOLKMAN DECLARATION IN
SUPPORT OF PLAINTIFF'S EX PARTE MOTION
FOR DISCOVERY

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

# <u>TABLE OF CONTENTS</u>

Exhibit 1     2007 Annual Report of Oxford BioMedica plc

Exhibit 2     Letter dated January 8, 2007 from Peter J. Nolan to Li Westerlund

Exhibit 3     Letter dated February 12, 2007 from Peter J. Nolan to Li Westerlund

Exhibit 4     Letter dated August 9, 2007 from Peter J. Nolan to Li Westerlund

Exhibit 5     Letter dated October 10, 2007 from Peter Nolan to Li Westerlund

Exhibit 6     Letter dated November 26, 2007 from Peter J. Nolan to Li Westerlund

Exhibit 7     Letter dated December 20, 2007 from Peter Nolan to Li Westerlund

Exhibit 8     Letter dated January 24, 2008 from Peter Nolan to Li Westerlund

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

# EXHIBIT 1



28 March 2007

**TroVax**

Global development and commercialisation deal with sanofi-aventis

13 December 2007

**ProSavin**

Clinical Trial Application approved for Phase I/II trial

# A Year of Transformation

## Oxford BioMedica

Annual Report & Accounts 2007



bioMedica

Exhibit 1 - 1 of 102

Page 1

# A Year of Transformation

2007 has been a transformational year for Oxford BioMedica with the achievement of our two main corporate objectives: a global alliance with sanofi-aventis to develop and commercialise TroVax for the treatment of cancer; and the initiation of a Phase I/II trial with ProSavin, our gene-based treatment for Parkinson's disease. We have ended 2007 with four products in clinical development; support for our lead product from a partner that is a major player in oncology and vaccines; and a strengthened balance sheet. Over the next 18 months, key clinical results are expected from trials of both TroVax and ProSavin, which could dramatically enhance the value of these programmes and could support the registration of our first therapeutic product.

Exhibit 1 - 2 of 102

Page 2

# Highlights

## TroVax® cancer

- Global collaboration with sanofi-aventis
- Achieved two milestones under sanofi-aventis agreement
- Three successful DSMB reviews of TRIST study in renal cancer
- Further Phase II results in renal cancer suggest therapeutic potential

## ProSavin® Parkinson's disease

- Initiated Phase I/II trial in Parkinson's disease
- Efficacy in ongoing preclinical studies exceeds 27 months

## Hi-8® MEL melanoma

- Phase II follow-up confirms survival advantage in immune responders

## Other development products

- Recruitment progressing in Phase II trial of MetXia® in pancreatic cancer
- Preclinical results with RetinoStat® in wet AMD confirm proof of concept
- Preclinical results with StarGen™ in Stargardt's disease confirm proof of concept
- Initiated EndoAngio-GT anti-cancer programme

## Technology and corporate

- Acquisition of Oxxon Therapeutics
- Technology licensing agreement with major US biotech company
- Secured rights to therapeutic use of Nobel Prize-winning RNAi technology

## Financial

- Payments from sanofi-aventis £25.8 million (2006: nil)
- Revenue £7.2 million (2006: £0.8 million)
- Research & development costs £22.1 million (2006: £19.5 million)
- Loss for the year £15.3 million (2006: £17.6 million)
- Positive operational cash flow £5.9 million (2006: cash burn £15.9 million)
- Net cash[1] £38.1 million (31 December 2006: £28.5 million)

[1] Cash, cash equivalents and current financial assets

# 1 Introduction

A Year of Transformation
01   Highlights
03   Corporate Mission
04   Company Overview

# 2 Chairman's Statement

10   Chairman's Statement

# 3 Strategy

13   Key Performance Indicators
16   Markets
19   Principal Risks and Uncertainties

# 4 Operational Review

23   Performance
26   Advanced Candidates
35   Early-stage Candidates
36   Technology Licensing
37   Intellectual Property
38   Financial Review
44   Outlook

# 5 Governance and Responsibility

47   Corporate Governance Statement
49   Corporate Social Responsibility

# 6 Directors' Reports

53   Board of Directors
55   Scientific Advisory Board
56   Directors' Report
60   Directors' Remuneration Report

# 7 Financial Statements

67   Independent Auditors' Report
69   Consolidated Income Statement
70   Balance Sheets
71   Cash Flow Statements
72   Statement of Changes in Shareholders' Equity
74   Notes to the Consolidated Financial Statements
98   Advisors

Business Review

Exhibit 1 - 4 of 102

Page 4

# Corporate Mission

Oxford BioMedica's mission is to be the leading company in the development and commercialisation of gene-based medicines that provide safe and effective treatments for patients with diseases that have an unmet medical need. Oxford BioMedica operates to high standards of integrity in its dealings with all parties, including shareholders, employees, patients, healthcare professionals, partners, licensees and the wider community, and seeks significant returns for shareholders through the application of scientific, commercial and operational excellence.

# Company Overview

## OPERATIONS

Oxford BioMedica is one of the leading companies in gene therapy and immunotherapy. A biopharmaceutical company established in 1996 as a spin out from Oxford University, Oxford BioMedica is listed on the London Stock Exchange (LSE: OXB). The Company has raised £117 million (before costs) through market issues of equity since its inception and has no debt obligations. The Company has a staff of 82, mainly based in laboratories and offices in Oxford. We also have a wholly owned subsidiary, BioMedica Inc, in San Diego, USA.

Oxford BioMedica is developing novel gene-based medicines and therapeutic vaccines based on a broad technology platform. Four products are currently in clinical development and a further nine programmes are being evaluated in preclinical studies. The Company aims to advance at least one additional product per year into clinical development.

The Company has in-house research, clinical, regulatory and manufacturing capabilities. Our product candidates and technologies are protected by over 80 patent families, which represent one of the broadest patent estates in the field.

Our strategy is to create a broad pipeline both through in-house research and development and through collaborations. For most of our products, Oxford BioMedica aims to partner with pharmaceutical companies for late-stage development and commercialisation. However, for certain products that address specialised markets, we plan to retain commercialisation rights. We also out-license our proprietary technologies on an exclusive or non-exclusive basis for near-term revenue. Oxford BioMedica has collaborations with sanofi-aventis, Wyeth, Sigma-Aldrich, MolMed and VIRxSYS; and has licensed its technology to a number of companies including Pfizer, GlaxoSmithKline, Merck & Co and Biogen Idec.

## PIPELINE

Oxford BioMedica's advanced development pipeline comprises four products in clinical development and a late-stage preclinical candidate. Our lead product is TroVax, a therapeutic vaccine that has potential application in a wide range of tumour types. TroVax is being evaluated in a Phase III trial in renal cancer and two Phase III trials in colorectal cancer are expected to start in 2008. Our next key programme is ProSavin, a gene-based therapy for Parkinson's disease in Phase I/II development. ProSavin makes use of the Company's proprietary LentiVector gene delivery technology. A further two anti-cancer programmes are in Phase II development: Hi-8 MEL, which is a therapeutic vaccine for melanoma; and MetXia, which is a gene-directed enzyme prodrug therapy for pancreatic cancer and other cancers that are accessible directly or via local perfusion. A fifth advanced product candidate, RetinoStat for the treatment of wet age-related macular degeneration, is expected to enter clinical development in 2009.

The Company has a further eight programmes in its early-stage development pipeline. These product candidates are progressing through preclinical development. The majority are gene-based therapies that utilise the Company's LentiVector technology. All of the programmes represent novel approaches for the treatment of diseases where there are inadequate or no current treatment options for patients.

## PRODUCT CANDIDATES

### TROVAX® (SANOFI-AVENTIS): CANCER

TroVax is a therapeutic vaccine that could have broad application in the treatment of cancer. The product is designed to stimulate a specific anti-cancer immune response against a protein called 5T4, which is broadly distributed throughout a wide range of solid tumours but is not found on any essential organs. TroVax consists of a Modified Vaccinia Ankara (MVA) virus, which delivers the gene for 5T4. Vaccinia viruses are widely used as delivery systems for antigen-specific vaccines, such as TroVax. MVA is the vaccinia virus strain of choice because of its excellent safety profile and its effectiveness in stimulating an immune response. Once the immune system is activated by TroVax, antibodies and killer T-cells can migrate round the body seeking out and destroying cancer cells bearing the tumour antigen, 5T4.

Oxford BioMedica secured an alliance with sanofi-aventis in March 2007 for the global development and commercialisation of TroVax for the treatment of all cancers.

TroVax has been evaluated successfully in eight Phase II trials and one Phase I/II trial in a total of over 190 patients, as a single agent or in combination with standard therapy in renal, colorectal and prostate cancer. Results from these trials have shown that the product is safe and well tolerated and have demonstrated that TroVax can be administered in combination with various other treatments. Over 90% of patients treated with TroVax in these studies mounted an anti-cancer immune response to the 5T4 antigen, and, in most of the studies, there was a correlation between the level

## Advanced Development Candidates

| PRODUCT | RESEARCH | PRECLIN. | PH I | PH II | PH III | PARTNER/FUNDING |
|---------|----------|----------|------|-------|--------|-----------------|
| TroVax® | Renal Cancer | | | | | sanofi-aventis |
| TroVax® | Colorectal Cancer | | | | | sanofi-aventis |
| TroVax® | Prostate Cancer | | | | | sanofi-aventis |
| Hi-8® MEL | Melanoma | | | | | – |
| MetXia® | Pancreatic Cancer | | | | | – |
| ProSavin® | Parkinson's Disease | | | | | – |
| RetinoStat® | Retinopathy | | | | | Foundation Fighting Blindness |

## Early-stage Development Candidates

| PRODUCT | INDICATION | PARTNER/FUNDING |
|---------|-----------|-----------------|
| StarGen™ | Stargardt's Disease | Foundation Fighting Blindness |
| MoNuDin® | Motor Neuron Disease | ALS and MND Associations |
| SMN-1G | Spinal Muscular Atrophy | FightSMA |
| Innurex® | Spinal Cord Injury | Christopher Reeve Paralysis Foundation* |
| Requinate® | Haemophilia | UK Department of Health |
| ImmStat® | AIDS | - |
| EndoAngio-GT | Cancer | - |
| 5T4-targeted antibody therapy | Cancer | Wyeth |

* Christopher Reeve Paralysis Foundation has awarded a grant to Oxford BioMedica's collaborator King's College London

Exhibit 1 - 7 of 102

Page 7

**Introduction**
Company Overview

Oxford BioMedica Annual Report & Accounts 2007  05

Case 3:08-cv-01156-L-RBB    Document 25-4    Filed 09/04/2008    Page 13 of 73



10 January 2007

**TroVax**

Phase III Trial of TroVax in Renal Cancer adopted by UK clinical trial network

of the immune response elicited by TroVax and various measures of clinical benefit to patients. Final data from some of these trials will be reported in 2008 and another Phase II trial is ongoing in prostate cancer.

A Phase III trial of TroVax in renal cancer was initiated in November 2006 and two Phase III trials in colorectal cancer are expected to start in 2008. The renal cancer trial is designed to support initial product registration for TroVax in 2009. TroVax has attracted external support from Cancer Research UK and clinical trial networks in both the UK and the USA.

Worldwide cancer vaccine revenues are estimated to reach approximately US$6 billion by 2010 (Arrowhead). Renal cell carcinoma (RCC), which is the focus of the first Phase III trial of TroVax, is the most common form of kidney cancer. The incidence of RCC in the seven major pharmaceutical markets, USA, Japan, Germany, France, UK, Italy and Spain, was estimated to total 86,900 in 2007 (Datamonitor). Prognosis is very poor. If RCC has metastasised to other organs at the time of first diagnosis, the five-year survival rate is less than 5%. In the USA and Europe, RCC accounts for more than 33,000 deaths each year. With ongoing development in renal, colorectal and prostate cancer, TroVax is addressing markets that currently exceed US$8 billion based on annual sales of existing cancer treatments (Datamonitor).

## PROSAVIN®
## PARKINSON'S DISEASE

ProSavin is a novel gene-based approach to the treatment of Parkinson's disease, a progressive movement disorder caused by the degeneration of dopamine producing nerve cells in the brain. The product uses our LentiVector system to deliver the genes for three enzymes that are required for

the synthesis of dopamine. The product is administered locally to the region of the brain called the striatum, converting cells into a replacement dopamine factory within the brain, thus replacing the patient's own lost source of the neurotransmitter.

Preclinical studies have shown that ProSavin appears safe, well tolerated and provides long-term efficacy in industry-standard models of Parkinson's disease. The most recent data show almost total recovery of movement behaviour in a model of the disease from about five weeks after a single administration of ProSavin through to the latest time point of over 27 months. This rapid and complete response to treatment and duration of action are rarely achieved by other treatments in this model.

Oxford BioMedica has commenced a Phase I/II study of ProSavin at a centre of excellence for neurosurgery in France, the Henri Mondor Hospital. ProSavin is the first gene-based treatment for Parkinson's disease to be evaluated in a European clinical trial. The trial is designed to assess the safety and efficacy of ProSavin in patients with Parkinson's disease who are failing on current treatment with L-DOPA but have not progressed to experiencing drug-induced movement disorders called dyskinesias.

Parkinson's disease affects approximately 4.1 million people worldwide. In 2006, global sales of drugs for Parkinson's disease exceeded US$3 billion (Visiongain, 2008). None of the current treatments provide long-term relief from symptoms and, as the prevalence of Parkinson's disease is set to rise significantly in the coming years owing to demographic changes, innovative clinical interventions are expected to play a major role in combating the unmet needs associated with the disease.



Global sales of innovative anti-cancer therapies
(Business Insights, 2007)



Prevalence of Parkinson's disease across the seven major pharmaceutical markets
(Business Insights, 2007)

Exhibit 1 - 8 of 102

Page 8



Estimated new cases of cancer in the USA in 2007
(Cancer Facts & Figures 2007, American Cancer Society)

## HI-8® MEL MELANOMA

Hi-8 MEL is a therapeutic vaccine for metastatic melanoma. The product makes use of two recombinant vectors: one based on plasmid DNA and the other based on a non-replicating Modified Vaccinia Ankara virus. Both vectors contain a DNA sequence called the Mel3 polyepitope string, which encodes seven defined immunogenic peptide sequences (antigenic epitopes) derived from five different proteins that are found on melanoma cells. Administration of the two recombinant vectors sequentially is designed to induce broad melanoma-specific killer T-cell responses by first priming and then boosting the immune system.

The product has been successfully evaluated in two clinical studies in a total of 55 patients. In a Phase II dose-selection study in 41 patients with non-resectable, stage III/IV melanoma that tested positive for the HLA-A2 histocompatibility antigen, melanoma-specific T-cell responses were seen in 91% of patients receiving the highest, optimal dose of Hi-8 MEL. In this trial, eight patients (20%) showed a period of disease control. Furthermore, median survival was significantly improved in immune responders versus non-responders. Oxford BioMedica is planning a follow-on Phase II study to confirm these promising results.

Melanoma comprises just 5% of all skin cancers but it is the most deadly. It is estimated that in 2006, more than 100,000 people were diagnosed with melanoma in the seven major pharmaceutical markets. High unmet needs still persist for this tumour type: existing treatments for Stage III/IV metastatic melanoma offer limited efficacy and often have serious side effects. The total treatment market for melanoma is forecast to be in excess of US$775 million by 2010 (Datamonitor).

## METXIA® PANCREATIC CANCER

MetXia is a cancer therapeutic that is based on Oxford BioMedica's platform for Gene-Directed Enzyme Prodrug Therapy (GDEPT). It is designed to enhance the effectiveness of cyclophosphamide, a widely used anti-cancer prodrug, specifically at the tumour site. The product is administered locally to the tumour site. MetXia uses a highly-engineered retrovirus gene delivery system to deliver a specific gene for human cytochrome P450, which activates the prodrug cyclophosphamide in situ. By increasing the effective concentration of the cytotoxic derivative of cyclophosphamide in the tumour mass, the need for systematic administration of high levels of the prodrug is reduced. This in turn should reduce the dose-limiting toxicity of the drug and expand the therapeutic window.

MetXia is potentially useful in the treatment of any solid tumour that is accessible either directly or via local perfusion. Two Phase I/II trials in patients with advanced breast cancer or melanoma have generated encouraging results and a two-stage Phase II trial in pancreatic cancer is ongoing. Preliminary results from this trial confirm that MetXia can deliver the P450 gene to the tumour site following intra-arterial administration.

Pancreatic cancer is the fifth leading cause of cancer-related mortality in the USA with over 30,000 deaths attributable to this disease annually. It is one of the most aggressive forms of cancer with a five-year survival rate in the low single percentage digits, which has created a critical need for novel treatment options. Annual sales of existing therapies for pancreatic cancer are approximately US$600 million (Datamonitor).

Oxford BioMedica has also developed a cell-based GDEPT strategy, which similarly delivers the P450 gene. The product, MetXia-MG, has shown encouraging results in preclinical studies.

## RETINOSTAT® RETINOPATHY

RetinoStat is the Company's novel gene-based treatment for neovascular age-related macular degeneration (AMD) and diabetic retinopathy (DR), which are caused by the aberrant growth of leaky and disruptive blood vessels in the retina. The product uses the LentiVector system to deliver two genes to the retina that block the formation of new blood vessels, a process called angiogenesis.

Preclinical studies have shown that a single administration of RetinoStat to the eye enables efficient delivery and long-term expression of the anti-angiogenic genes, endostatin and angiostatin, in the retina, and also achieves statistically significant efficacy in an industry-standard model of AMD. Additional studies are ongoing at the Johns Hopkins University School of Medicine in the USA in collaboration with a US charity, the Foundation Fighting Blindness. These studies are designed to support a regulatory submission for clinical trials in the USA or Europe.

AMD and DR are major causes of blindness, with AMD affecting an estimated 25 to 30 million people in the Western world. Neovascular AMD accounts for 90% of all severe vision loss from the disease. DR affects approximately 50% of all people diagnosed with diabetes. Existing treatments for the two conditions have to be administered to patients many times over many years by direct injection into the eye. RetinoStat has a potential competitive advantage over these treatments, as it would require only a single or infrequent

**Introduction**
Company Overview



Prevalence of eye diseases in US adults aged 40 and over (Archives of Ophthalmology 122(4):444-676; Centers of Disease Control and Prevention)

administration, and may also provide a safer and more efficient means of inhibiting angiogenesis. The current leading treatment, Lucentis® (Novartis) has generated annualised sales of approximately US$1 billion following its launch in 2006.

## ENDOANGIO-GT CANCER

In 2007, Oxford BioMedica initiated a new development programme for EndoAngio-GT, an anti-cancer gene therapy based on the anti-angiogenic genes, endostatin and angiostatin. The rationale is that the product will limit tumour vasculature and prevent the formation of new blood vessels at tumour sites, inhibiting the growth and spread of the tumours. The EndoAngio-GT programme is expected to benefit from development and manufacturing synergies with the RetinoStat programme, as the product utilises the same therapeutic genes.

The product could have broad application as a treatment for solid cancers. Current anti-angiogenic therapies for cancer have been successfully developed in various types, including colorectal cancer and lung cancer. The market leader in this field is Avastin® (Genentech), which generates annualised sales in excess of US$4 billion.

## 5T4-TARGETED ANTIBODY THERAPY (WYETH): CANCER

Wyeth has licensed the rights to Oxford BioMedica's proprietary antibody against the 5T4 tumour antigen for use in the treatment of cancer. Wyeth is developing a targeted antibody therapy using our monoclonal antibody linked to a potent anti-cancer agent calicheamicin. Preclinical development of the 5T4-targeted antibody therapy is ongoing and, if warranted, initial clinical trials are expected

to be carried out in patients with any solid tumours that express the 5T4 tumour antigen. In preclinical studies, the product has shown improved survival in standard models of cancer.

The collaboration with Wyeth is worth US$24 million in upfront and milestone payments, plus royalties on product sales. The collaboration was signed in 2001 as an option to license and, in 2003, Wyeth exercised its option to develop the product.

The 5T4-targeted antibody could be developed to treat any solid cancer that expresses the 5T4 tumour antigen, which represents a multi-billion US Dollar market. Based on the product's profile, it could have application as a single agent or could be used in combination with other treatments. Wyeth is responsible for the development and commercialisation of the product.

## STARGEN™ STARGARDT'S DISEASE

StarGen is a novel gene-based therapy for the treatment of Stargardt's disease. The disease is caused by a mutation of the ABCR gene which leads to the degeneration of photoreceptors in the retina and vision loss. StarGen uses the Company's LentiVector system to deliver a corrected version of the ABCR gene. It is administered directly to the retina.

StarGen has shown preclinical efficacy in the only available model of Stargardt's disease. A single administration was effective for the duration of the six-month study. Further preclinical development is ongoing at Columbia University in the USA, in collaboration with the Foundation Fighting Blindness (FFB) and FFB's support organisation, the National Neurovision Research Institute.

Stargardt's disease is the most common juvenile degenerative retinal disease with a US and EU population of approximately 50,000 cases and an incidence of 1/10,000 (600 new cases per year). There is no current treatment for patients but, based on prevalence, the commercial market could exceed US$75 million. Additional opportunities also exist in cone-rod dystrophy and the dry form of AMD, where the same mutant gene plays a role. These indications would significantly expand the commercial market for StarGen.

## OTHER EARLY-STAGE CANDIDATES

Oxford BioMedica has several other early-stage development programmes that exploit the broad application of its proprietary LentiVector technology. In addition to the ophthalmic products, RetinoStat and StarGen, Oxford BioMedica has preclinical programmes in motor neuron disease, spinal muscular atrophy, spinal cord injury, haemophilia and AIDS.

The Company has attracted support from disease-focused charitable organisations or governments for the majority of these programmes. These groups have provided direct funding of preclinical studies or grants to the Company, which reduce the financial burden on Oxford BioMedica and enables us to pursue a broader number of opportunities.

12 March 2007



**M&A**

Acquisition of Oxxon Therapeutics for
£16 million in shares

# TECHNOLOGY

Oxford BioMedica has established a broad platform of proprietary technologies in immunotherapy and gene delivery. Our various technologies can be used to develop gene-based therapeutic products but the gene delivery systems also have utility in research for disease modelling and target validation.

## LENTIVECTOR®

Oxford BioMedica's LentiVector technology represents one of the most advanced gene delivery systems currently available. Licensed users include Biogen Idec, GlaxoSmithKline, Merck & Co and Pfizer. The Company also has a strategic alliance with Sigma-Aldrich to develop and commercialise LentiVector-based reagents for the research market. Oxford BioMedica has recently secured exclusive rights to develop novel therapies using its LentiVector technology for turning off gene expression (gene silencing) through RNA interference, which provides a new opportunity for both internal and also collaborative drug development.

The LentiVector system used for therapeutic applications derives from a highly engineered non-human, non-pathogenic lentivirus. It is designed to achieve safe and long-term gene transfer to a broad range of dividing and non-dividing cell types, including neurons and retinal cells, in a stable and efficient fashion. The Company has shown in preclinical studies that gene expression using the LentiVector technology can be maintained for more than 27 months. To date, Oxford BioMedica has not identified any situation where expression has ceased during the course of an experiment.

# IMMUNOTHERAPY

The acquisition of Oxxon Therapeutics in March 2007 strengthened Oxford BioMedica's proprietary technology in the field of immunotherapy. The Hi-8® PrimeBoost technology is a pioneering method for producing a potent and specific T-cell immune response against diseased cells. The technology can be used in therapeutic vaccine strategies for the treatment of both cancer and infectious diseases. The approach is based on the sequential administration of an antigen in different vaccine vectors; the first to "prime" and the second to "boost" the immune response (known as heterologous boosting).

# GENE-DIRECTED ENZYME PRODRUG THERAPY

Oxford BioMedica has proprietary technology for Gene-Directed Enzyme Prodrug Therapy (GDEPT) approaches for cancer. GDEPT is based on a two-step strategy. Firstly, a vector is used to deliver a prodrug-activating enzyme to tumour cells where it is expressed. This is followed by the administration of an otherwise non-toxic (or minimally toxic) prodrug, which is converted to its active, toxic metabolite by the enzyme within the tumour, thus killing the tumour cells. The technology could be applied to treat any solid tumour that is accessible either directly or via local perfusion.

Exhibit 1 - 11 of 102

Page 11

**Introduction**
Company Overview

Oxford BioMedica Annual Report & Accounts 2007  09

2



# CHAIRMAN'S STATEMENT

Exhibit 1 - 12 of 102
Page 12

2007 has been a transformational year for Oxford BioMedica with the achievement of our two main corporate objectives. Firstly, the global alliance with sanofi-aventis for TroVax, signed in March 2007, is one of the most valuable licensing agreements for an active cancer immunotherapy and provides both near and long-term value for Oxford BioMedica. TroVax will benefit from sanofi-aventis' substantial development expertise in oncology and vaccines as well as its global commercial infrastructure. Together with sanofi-aventis, we are preparing for commercialisation of TroVax, with the first of three planned Phase III trials progressing well. Secondly, in December 2007 we initiated a Phase I/II trial of ProSavin, which is a potentially revolutionary treatment for Parkinson's disease. This is the first clinical trial of a product that utilises our proprietary LentiVector technology, which is the backbone of multiple product candidates in our pipeline and various licensing deals. The start of this trial is the culmination of over ten years of research at Oxford BioMedica. In summary, we ended 2007 stronger than ever in terms of our development pipeline, and our financial position has also been strengthened following the initial payments from sanofi-aventis.

## STRATEGIC FOCUS

Owing to the current risk-adverse capital markets, we have reassessed our development priorities to ensure that internal efforts are focused on those product candidates that offer the greatest potential value to Oxford BioMedica. The strategic purpose of this review was to ensure that the Company continues to grow and expand, but maintains prudent management of its financial resources. We own some exceptional assets in the field of cancer immunotherapy and gene-based medicines with a deep and robust pipeline of product candidates. The strength of these assets means that we are well positioned to pursue our strategy of partnering certain assets to access additional resources, while investing in the further development of key programmes.

As part of our strategy, we have sought to broaden our technology platform creating opportunities both for near-term revenue streams from licensing and also new in-house development programmes. In 2007 we acquired Oxxon Therapeutics, which has brought complementary intellectual property in immunotherapy and a novel vaccine for melanoma in Phase II development. Furthermore, in January 2008, we secured exclusive rights to use Nobel Prize-winning RNA interference (RNAi) technology in therapeutic approaches where the active RNAi molecules are delivered using our LentiVector technology. RNAi represents a new treatment approach based on turning off gene expression (gene silencing).

We will continue to evaluate new opportunities that are consistent with our strategy and can accelerate the growth of our business. Our core strategic themes are described in the Strategy section of the Business Review on pages 13 to 20.

## PEOPLE

Our employees are crucial to the success of Oxford BioMedica and we are committed to the development of a motivated and professional workforce. It is their skill and expertise that has enabled us to achieve our progress to date. In 2007, we expanded our staff count to 82 from 73. We will continue to add to our existing team, as we broaden our activities and move towards the commercialisation of our first product, to ensure that we have the appropriate skill base to address these challenges. On behalf of the entire Board, I would like to thank our staff for their hard work in 2007 and their continued support and commitment.

## CORPORATE REPORTING

This year's Annual Report follows a similar format to last year. We strive to be transparent in all our communications and have designed the Annual Report to present a clear picture of our strategy, performance and practices, which is in line with the revised requirements under the Disclosure and Transparency Rules and Enhanced Business Review. We have provided a balanced and comprehensive assessment of our operational activities and performance compared to our previously disclosed objectives for 2007. As in previous years, we describe how and why actual events may have differed from those forecast, and set out our objectives for the coming year as part of our commitment to enhanced narrative reporting. We have also reported on the Company's working practices in relation to our Corporate Social Responsibility on pages 49 and 50.

## LOOKING AHEAD

The fundamentals of the biotechnology industry remain strong, particularly for companies that are developing novel biological therapies for major unmet medical needs. The pharmaceutical industry is under pressure to improve its research and development productivity and many of the major pharmaceutical firms have raised their targets for revenue from in-licensed and biological products within the next few years. Oxford BioMedica aims to be the leading company in the specialised areas of cancer immunotherapy and gene-based medicines. During 2007, the pharmaceutical industry showed increased interest in these fields and made some significant investments, as evidenced by several recent collaborations, including our alliance with sanofi-aventis. Over the next few years, we expect to benefit from further convergence between the pharmaceutical industry and innovative biotechnology companies. In 2008, as TroVax moves towards commercialisation and data emerge from the Phase I/II trial of ProSavin, we will maintain our focused and financially prudent strategy for growth.

Dr Peter Johnson

CHAIRMAN

Exhibit 1 - 13 of 102

Page 13

# 3



**TroVax**

Global development and
commercialisation deal with
sanofi-aventis

BUSINESS REVIEW
# STRATEGY

13   Key Performance Indicators
16   Markets
19   Principal Risks and Uncertainties

# Key Performance Indicators

Our goal is to create a profitable biopharmaceutical company through the commercialisation of novel safe and effective gene-based medicines to treat unmet medical needs. To mitigate the inherent risks of drug development, we have adopted a hybrid business model that combines in-house and collaborative research and development, enabling us to establish a portfolio of product candidates that address multiple therapeutic areas. We also actively out-license our proprietary technologies for use in research or drug development to generate near-term revenue streams and, in some cases, royalties on product sales. In 2007, we undertook a review of our pipeline to prioritise our development efforts and maximise the potential return from our in-house investment. With rigorous financial management, we aim to deliver sustained growth and value for our shareholders and other stakeholders.

Our corporate strategy is defined by six core strategic themes. These themes are consistent with our near and long-term objectives for the business, and we have adopted them as Key Performance Indicators to measure our progress. Our six themes are as follows:

1. Focus on advancing key development programmes, which offer the greatest commercial value

2. Broaden the technology platform and out-license technologies for near-term revenue

3. Expand the clinical pipeline by at least one new product per year

4. Partner certain products with companies for late-stage development

5. Retain commercial rights for certain products to maximise value

6. Maintain effective management of financial and human resources

In this section, we describe the relevance of these themes to our corporate strategy, assess our performance in 2007, and set out our targets for 2008.

## FOCUS ON ADVANCING KEY DEVELOPMENT PROGRAMMES

Link to Strategy: In 2007, we conducted a review of our pipeline to assess the return on investment for each product candidate, by considering the commercial opportunity based on the anticipated competitive profile, together with timelines and costs of development. We are now focusing our internal resources on those product candidates that offer the greatest potential value.

Performance: Our focus in 2007 has been on progressing TroVax through Phase III development in renal cancer, advancing ProSavin into a Phase I/II trial in Parkinson's disease, and preparing for the clinical development of RetinoStat in wet age-related macular degeneration. We also initiated a new anti-cancer programme, EndoAngio-GT, which is designed to block blood vessel growth (angiogenesis) in tumours. This mechanism of action has been proven in various preclinical models of solid tumours and confirmed in clinical studies with monoclonal antibodies targeting tumour vessel growth. The development of EndoAngio-GT is expected to benefit from synergies with RetinoStat.

Targets: Our development priorities in 2008 are unchanged. We will continue to manage the Phase III TRIST study of TroVax, while sanofi-aventis takes responsibility for Phase III development in colorectal cancer. For ProSavin, in addition to the ongoing Phase I/II trial, we are preparing for the next stage of the product's development, which could be a Phase III trial. We are continuing our preparations for clinical trials of RetinoStat.

## BROADEN TECHNOLOGY PLATFORM

Link to Strategy: Intellectual property (IP) is essential to our success. It provides us with freedom to operate and protects our products from competition, enhancing their commercial value. We aim to be the leading company in our fields of gene-based medicines and immunotherapy with a toolbox of technologies, such that we can apply the most appropriate gene delivery system for any therapeutic gene, mechanism of action or target tissue. By out-licensing our technologies, we also generate near-term revenue and build commercial relationships that may become more valuable in the future.

Exhibit 1 - 15 of 102

Page 15

Performance: In January 2008, we secured exclusive rights to use our LentiVector technology in the field of RNA interference (gene silencing), which is a targeted therapeutic approach that has many applications and is attracting substantial investment. In March 2007, we acquired Oxxon Therapeutics, which has strengthened our proprietary position in immunotherapy. Sigma-Aldrich is our strategic partner for the commercialisation of LentiVector-based reagents for use in research. We receive royalties on sales of these reagents. During 2007 Sigma-Aldrich expanded its product range. In 2007, Oxford BioMedica and Sigma-Aldrich also licensed the LentiVector technology to another major US-based biotechnology company for use in its in-house research activities.

Targets: We are evaluating various opportunities to in-license or acquire technology that complements our existing IP and can generate both near and long-term value. During 2008, we plan to exploit our rights in RNA interference through partnerships and also new in-house programmes.

## EXPAND CLINICAL PIPELINE

Link to Strategy: Our success will ultimately come from commercialisation of novel, safe and effective therapies that utilise our proprietary technologies, whether developed by Oxford BioMedica or our partners. Broadening our clinical pipeline with additional product candidates increases our commercial potential and also reduces development risk through diversification.

Performance: In 2007, we added two programmes to our clinical pipeline. Firstly, through Oxxon Therapeutics, we acquired a therapeutic vaccine for melanoma, Hi-8 MEL, which is in Phase II development. Secondly, in December 2007, we received clearance from the regulatory authorities to start the Phase I/II trial of ProSavin in Parkinson's disease. This is the first product

to enter clinical development that uses our LentiVector technology.

Targets: We are preparing for a submission to start clinical trials of RetinoStat for the treatment of wet age-related macular degeneration. We expect this to happen in 2009. We have several further preclinical candidates that could enter the clinic in the next two years, including EndoAngio-GT for cancer and StarGen for Stargardt's disease.

## PARTNER CERTAIN PRODUCTS

Link to Strategy: Our product candidates are principally designed for use in hospital settings and specialist centres. Some hospital products require competitive marketing and substantial investment in commercial infrastructure. Based on our current resources, our strategy is to seek partners for these types of products to access additional capabilities for product development and commercialisation. In addition, following the strategic review of our pipeline, we are seeking suitable partners for our non-priority product candidates to ensure that they are developed and commercialised to their full potential.

Performance: In 2007, our licensing deal with sanofi-aventis for TroVax was a major achievement. The development of TroVax will require substantial investment over the next few years. Similarly, its commercialisation will benefit from an established sales and marketing infrastructure, particularly if the product has proven application in multiple settings and cancer types. Sanofi-aventis is an ideal partner for TroVax, given its global capabilities and existing oncology franchise.

Targets: In our strategic review, we identified certain non-priority product candidates, which we intend to partner for further development. These include MetXia, which is a localised therapy for accessible tumours, that could be developed to treat pancreatic, breast and prostate cancer and also glioma (brain cancer).

## RETAIN RIGHTS FOR CERTAIN PRODUCTS

Link to Strategy: The most successful biotech companies are fully integrated, which means that they develop and market their own products. By following this model in niche markets that require small but specialised sales forces, we can capture more value from the commercialisation of our innovative products with limited investment.

Performance: In 2007, we conducted a risk-reward assessment of the ProSavin programme and concluded that there was a strong rationale to retain commercialisation rights in certain territories and establish a specialised neurological sales and marketing infrastructure. Furthermore, in our alliance with sanofi-aventis, we have retained an option to participate in the promotion of TroVax in the USA and EU, which would enable us to establish an oncology franchise.

Targets: We are evaluating various strategies for the development of ProSavin, which would provide additional finance and resource, thus reducing the financial risk for Oxford BioMedica, while allowing us to retain commercialisation rights. For ProSavin and some of our preclinical product candidates, we aim to progress discussions with potential partners in territories that are outside of our core focus, during 2008.

## MAINTAIN EFFECTIVE MANAGEMENT

Link to Strategy: Our continued growth requires ongoing investment in our pipeline and technologies. We also need to recruit and retain key people with relevant skills and training for our in-house activities. We aim to keep our fixed costs to a minimum by using outsourced service providers where appropriate. To ensure that our business is sustainable during our pre-commercialisation

Exhibit 1 - 16 of 102

Page 16

07 May 2007



## RetinoStat & StarGen

Preclinical data presented at ARVO meeting

phase, we maintain a principle of having financial resources for a minimum operational period of 12 months.

**Performance:** We have established a solid track record of meeting or beating our financial targets in recent years. In 2007, we have strengthened our cash position and have sufficient resources for our ongoing operations. During the year we conducted a strategic review of our development pipeline to enable us to focus investment on opportunities that could generate the greatest value.

**Targets:** We will continue to monitor the investment requirements for each of our programmes and will expand our internal operations as required to meet our objectives. Our financial goal is to be profitable within 12 months of registration of our first product, which could be in 2009 following a successful outcome from the Phase III TRIST study of TroVax in renal cancer.

# Markets



Average deal values for small molecule and biologic deals. (PharmaDeals, 2008)

■ Small Molecule
▨ Biological



Proportion of biologics sales by big pharma in 2006 (Pharma Deals; Evaluate Pharma, 2008)

2007 could be described as the year that the pharmaceutical industry reinforced its long-term commitment to the development and commercialisation of novel biological therapies and technologies. The acquisition of the US biotechnology company MedImmune by AstraZeneca was one of the largest ever biotech deals, and followed AstraZeneca's previous buyout and integration of Cambridge Antibody Technology in the UK. Pfizer, Novartis and Roche are investing in new or enhanced biotechnology units with increased budgets for the discovery and development of novel biologics. Potentially more relevant to Oxford BioMedica, was an announcement by our partner for TroVax, sanofi-aventis, of its goal to boost sales from biologics to up to 30% of total sales in five years from about 10% today.

Biotechnology drugs, which can be defined simply as drugs derived from living cell cultures instead of traditional chemistry, are an attractive investment for two basic reasons: the industry is fast-growing and generic competition is limited.

- The biotechnology industry is expanding much more rapidly than traditional pharmaceuticals. Biotech sales in the USA grew 20% to US$40.3 billion in 2006, while pharmaceutical sales grew 8% to US$275 billion, according to IMS Health.

- Biotechnology drugs are less vulnerable to generic competition upon patent expirations, which is the main concern of the pharmaceutical industry. The pharmaceutical industry lost US$14 billion worth of annual drug sales to patent expirations in 2006 and was expected

to lose another US$12 billion in 2007, according to IMS Health. Biotechnology drugs face less competition from generic versions because their complexity raises the clinical and regulatory requirements for approval of "biogenerics" and their manufacturing requires substantial investment and infrastructure.

Within the multiple sub-sectors of biotechnology, Oxford BioMedica is focused on gene therapy and cancer immunotherapy.

## GENE THERAPY AND CANCER IMMUNOTHERAPY

Gene therapy is 'the treatment or prevention of disease by gene transfer' and involves the genetic modification of human cells by introducing one or more genes. This approach is most obviously associated with replacing missing or defective genes, through the introduction of a normal working version of the gene. However, the field has its greatest potential in providing endogenous factories of pharmacologically active molecules that cannot be administered by conventional means. This is our approach with ProSavin, which delivers genes for synthesising dopamine for treatment of Parkinson's disease. Furthermore, gene-based approaches can be used to activate the immune system to kill disease cells. Our lead product, TroVax, delivers a gene that produces a protein found on cancer cells in a fashion that enables this to be recognised as foreign by the patient's immune system. The patient's immune system then attacks and kills cancer cells that express the protein.

Exhibit 1 - 18 of 102

Page 18





Biotech and big pharma R&D expenditures vs approvals (Ernst & Young, 2007)

Biotech R&D    Pharma R&D    Biotech NME    Pharma NME

## DELIVERY SYSTEM IS KEY

There is no perfect delivery system that can be used to treat every disorder. Like any type of medical treatment, a delivery system must be customised to address the unique features of the disorder and choosing the most suitable vector is part of the challenge in gene therapy. Factors that influence the selection of the delivery system include the target cell type and whether these have been removed from the body (ex vivo) or are still in the body (in vivo), the duration of gene expression required for therapeutic effect, and the size of the piece of DNA to be used in the gene therapy.

Viral vectors are widely used for gene delivery since they have a natural ability to enter a cell and deliver genetic material both efficiently and in a defined manner. Oxford BioMedica's proprietary LentiVector system is based on highly engineered lentiviruses. Unlike some other commonly used viral vectors, the LentiVector system has the ability to integrate genes into the genome of non-dividing cells as well as dividing cells. The breadth of our LentiVector-based pipeline reflects the utility of the technology. It has potential application in the treatment of neurological disorders (e.g. ProSavin for Parkinson's disease), eye diseases (e.g. RetinoStat for wet age-related macular degeneration), genetic diseases, chronic infections and also cancer.

Our cancer immunotherapy programmes utilise a Modified Vaccinia Ankara (MVA) virus, which is an attenuated form of vaccinia. MVA is an effective vector system for delivering and inducing an immune response against recombinant tumour antigens. The vector itself has an excellent safety profile and

was used widely some years ago as a vaccine for the eradication of smallpox and more recently for biodefence stockpiling.

## SAFETY CONCERNS

Regulatory authorities in the USA and EU have yet to approve a human gene therapy for sale. There have been some notable clinical successes with gene therapy in various disease settings. However, the critics of gene therapy have always focused on the handful of adverse events that have occurred in some of these trials, although none of these have been with Oxford BioMedica's products or vector systems.

In 1999, gene therapy suffered its first major setback with the death of 18-year-old Jesse Gelsinger. Mr Gelsinger was participating in a gene therapy trial and his death is believed to have been triggered by a severe immune response to the adenoviral vector being evaluated.

Another issue arose in 2003 when the FDA placed a temporary halt on all gene therapy trials using retroviral vectors in blood stem cells. The FDA took this action after two children treated in a French gene therapy trial developed a leukaemia-like condition. On analysis, it was concluded that these events were primarily driven by the trial design and nature of the therapeutic gene and not a broader issue related to gene therapy per se. Less media coverage was given to the fact that most patients were successfully treated by this potentially life-saving gene therapy for X-linked severe combined immunodeficiency disease (X-SCID), also known as 'bubble boy syndrome' where no alternative treatments exist.

More recently, in 2007, a patient died following treatment in a trial of an adeno-associated virus-based product for inflammatory arthritis in the USA. The FDA suspended the trial but then lifted its hold after its safety review indicated that the product did not contribute to the patient's death. Very few pharmaceuticals or biopharmaceuticals have zero risk and gene therapy is no exception.

It is worth stressing that Oxford BioMedica's LentiVector technology and the MVA system in our cancer immunotherapies have not been associated with any serious safety issues. However, these previous incidents reinforce the need for rigorous safety testing of our gene-based products.

## REGULATORY PROGRESS

A new regulatory process for the approval of advanced products, including gene therapies, in the EU came in to force on 30 December 2007. The regulation on advanced therapy medicinal products offers a framework to support the advancement of these products with access to scientific advice and a centralised European approval process. For Oxford BioMedica, the new regulation provides greater clarity on the route to market in Europe for our product candidates, and potentially reduces clinical timelines and regulatory uncertainty.

In 2007, for the first time, an advisory panel of the US FDA assessed a therapeutic cancer vaccine. The product in question was Dendreon's prostate cancer vaccine, Provenge. The panel was unanimous that a safety claim could be supported and voted 13-4 that there was substantial evidence of efficacy based on a secondary endpoint of median survival.

Testimony from patients and patient advocacy groups also appeared to influence the FDA panel in light of the toxicity associated with other existing treatments. There was a very strong appeal for the approval of a product that could provide a better quality of life with a good safety profile, even if it conferred only a slight extension on life.

The supportive sentiment of the advisory panel is a landmark event for the field of cancer vaccines, although the FDA subsequently issued an "approvable letter" requesting additional clinical data. It indicates that the FDA's advisory committee has adopted a pragmatic and flexible approach to this new treatment paradigm and is an encouraging sign for the field of cancer vaccines including TroVax.

China is the first country to have a commercial gene therapy. The Chinese biotechnology company, Shenzhen SiBiono GenTech, received approval from the State Food and Drug Administration of China for its anti-cancer product, Gendicine, for the treatment of head and neck cancer in 2003. Gendicine uses an adenoviral vector to deliver the gene for p53. The success of Gendicine can only help Oxford BioMedica and the field of gene therapy gain global acceptance.

# RNA INTERFERENCE

In January 2008, Oxford BioMedica entered the field of RNA interference (RNAi) based therapeutics through a licensing agreement that provides rights to key Nobel Prize-winning RNAi patents. There has been substantial investment in the therapeutic application of RNAi in the last few years.

For example, Merck & Co acquired the US RNAi company Sirna for US$1.1 billion, closing the transaction in early 2007, and there have been several large pharma-biotech collaborations in the field.

## ADDRESSING LONG-TERM DELIVERY

Traditionally, gene therapy has focused on supplying a normal copy of a faulty or absent gene, whereas RNAi turns off a problematic gene. In fact, these contrasting approaches share some of the same challenges, principally the delivery of the therapeutic gene or siRNA into cells. For many diseases, particularly genetic and chronic disorders, the success of RNAi therapies will depend upon efficient long-term delivery of the intermediates of RNAi, particularly short interfering RNA (siRNA). Oxford BioMedica's LentiVector technology provides an ideal solution for long-term delivery of siRNA. Several pharmaceutical companies, such as GlaxoSmithKline, Merck & Co and Pfizer, are already using our system for targeted delivery of siRNA in their research activities, under technology licensing agreements. With rights for therapeutic RNAi applications, we are evaluating in-house and collaborative opportunities.

# Principal Risks and Uncertainties

Risk assessment and evaluation is an integral part of our planning. Most of the risks and uncertainties that we face are common to all development-stage biopharmaceutical companies. Where possible, our strategy is designed to manage and mitigate these issues. Our principal risks and the uncertainties, particularly as they relate to the next few years, are described below.

## INTELLECTUAL PROPERTY AND PATENT PROTECTION RISK

Our commercial success will depend, amongst other things, on maintaining proprietary rights to our products and technologies. There can be no assurance that our products and technologies are adequately protected by intellectual property. If proceedings are initiated against our patents, the defence of such rights could involve substantial costs and an uncertain outcome. Third-party patents may emerge containing claims that impact our freedom to operate. There can be no assurance that we will be able to obtain licences to these patents at reasonable cost, if at all, or be able to develop or obtain alternative technology. The Board of Oxford BioMedica gives high priority to the strategic management of the Company's intellectual property portfolio and we actively monitor the competitive environment. As well as protection of our products and technologies, we use our intellectual property estate to generate value through out-licensing activities.

## DEVELOPMENT RISK

Safety or efficacy issues may arise at any stage of the drug development process. Adverse or inconclusive results from preclinical testing or clinical trials may substantially delay, or halt, the development of our product candidates, consequently affecting our timelines for profitability. Results of the TRIST study and the other planned Phase III trials may differ from those obtained in previous clinical trials and additional data may be required for regulatory approval. Similarly, the results of our preclinical studies with ProSavin and RetinoStat may not be reproduced in human clinical trials.

## REGULATORY REVIEW RISK

Our products will be subject to the regulatory review and approval process by agencies across the world to assess their safety, efficacy and manufacture, amongst other aspects. There can be no assurance that our products will successfully gain the necessary regulatory approvals for launch. The time taken to obtain regulatory approval varies between territories and while some agencies, like the US FDA, have pre-defined review periods, others are less predictable. Furthermore, each regulatory authority may impose its own restrictions on the product label, or may require additional data before granting an approval. In the case of TroVax, sanofi-aventis has global responsibility for the regulatory process and the programme remains on-track for the first regulatory submission and review in 2009.

## COLLABORATION AND THIRD-PARTY RISK

Our current and future revenue is dependent on the successful outcome of a number of collaborations. Our most important alliances are with sanofi-aventis, Wyeth and Sigma-Aldrich. In addition, we have collaborations with other companies relating to products and technologies, as well as agreements with contract organisations for preclinical and clinical testing and manufacturing. There can be no assurance that these relationships will be successful and they may be terminated or require re-negotiation. Circumstances may also arise where the failure by collaborators and third parties to perform their obligations in accordance with our agreements could delay, or halt entirely, the evaluation, development, production or commercialisation of our products and technologies. Such events could adversely affect our existing and anticipated revenue streams.

## PHARMACEUTICAL PRICING RISK

The ability of Oxford BioMedica and our partners to commercialise our products may depend on the extent to which reimbursement will be available from government health administration authorities, private health coverage insurers and other organisations. There is no assurance that adequate health administration or third-party re-imbursement will be available or that

Exhibit 1 - 21 of 102

Page 21



## Hi-8 MEL

Encouraging results from Phase II trials of Hi-8 MEL presented at American Association of Immunologists Meeting

satisfactory price levels will be reached. In addition, there is increasing pressure in many territories to contain healthcare costs by limiting both coverage and the level of reimbursement. Increasingly, new therapeutic products are being assessed on the basis of their cost effectiveness. TroVax is being evaluated in Phase III trials in combination with standard therapy. As an add-on to existing treatment, we will need to justify its cost effectiveness in order to secure suitable pricing and reimbursement.

## COMPETITION RISK

Our competitors, and potential competitors, include some of the major pharmaceutical and biotechnology companies, many of whom have substantially greater resources than us. Our products are potentially "best in class" candidates and, in the case of TroVax, we are collaborating with a major company in oncology and vaccines. However, there can be no assurance that competitors will not succeed in developing products and technologies that are more effective or economic than ours, which, in the worst case, could render our products and technologies obsolete or otherwise uncompetitive.

## FINANCIAL RISK

We expect to record a net cash outflow from operations in 2008 as we continue to invest in our research and development efforts, taking into account milestone payments from sanofi-aventis and our other licensing income. We have sufficient working capital for our current operating activities until the end of 2009, excluding future milestone

payments from sanofi-aventis. Our capital requirements after that date, if any, depend on the achievement of TroVax-related milestones and securing new collaborations. The first regulatory submission of the product in renal cancer, which is anticipated in 2009 in the USA, triggers a significant milestone payment. However, there is the risk that we may have to increase the follow-up duration of the Phase III TRIST study, which would delay the timing of this payment. Similarly, the achievement of these regulatory milestone events depends on various factors, some of which are outside our control, the most important determinant being the outcome of the Phase III TRIST study.

## STAFF RISK

While we have employment contracts with all of our personnel, the retention of their services cannot be guaranteed. Recruiting and retaining key management and scientific personnel as we build the business will be critical to our success.

## GENE THERAPY RISK

There are no gene therapies approved for sale in the USA or EU. The commercial success of gene-based medicines such as ours will depend, in part, on acceptance by the medical community and the public. Furthermore, specific regulatory requirements, over and above those imposed on pharmaceutical products generally, apply to gene therapy and there can be no assurance that further additional requirements will not be imposed in the future as a result of new concerns. This may increase the cost and time necessary

for development of our products. However, there have been some recent developments relating to cancer vaccines and gene-based medicines that suggest the regulatory authorities in the USA and EU are supportive of these novel treatment approaches. These are described in the Markets section of the Business Review on pages 16 to 18.

Exhibit 1 - 23 of 102
Page 23

# 4

## TroVax

Encouraging Phase II results in renal
cancer presented at ASCO



BUSINESS REVIEW

# OPERATIONAL REVIEW

23    Performance
26    Advanced Candidates
35    Early-stage Candidates
36    Technology Licensing
37    Intellectual Property
38    Financial Review
44    Outlook

Exhibit 1 - 24 of 102

Page 24

# Performance

In our 2006 Annual Report, we set out key operational objectives for our drug development and licensing activities in 2007. There were 20 key objectives for the year. In total, we achieved 14 of these during the period, and we expect to deliver on another four within the next 12 months, which equates to success rate of 90%. The two remaining objectives are no longer relevant to our modified strategy in 2008. We have listed our 2007 objectives and our performance in relation to these targets in the table below:



### FINALISE GLOBAL LICENSING DEAL WITH A MAJOR PHARMACEUTICAL COMPANY

In March 2007, we signed a global licensing agreement with sanofi-aventis. It is one of the largest alliances in the field of cancer immunotherapy in terms of potential payments.

### REPORT FURTHER RESULTS FROM PHASE II TRIALS IN RENAL CANCER

At ASCO in June 2007, we reported new positive data from two Phase II trials. 68% of evaluable patients with clear cell renal carcinoma showed disease control when treated with TroVax and there was a relationship between reduction in tumour burden and patients' anti-5T4 responses.

### REPORT RESULTS FROM PHASE II TRIAL IN PROSTATE CANCER

At AACR in April 2007, we reported preliminary data from the Phase II trial of TroVax with or without standard therapy of GM-CSF in hormone-refractory prostate cancer. TroVax was well tolerated and all patients developed anti-5T4 responses.

### FIRST REVIEW BY DSMB OF PHASE III TRIST TRIAL IN RENAL CANCER

The independent Data Safety Monitoring Board (DSMB) has completed three analyses, the most recent one being in February 2008. Following each review, the DSMB concluded that the trial should continue as planned without modification.

### US NATIONAL CANCER INSTITUTE TO INITIATE PHASE II TRIAL IN BREAST CANCER

Since TroVax is in a broad Phase III programme, Oxford BioMedica and sanofi-aventis concluded that it was no longer appropriate to carry out a study of this design. We are coordinating with the US clinical trials network to design a larger study of TroVax in breast cancer.

### QUASAR TO INITIATE PHASE III TRIAL IN EARLY-STAGE COLORECTAL CANCER

Following our collaboration, sanofi-aventis became a party to the QUASAR preparations and is acting as US regulatory agent for the trial, which has been submitted to the US and UK regulatory authorities for review prior to patient recruitment.



Exhibit 1 - 25 of 102

Page 25



### PROSAVIN

#### PUBLISH PRECLINICAL RESULTS IN SCIENTIFIC JOURNAL

In 2007, we submitted a manuscript for publication. We have subsequently updated the reported data and responded to comments from the medical journal. We anticipate publication in 2008.

#### GAIN REGULATORY APPROVAL FOR START OF CLINICAL TRIALS

In December 2007, we received regulatory clearance from the French Health Products Safety Agency for our Clinical Trial Application (CTA). The CTA was submitted in July 2007.

#### START PHASE I/II TRIAL IN MODERATE TO LATE-STAGE PARKINSON'S DISEASE

Patient recruitment is underway and we plan to report preliminary results once the first cohort of patients is assessable, which is expected in mid-2008. The trial is being conducted at the Henri Mondor Hospital in Créteil, France.





### METXIA

#### REPORT RESULTS FROM STAGE TWO OF PHASE II TRIAL IN PANCREATIC CANCER

Preliminary results have shown disease stabilisation in 50% of evaluable patients. Patient survival is difficult to interpret for this heterogeneous patient group but has ranged from four to almost 110 weeks. Median survival for the evaluable patients is 26 weeks.

#### DEFINE OPTIMAL DOSE OF CYCLOPHOSPHAMIDE FROM STAGE TWO OF PHASE II TRIAL

Five dose levels of cyclophosphamide have been evaluated and additional patients are being recruited at the maximum tolerated (optimal) dose to establish more efficacy data in this patient group.

#### START DISCUSSIONS WITH PRINCIPAL INVESTIGATORS AND REGULATORY AUTHORITIES TO DETERMINE ROUTE TO REGISTRATION IN PANCREATIC CANCER

We have discussed the next development steps internally and with our clinical advisors. However, we have decided to collaborate with an industry partner for further development and commercialisation of MetXia.

#### PROGRESS COMMERCIAL DISCUSSIONS

We have initiated some discussions with prospective partners but we intend to broaden our business development efforts following successful completion of the Phase II trial.



## RETINOSTAT

### COMMENCE MANUFACTURING SCALE-UP OF CLINICAL MATERIAL

In 2007, we initiated the process for clinical scale-up. We have commissioned GMP production of a key component of RetinoStat and we aim to have final clinical material by the end of 2008.



### SUBMIT INVESTIGATIONAL NEW DRUG (IND) APPLICATION TO THE FDA FOR START OF CLINICAL TRIALS IN USA

During 2007, our internal resources for LentiVector-based programmes were prioritised to ProSavin, which has extended our timetable for clinical development of RetinoStat. We expect to submit the IND in early 2009.

## 5T4-TARGETED ANTIBODY THERAPY

### WYETH TO CONTINUE ITS EVALUATION OF 5T4-TARGETED ANTIBODY THERAPY IN PRECLINICAL MODELS

Wyeth's evaluation is ongoing. It aims to start clinical trials of its 5T4-targeted antibody therapy in solid cancers if warranted by the data.



## TROVAX-VET

### LEADING ANIMAL HEALTH PARTNER TO START FIELD TRIALS IN DOGS

Following the sanofi-aventis collaboration for TroVax in human cancers, Oxford BioMedica has decided on commercial grounds not to renew the collaboration for TroVax-Vet.



## TECHNOLOGY LICENSING

### SIGN ADDITIONAL TECHNOLOGY LICENSING DEALS WITH BLUE-CHIP COMPANIES

In July 2007, a major US-based biotechnology company licensed our LentiVector technology for research activities.



### EXPAND EXISTING RELATIONSHIPS TO ESTABLISH MORE SIGNIFICANT COLLABORATIONS

In January 2008, we gained exclusive rights to therapeutic RNAi technology using our LentiVector system. Many of our existing technology licensees use LentiVector-RNAi in research. These licences could be broadened to therapeutic RNAi applications.

Exhibit 1 - 27 of 102

Page 27

# Advanced Candidates

## KEY HIGHLIGHTS
- Global development and commercialisation deal with sanofi-aventis
- Achieved two development milestones under sanofi-aventis agreement
- Three successful DSMB reviews of Phase III TRIST study in renal cancer
- Further Phase II results in renal cancer confirm therapeutic potential

## KEY OBJECTIVES
- Complete recruitment and continue to manage the Phase III TRIST study
- Sanofi-aventis to initiate Phase III trial in metastatic colorectal cancer
- QUASAR to initiate Phase III trial in early-stage colorectal cancer
- Support sanofi-aventis in preparation for licensure and pre-marketing

## TROVAX®

Development of our lead product candidate, TroVax, is progressing in multiple cancer types. The product is one of the most advanced therapeutic cancer vaccines in development. Therapeutic vaccines have the potential to play a significant role in cancer therapy as additive treatment options for patients. We believe that TroVax could be one of the first registered products in this field.

### SANOFI-AVENTIS COLLABORATION

In March 2007, we secured a licensing agreement with sanofi-aventis for the global development and commercialisation of TroVax. The agreement is one of the largest alliances in the field of cancer immunotherapy.

Oxford BioMedica received payments from sanofi-aventis totalling €38 million in 2007, comprising an initial payment of €29 million and an early development milestone payment of €9 million. A further milestone payment of €10 million was triggered in February 2008 following the third successful interim analysis of the TRIST study by the Data Safety Monitoring Board. Further development and regulatory milestone payments could yield up to €470 million if TroVax is approved for a small number of defined cancer types. Oxford BioMedica is entitled to additional

milestone payments for other cancer types, commercial milestone payments when sales reach certain targets and tiered escalating royalty income on global sales.

The Phase III TRIST study of TroVax in renal cancer is being managed by Oxford BioMedica and co-funded with sanofi-aventis. All other TroVax activities, including development, registration and commercialisation, will be funded by sanofi-aventis. As part of the agreement, sanofi-aventis is committed to the rapid initiation of a Phase III trial in colorectal cancer. In terms of commercialisation, Oxford BioMedica retains an option to participate in the promotion of TroVax in the USA and the European Union.

### PHASE III TRIST STUDY PROGRESS

The Phase III TRIST (TroVax Renal Immunotherapy Survival Trial) study, is progressing well. We are approaching full recruitement of 700 patients. The rate of recruitment has been encouraging. Over 100 centres are participating in the USA, Western Europe and Eastern Europe. It is rare for such a large trial to recruit to plan. One factor that affects the rate of recruitment, but is difficult to predict at the outset of a multi-centre trial, is clinicians' enthusiasm for the product. Clinicians have been highly supportive of the

trial, which reflects TroVax's excellent safety profile and potential to improve patients' survival and quality of life.

The trial has been recruiting at a rate of about 50 patients per month. This is comparable to the recruitment rate for the Phase III trial of Pfizer's Sutent® (sunitinib), which was one of the recently launched targeted agents for renal cancer that has had rapid uptake in terms of commercial sales. In January 2007, the UK National Cancer Research Network (NCRN), which provides the UK National Health Service (NHS) with the infrastructure to support cancer clinical trials, agreed to adopt the trial. The NCRN's adoption of TRIST means that multiple NHS centres are participating in the study. In reaching its decision to adopt the TRIST trial, the Renal Cancer Clinical Studies Group of the NCRN evaluated TroVax and the trial design and concluded that the product offers potential improvement in care for patients within the NHS.

The study is being conducted in patients with locally advanced or metastatic clear cell renal carcinoma. It is a randomised, placebo-controlled, two-arm study comparing TroVax in combination with standard of care to placebo with standard of care. The standard of care therapy can be sunitinib, interferon-alpha or interleukin-2. The protocol stratifies treatment between the three standards

Exhibit 1 - 28 of 102

Page 28



Marc Cluzel, Senior Vice President Research and Development, sanofi-aventis.

Sanofi-aventis is one of the world's leading pharmaceutical companies and number one in Europe. It is active in many therapeutic areas and has a broad franchise in the field of cancer with two of the world's top five selling cancer treatments. Sanofi-aventis is present in 100 countries throughout the five continents. Its vaccines division,

Sanofi Pasteur, is a world leader in the industry, offering an extensive range of vaccines.

In 2007, sanofi-aventis signed an exclusive global license agreement with Oxford BioMedica to develop and commercialise TroVax, for the treatment and prevention of cancer.

Marc Cluzel, Senior Vice President Research and Development, sanofi-aventis, said: "We are very excited about the opportunity to be associated with this innovative therapeutic vaccine. Sanofi-aventis is committed to the development of novel anti-cancer agents that provide safer and more effective therapeutic options for cancer patients. We consider that therapeutic vaccines have an important role to play in the treatment of cancer, and the initial clinical data for TroVax suggest that it is one of the most promising candidates in the field.

Our collaboration combines Oxford BioMedica's expertise in cancer immunotherapy with the experience of sanofi-aventis in clinical development and commercialisation of oncology products. The collaboration is working well. The Phase III TRIST study of TroVax in renal cancer is on-track and we will shortly be starting Phase III trials in colorectal cancer. Given the broad distribution of the targeted tumour antigen, 5T4, TroVax could be evaluated in various solid tumours and stages of disease.

We look forward to our continuing partnership with Oxford BioMedica to advance the development and commercialisation of TroVax and, importantly, to provide cancer patients with new treatment options."

of care to ensure that the allocation of TroVax and placebo is rigorously balanced. The primary endpoint for the trial is overall survival; secondary endpoints include the percent of patients with progression-free survival at week 26, tumour response rates and quality-of-life scores. The trial is being conducted under a Special Protocol Assessment (SPA) agreement from the FDA. The SPA specifies the design, conduct, analysis and endpoints of the trial. With this in place, this single comparative trial may be used to support an efficacy claim in a regulatory submission to the FDA.

The independent DSMB for the TRIST study has completed three scheduled interim analyses, the most recent one being in February 2008. Following each review, the DSMB concluded that the trial should continue as planned without modification. The role of the DSMB is to evaluate unblinded data from the ongoing trial to determine whether there are safety or efficacy issues that would warrant modification of the protocol or early termination of the study. The DSMB is independent of Oxford BioMedica and sanofi-aventis. To preserve the study blinding, the DSMB provides no additional information other than its recommendation.

Based on the current progress, we expect the trial to reach its primary endpoint in the first half of 2009, which is aligned with our expectations at the outset of the study. If the primary endpoint is achieved, sanofi-aventis could file its first regulatory submission for registration of TroVax in renal cancer within a few months of the trial results. With Priority

Review from the FDA, the regulatory review period could be six months from submission.

## COLORECTAL CANCER PHASE III TRIALS STARTING

Sanofi-aventis is starting an international, randomised, placebo-controlled Phase III trial of TroVax in colorectal cancer. The Phase III trial, which has been named FLAMENCO, is designed to assess TroVax as a first line treatment of patients with Stage IV metastatic colorectal cancer. It is expected to enrol approximately 1,300 patients. The trial design is similar to the TRIST study, in that it will evaluate TroVax in combination with first line standard of care versus placebo plus first line standard of care.

### TRIST trial design

TroVax
Stratified
Randomisation
Placebo
1 3 6 9   13   17 21 25   33   41   48 57   65

Vaccination Time Points (weeks)

BASELINE                    26                    65

Selected Standard of Care

CT Scan                     CT Scan



## TECHMARK MEDISCIENCE AWARD FOR 'BREAKTHROUGH OF THE YEAR' – JUNE 2007

The techMARK Mediscience awards recognise and reward excellence of within the quoted life sciences sector. As winners of this award we were recognised as the company which made the most significant breakthrough between 1 April 2006 and 31 March 2007.

## TECHMARK AWARD FOR 'ACHIEVEMENT OF THE YEAR' – NOVEMBER 2007

The techMARK awards recognise the achievements and reward the successes of technology companies listed on AIM and the London Stock Exchange. This award was extremely wide ranging, recognising exceptional achievement by an individual or company, for example a major contract or joint venture.



sources, including the UK Medical Research Council and the Department of Health as well as Oxford BioMedica and sanofi-aventis. Patient recruitment is expected to commence in mid-2008.

## UPDATE ON US-SPONSORED BREAST CANCER TRIAL

Over the last two years, we have been liaising with the SouthWest Oncology Group (SWOG), which is one of the largest cancer clinical trials cooperative groups in the USA, funded by research grants from the US National Cancer Institute, part of the National Institutes of Health. SWOG was planning to conduct a Phase II trial of TroVax in patients with advanced breast cancer. Since TroVax is being evaluated in a major Phase III programme, SWOG, Oxford BioMedica and sanofi-aventis have now concluded that an open-label Phase II study of TroVax to evaluate safety and immunology in this patient group is no longer necessary. SWOG remains committed to the TroVax programme, and we are working with the organisation to design a larger study of TroVax in breast cancer.

The standard treatment will be chemotherapy with or without Avastin® (bevacizumab), which will be stratified between the two arms of the study. The primary endpoint will be overall survival and the trial will include an interim analysis to evaluate time to disease progression. The trial will be conducted under a SPA with the FDA and patient recruitment is expected to start in mid-2008. Results from the interim analysis are anticipated in 2010.

In addition to the Phase III trial in metastatic colorectal cancer, the UK clinical trials network QUASAR is starting a trial of TroVax in early-stage colorectal cancer. This trial is supported by both sanofi-aventis and Oxford BioMedica. Sanofi-aventis will act as the US regulatory agent for the trial, which has been submitted to the US and UK regulatory authorities. The trial will assess TroVax in patients with Stage II/III colorectal cancer who have had surgical resection of their primary tumours and been treated with adjuvant chemotherapy. It is expected to enrol approximately 3,000 patients and has been designed with a primary endpoint of three-year disease-free survival. The funding of the QUASAR trial derives from a variety of

## ENCOURAGING RESULTS FROM PHASE II TRIALS IN RENAL CANCER

At the Annual Meeting of the American Society of Clinical Oncology (ASCO) in June 2007, new data were reported from two Phase II trials of TroVax in renal cancer. TroVax was well tolerated with no serious adverse events attributable to the treatment and the product induced anti-5T4 antibody responses in 91% of patients. Twenty-four of 35 evaluable patients with clear cell renal carcinoma (68%) showed disease control. Two patients had complete responses (i.e. their tumours were completely eradicated),

three had partial responses (i.e. tumour shrinkage) and 19 had stable disease for periods exceeding three months, including three patients that were stable for more than 17 months. Preliminary analysis of clinical benefit showed a statistically significant relationship between reduction in tumour burden in patients with clear cell renal carcinoma and patients' anti-5T4 antibody responses (p=0.028). These encouraging new data support the hypothesis that the 5T4-specific immune response induced by TroVax has therapeutic benefit.

Exhibit 1 - 30 of 102

Page 30

Award

The monetary and strategic value of our global licensing deal for TroVax with sanofi-aventis has been widely recognised by the industry and the financial community, with Oxford BioMedica receiving three prestigious awards during 2007. This was particularly gratifying, given the number of significant achievements in the sector as a whole over the year. Andrew Umbers, Chief Executive of Evolution Securities, which sponsored the techMARK mediscience awards summed this up by saying: "An obvious highlight [of 2007], which is reflected by this year's award nominees, has been the announcement of major product licensing deals by UK biotechnology firms." John Davis, Editor of Scrip commented on the awards: "The number and more importantly the quality of this year's entries was outstanding, and we feel this is a testament to the exciting and innovative work that the pharmaceutical and biotech industries continue to deliver."

**SCRIP AWARD FOR 'LICENSING DEAL OF THE YEAR' – DECEMBER 2007**

The Scrip awards recognise the pharmaceutical industry's achievements and contributions to science and the advancement of healthcare, and are testament to the hard work that goes on behind the scenes of drug development. In choosing the winner of this award, the judges considered not just the monetary value of each deal but also its strategic value to both the licensor and the licensee, the geographic spread and how it complemented the licensees' existing product pipeline.

## PRESENTATION OF FINAL PHASE II RESULTS

Together with sanofi-aventis, we aim to present final data from all four open-label Phase II trials of TroVax in renal cancer at ASCO in May/June 2008. The trials evaluated TroVax as a single agent and in combination with high-dose interleukin-2, low-dose interleukin-2 or interferon-alpha.

Separately, we plan to report results from the completed Phase II trial of TroVax in prostate cancer at the Targeted Anticancer Therapies meeting, 20-22 March 2008, in the USA. The trial, in 27 patients with hormone-refractory prostate cancer, evaluated TroVax as a single agent and in combination with the standard therapy, granulocyte-macrophage colony-stimulating factor (GM-CSF). Preliminary data from this trial were previously reported in April 2007 at the Annual Meeting of the American Association for Cancer Research, showing that TroVax was well tolerated and all patients developed anti-5T4 antibody responses.

## PRE-COMMERCIALISATION PLAN

The presentation of clinical data at upcoming conferences is part of the pre-commercialisation plan for TroVax ahead of the Phase III TRIST study results and potential registration in 2009. Sanofi-aventis is implementing a communications initiative to inform and educate the oncology community regarding TroVax ahead of its potential launch.

The companies have secured manufacturing for commercial launch, together with material for the Phase III trials in colorectal cancer. Discussions are ongoing with sanofi-aventis and our contract manufacturer regarding longer-term supply. Sanofi-aventis is evaluating its manufacturing strategy, which may include an in-house manufacturing facility for TroVax.

## SUMMARY

We are delighted by the progress of the TroVax programme and by the commitment of our partner, sanofi-aventis. By combining Oxford BioMedica's expertise in cancer immunotherapy and the experience of sanofi-aventis in clinical development and commercialisation of oncology products, we hope to be able to bring this innovative and potentially valuable medicine to patients as soon as possible.

Exhibit 1 - 31 of 102
Page 31

## KEY HIGHLIGHTS
- Initiated Phase I/II trial in moderate to late-stage Parkinson's disease
- Efficacy in ongoing preclinical studies exceeds 27 months

## KEY OBJECTIVES
- Publish preclinical results in scientific journal
- Report preliminary results from first cohort of patients in Phase I/II trial

# PROSAVIN®

The first clinical trial of ProSavin in Parkinson's disease is underway in France. It is the first trial using our proprietary LentiVector technology and, as such, represents a major event for Oxford BioMedica and the future of the pipeline of products that use the same technology. The superior efficacy of ProSavin combined with the absence of side effects in preclinical studies suggest that ProSavin could be used to replace standard L-DOPA therapy in patients with moderate to late-stage Parkinson's disease. Following our discussions with the regulatory agency in France, we have started preparations to move from this Phase I/II trial directly into a Phase III trial, which could start at the end of 2009 or early 2010.

## PHASE I/II TRIAL INITIATED

In December 2007, we opened the Phase I/II trial of ProSavin, having received regulatory clearance from the French Health Products Safety Agency (AFSSAPS) for our Clinical Trial Application (CTA). The CTA was submitted in July 2007. Patient recruitment is underway at the Henri Mondor Hospital in Paris, which is a European centre of excellence for neurosurgery and a member of the Assistance Publique Hôpitaux de Paris (APHP) in France. Several patients are undergoing detailed evaluation of their baseline Parkinsonian status prior to surgical administration of ProSavin. Treatment of the first patient is imminent.

The primary objectives of the trial are to assess the safety and efficacy of ProSavin. The analyses of patients will include the application of advanced non-invasive neuro-imaging techniques.

## PHASE I/II TRIAL DESIGN

Patients in the trial will have been diagnosed with Parkinson's disease and will be failing on current treatment with L-DOPA but they will not have progressed to experiencing drug-induced movement disorders (dyskinesias). It is a two-stage study. The first stage is an open-label dose escalation to evaluate two dose levels of ProSavin in cohorts of three patients each. In the second stage of the trial, a further 12 patients will be recruited. Four of the 12 patients will act as a control group and only receive "sham" surgery.

ProSavin is administered locally to the brain, converting the target cells into a dopamine factory, thus replacing the patient's own lost source of the neurotransmitter. The surgical procedure for administration of ProSavin entails stereotactic bilateral injection into the striatum of the brain under general anaesthesia using MRI-imaging and mapping. The procedure is designed to be non-destructive to tissue and does not leave any device in the brain.

The efficacy of ProSavin will be assessed using the Unified Parkinson's Disease Rating Score (UPDRS). Patients will be monitored at regular intervals, with the primary endpoint being an efficacy assessment at six months

after treatment. The secondary objective of the trial is to assess the extent to which patients' current therapy (L-DOPA) can be reduced or removed following administration of ProSavin.

## SUSTAINED EFFICACY IN PRECLINICAL STUDIES

We continue to assess the long-term efficacy data of ProSavin in a preclinical setting. In the industry-standard preclinical model of Parkinson's disease, known as the MPTP model, ProSavin induces almost complete recovery of movement function and other behavioural measurements following a single administration. In this model, the most recent time point shows that the therapeutic effect of ProSavin has been maintained for over 27 months with no diminution. Efficacy was similar to that expected with standard daily treatment with L-DOPA but with no evidence of the dyskinesias associated with prolonged L-DOPA treatment.

## PHASE III PREPARATIONS

If the safety and efficacy observed in preclinical studies of ProSavin is replicated in the Phase I/II trial, then we would aim to move directly to a Phase III trial. Based on our anticipated timelines for the Phase I/II trial and for scaling-up the manufacture of ProSavin for Phase III and commercialisation, the Phase III trial could start in late 2009 or early 2010. The trial could be completed within two years, supporting first product registration in 2012-13.

ProSavin potentially has a unique profile and position in the treatment of Parkinson's disease. In 2007, a leading consulting group (Datamonitor) undertook an assessment of the opportunity for ProSavin based on responses from key opinion leaders and other stakeholders in the field of neurology. The key findings from this analysis are summarised below:

- The problems caused by long-term dopamine therapy are not addressed by current treatments for Parkinson's disease

- More invasive therapy used earlier in Parkinson's disease will allow better treatment of patients

- Physicians see gene therapy, particularly ProSavin, as one of the most promising new treatment options for Parkinson's disease

- Physicians were impressed with the profile of ProSavin in terms of potential efficacy, side effects and duration of action

- Patients with mid-stage or Hoehn and Yahr Stage III Parkinson's disease would be the largest group referred for ProSavin, followed by late-stage or Stage IV patients. Stage III and IV patients represent approximately 40% of the total prevalence.

- Physicians suggest earlier use of ProSavin than in Stages III and IV of disease would be possible depending on the surgical risks and cost/benefit of treatment

- ProSavin is expected to compete with current treatments such as deep brain stimulation as well as other future gene or cell therapy, while neuroprotectants are unlikely to compete directly with ProSavin

- Physicians indicated that the surgical procedure for ProSavin is easier to perform than deep brain stimulation and would therefore have no negative impact on patients when compared to current surgery

- All payers are expecting a high level of reimbursement for ProSavin if its efficacy and safety are demonstrated

- Using baseline assumptions, Datamonitor forecasts annual peak sales of ProSavin of approximately $US900 million in the USA and top five European countries

## SUMMARY

Current standard therapy for Parkinson's disease is only partially effective in the mid to late stage of disease and can induce debilitating side effects after long-term use. ProSavin has the potential to address this unmet medical need, offering long-lasting benefit from a single administration with an excellent safety profile. We are pleased to have started our first clinical trial of this potentially important new treatment approach for Parkinson's disease. The product could significantly expand the worldwide market for Parkinson's disease therapies, which are estimated to generate sales in excess of US$3 billion, by reducing the social care burden associated with the mid to late-stage of disease.

The LentiVector system used within ProSavin is common to multiple preclinical candidates in our pipeline. The infrastructure for ProSavin that relates to manufacturing scale-up and safety testing can be applied across this portfolio. Hence, the time invested in the ProSavin programme should benefit our other LentiVector-based programmes.

## KEY HIGHLIGHTS

- Acquisition of Oxxon Therapeutics included Hi-8 MEL melanoma vaccine
- Phase II follow-up confirms survival advantage in immune responders

## KEY OBJECTIVES

- Prepare strategy for future development

# HI-8® MEL

Hi-8 MEL is a therapeutic vaccine for metastatic melanoma, which was added to the pipeline following the Company's acquisition of Oxxon Therapeutics in March 2007. Oxxon Therapeutics had previously evaluated Hi-8 MEL in two clinical trials. These trials showed that the vaccine was well tolerated and produced strong killer T-cell immune responses against the cancerous cells at certain dose levels. The product has the potential to reduce mortality in patients with advanced disease, and can be used alongside standard therapy without adding significant toxicity. Hi-8 MEL is based on the same MVA vector technology as TroVax, together with a DNA-based configuration of the vaccine. If melanoma is treated early it can be cured by surgical resection. However, half of those with metastatic melanoma die of the disease within five years. A melanoma vaccine would offer new hope to such patients.

## ENCOURAGING UPDATE ON PHASE II TRIAL IN MELANOMA

Updated results from a Phase II trial were presented at the American Association of Immunologists Annual Meeting in May 2007. The trial, in 41 patients with Stage III/IV melanoma, was designed to evaluate the immune and clinical responses elicited by Hi-8 MEL. The product was highly immunogenic with 91% of patients that received the optimal dose showing an antigen-specific immune response. Eight

patients (20%) showed periods of disease control. The presentation included follow-up of one patient that exhibited a sustained partial response for more than two years. The median survival for immune responders was 100 weeks versus 37 weeks for non-responders (p<0.001).

## STRATEGY FOR FUTURE DEVELOPMENT

The Company believes information garnered from the ongoing TroVax studies will provide additional useful information on how best to develop Hi-8 MEL, which is a MVA-based tumour vaccine, like TroVax. We are reviewing the current formulation and data generated by Oxxon to ensure that Hi-8 MEL is ready for full development pending successful completion of the Phase III TRIST study of TroVax.

## SUMMARY

Melanoma is one of only a few cancers in which the immune system appears to play a prominent role. The 5T4 antigen, that is the basis of TroVax, is not found on melanoma cells. Hence, Hi-8 MEL is an ideal complement to the potential applications of TroVax in solid tumours. Through our experience with TroVax, we have substantial expertise in cancer. We will apply this knowledge to the further development of Hi-8 MEL.



Median survival for immune responders versus non-responders in Phase II trial of Hi-8 MEL in Stage III/IV melanoma



Exhibit 1 - 34 of 102

Page 34

**KEY HIGHLIGHTS**
- Recruitment progressing in Phase II trial
- Preliminary Phase II results confirm gene transfer

**KEY OBJECTIVES**
- Report further clinical data from the Phase II trial in pancreatic cancer
- Advance collaboration discussions for MetXia and the GDEPT technology

# METXIA®

MetXia is potentially useful in the treatment of a number of solid tumours and their metastases, particularly those where cyclophosphamide is commonly used as a treatment. The product is being evaluated in a Phase II trial in pancreatic cancer. The trial is a dose-escalation study to identify the optimal dose levels for MetXia and cyclophosphamide. In 2007, we initiated commercial discussions with potential partners for both MetXia and our associated technology for Gene-Directed Enzyme Prodrug Therapy (GDEPT).

## PATIENT RECRUITMENT PROGRESSING IN PHASE II TRIAL

We initiated the Phase II trial of MetXia in 2004 in patients with non-resectable pancreatic tumours. The recruitment of patients has been purposefully staged since each patient needs to be carefully reviewed for their response to therapy prior to treatment of subsequent patients. However, the rate of enrolment in this trial has been problematic due to the strict criteria for patient suitability and the poor health of the majority of patients presenting for surgery. The patients are at an advanced stage of their disease, and most have previously failed to respond to other therapies.

To date, 23 patients have been treated in the study, in which MetXia and cyclophosphamide are delivered directly to the pancreatic tumour via a catheter inserted through an artery. Two dose levels of MetXia and five dose levels of cyclophosphamide have been evaluated to assess the efficiency of P450 gene transfer and to determine the maximum tolerated dose of the prodrug.

## PRELIMINARY PROOF OF CONCEPT RESULTS IN PHASE II TRIAL

Patients who received the optimal dose of MetXia and higher doses of cyclophosphamide are still being assessed. Preliminary results suggest that MetXia induces gene expression of P450 enzyme at the tumour site and that there have been no unexpected adverse events when MetXia and cyclophosphamide are used together in this manner.

To date, disease stabilisation has been evident in six of 12 evaluable patients (50%). Patient survival is difficult to interpret for this heterogeneous patient group but has ranged from four to almost 110 weeks. Median survival for the evaluable patients is 26 weeks. Additional patients are being recruited at the maximum tolerated dose to establish more efficacy data in this patient group. We plan to report further data from this trial during 2008.

## INITIATED COMMERCIAL DISCUSSIONS

Following our strategic review in 2007, we initiated discussions with potential partners for further development and commercialisation of MetXia. This will enable us to focus our resources on higher development priorities within the pipeline. MetXia is the most advanced product candidate to derive from our proprietary GDEPT technology. To maximise the commercial opportunity for MetXia and our GDEPT technology, we are seeking industry partners to provide additional resources and expertise.

## SUMMARY

Preliminary data from the Phase II trial in non-resectable pancreatic cancer are encouraging and demonstrate proof of concept for our GDEPT technology. This platform technology has the potential for broad application. With appropriate investment, MetXia could be the first of multiple GDEPT-based products developed for the treatment of localised, accessible tumours.

Exhibit 1 - 35 of 102
Page 35

## KEY HIGHLIGHTS
- Preclinical results confirm proof of concept

## KEY OBJECTIVES
- Prepare regulatory submission for clinical development

# RETINOSTAT®

RetinoStat is designed to provide long-term inhibition of aberrant blood vessel growth in the retina for the treatment of vision loss caused by conditions such as wet age-related macular degeneration (AMD) and diabetic retinopathy (DR). We have identified RetinoStat as our next LentiVector-based programme for clinical development, behind ProSavin. Our aim is to conduct an initial clinical trial in the USA, since the programme is supported by US organisations, namely Johns Hopkins University and the Foundation Fighting Blindness with its support organisation, the National Neurovision Research Institute.

## NEW PROOF OF CONCEPT PRECLINICAL RESULTS

In May 2007, Oxford BioMedica and our collaborators at Johns Hopkins University in Baltimore presented encouraging preclinical data with RetinoStat at the Association for Research in Vision and Ophthalmology Annual Meeting. The presentation included preclinical proof of principle in an industry-standard model of neovascular AMD.

## ONGOING CLINICAL PREPARATIONS

We have initiated the scale-up process for manufacturing clinical material. We have commissioned Good Manufacturing Practice (GMP) production of a key component of

RetinoStat and we aim to have final clinical material within the next 12 months. With our US collaborators, we are conducting additional non-clinical studies with RetinoStat that are required for our regulatory submission to start clinical trials. During 2007, our internal resources for LentiVector-based programmes were prioritised to ProSavin, which has extended our anticipated timelines for RetinoStat. However, the development of RetinoStat should benefit considerably from our investment in the manufacturing of ProSavin. We expect to submit an Investigational New Drug (IND) application to the FDA for the start of trials in patients with wet AMD during 2009.

## SUMMARY

We have had initial discussions with potential partners for further development and commercialisation of RetinoStat. The industry is clearly interested in new anti-angiogenic treatment strategies for wet AMD, which have potential for superior efficacy and a lower injection frequency than the current standard therapy, which is Novartis' Lucentis®. Treatment with Lucentis requires injections into the eye every one to two months. Given the long-term gene expression capabilities of our LentiVector technology, a single administration of RetinoStat could be effective for over a year.

# Early-stage Candidates

## KEY HIGHLIGHTS

- Preclinical results with StarGen in model of Stargardt's disease
- Initiated EndoAngio-GT anti-cancer programme

## KEY OBJECTIVES

- Identify next programme for clinical development

We have established a diverse early-stage pipeline that comprises eight preclinical product candidates. The in-house programmes are all gene-based therapies that utilise our LentiVector technology. In 2007, several of these programmes benefited from financial support provided by disease-focused charitable organisations through direct funding of studies or grants. During 2007, we initiated a new anti-cancer programme, EndoAngio-GT, and presented preclinical proof-of-concept results with StarGen in Stargardt's disease.

## INITIATED ENDOANGIO-GT ANTI-CANCER PROGRAMME

In July 2007, we secured a licence from Children's Hospital Boston to the anti-angiogenic genes that are utilised in our RetinoStat vision loss programme for the treatment of cancer. This new anti-cancer programme, EndoAngio-GT, is based on a similar construct to RetinoStat. In 2007, we initiated preclinical optimisation of the product.

## PRESENTATION OF STARGEN™ PRECLINICAL RESULTS

StarGen is designed to deliver a normal functional gene to treat an inherited ocular condition, Stargardt's disease. The programme is funded by the Foundation Fighting Blindness, the National Neurovision Research Institute and a consortium of associated investors. At the Association for Research in Vision and Ophthalmology Annual Meeting in May 2007, we presented preclinical data with StarGen, showing efficacy in an industry-standard model of the disease. Additional preclinical studies are underway at Columbia University in New York, which could support advancement to clinical development in this niche commercial market.

In addition to our relationship around StarGen and RetinoStat, we are exploring a commercial collaboration with the Foundation Fighting Blindness to develop LentiVector-based therapeutic approaches for other ocular diseases.

# Technology Licensing



**Technology**

LentiVector technology licensing agreement with major US biotechnology company

## KEY HIGHLIGHTS

- LentiVector technology licensing agreement with major US biotechnology company
- Secured rights to therapeutic RNAi technology using LentiVector system
- Partner, MolMed, starts Phase III trial of product using ex vivo technology

## KEY OBJECTIVES

- Explore collaborations to exploit therapeutic LentiVector-RNAi opportunities

Our technology licensing activities exploit the potential of our suite of gene delivery technologies by providing third-party access for research or specific development applications. We have added two new industry partners to our list of licensed LentiVector users and we entered the field of RNA interference using our LentiVector system for genetic delivery. In addition, one of our partners announced the start of a Phase III trial with a product that uses another of our technologies, which triggered a milestone payment.

### NEW LENTIVECTOR LICENSING AGREEMENT

In July 2007, another major US-based biotechnology company licensed the LentiVector gene delivery technology for research activities in a joint agreement with Sigma-Aldrich. Sigma-Aldrich is our strategic partner and exclusive licensee for the commercialisation of the LentiVector technology for research use. In addition, in March 2008, as part of a patent dispute settlement, Open Biosystems acquired certain rights for use of our LentiVector technology in research activities.

### EXPANDING INTO THERAPEUTIC RNA INTERFERENCE

In January 008, we signed a license agreement with the Carnegie Institution of Washington and the University of Massachusetts Medical School that grants Oxford BioMedica rights to key RNA interference (RNAi) technology invented by Nobel Prize-winning scientists Andrew Z. Fire, PhD, and Craig C. Mello, PhD. The licence is exclusive for therapeutic RNAi strategies using our LentiVector technology. RNAi represents a potential new strategy for treating diseases by gene silencing. We plan to develop LentiVector-based RNAi therapies independently, but also offer this technology to our existing LentiVector licensees and other industry players as part of our technology licensing activities.

### MOLMED INITIATES PHASE III TRIAL

Also in January 2008, one of our partners, MolMed, received regulatory approval to start a Phase III trial of its TK therapy. The Phase III trial is being conducted in Italy in patients with high risk acute leukaemia who are receiving haematopoietic stem cell transplantation. The product is a cell/gene-based therapy that is designed to control the complications of graft versus host disease associated with these transplantations. The product employs our ex vivo retroviral gene delivery technology. The start of this Phase III trial triggered a milestone payment to Oxford BioMedica under the terms of our agreement.

### VIRAGEN STREAMLINES ITS RESEARCH

Another partner, Viragen, which licensed our LentiVector technology for the development of an avian transgenic biomanufacturing system, reported further progress with the technology and published results in a leading medical journal in January 2007. However, in June 2007, Viragen halted development as part of its efforts to cut costs and has subsequently sought bankruptcy protection. With the Roslin Institute, which was collaborating with Viragen on this programme, we are exploring alternative ways to advance and commercialise the avian transgenic technology.



**EndoAngio-GT**

Licence secured from Children's Hospital Boston to anti-angiogenic genes for cancer

# Intellectual Property

## KEY HIGHLIGHTS

- Acquisition of Oxxon Therapeutics adds immunotherapy IP
- Extended rights to anti-angiogenic genes for treatment of cancer
- Secured rights to therapeutic RNAi technology using LentiVector system

Our intellectual property estate is fundamental to our business to ensure that we control and protect our products in development and our technologies. In 2007, we bolstered our proprietary position in immunotherapy through the acquisition of Oxxon Therapeutics. At the end of 2007, our estate comprised 46 US and 20 European issued patents compared to 39 and 12, respectively, in the previous year. During 2007, we were granted five patents in the USA and five in Europe. We have a further 76 patents issued in other jurisdictions, with four of these being granted in 2007. In total, 198 patent applications are currently pending. Another 24 patent families, covering key technologies, are licensed from third parties.

In 2007 and early 2008, respectively, we announced two significant in-licensing deals of intellectual property. Firstly, we extended our rights to use two anti-angiogenic genes for the treatment of cancer. Secondly, we secured exclusive rights in the field of RNA interference for the development of therapeutics using our LentiVector technology. Furthermore, in March 2008, Oxford BioMedica, our partner, Sigma-Aldrich, and Open Biosystems settled a patent dispute over use of our LentiVector technology in research reagents.

## OXXON ACQUISITION ADDS IMMUNOTHERAPY IP

Our acquisition of Oxxon Therapeutics in March 2007 has added intellectual property in immunotherapy to our estate. Its Hi-8® PrimeBoost technology is a pioneering method for producing a potent and specific T-cell immune response against diseased cells. This platform has potential applications in developing prophylactic as well as therapeutic vaccines. Oxxon owned or had exclusively licensed a number of patent families covering the PrimeBoost technology and these patents and licences are now part of Oxford BioMedica's estate.

## EXTENDED RIGHTS TO ANTI-ANGIOGENIC GENES

In July 2007, we signed a license agreement with Children's Hospital Boston to extend our existing rights for the anti-angiogenic genes, endostatin and angiostatin, for the treatment of cancer. This has enabled us to initiate a new anti-cancer development programme, EndoAngio-GT. We previously licensed rights to these genes solely for the treatment of ocular diseases, and the genes are being successfully employed in RetinoStat. We expect the development of EndoAngio-GT to benefit from synergies with RetinoStat.

## NEW RIGHTS IN THERAPEUTIC RNA INTERFERENCE

In January 2008, (as described in Technology Licensing above) we licensed Nobel prize-winning RNA interference (RNAi) technology from the Carnegie Institution of Washington and the University of Massachusetts Medical School. This agreement provides exclusive rights to use our LentiVector technology for therapeutic RNAi applications. We plan to develop LentiVector-based RNAi therapies, both independently and through collaborations.



Issued patents

Number of issued patents

| | 2006 | 2007 |
|---|---|---|
| USA | 39 | 46 |
| Europe | 12 | 20 |
| Rest of World | 66 | 76 |

Exhibit 1 - 39 of 102
Page 39

# Financial Review

## KEY HIGHLIGHTS

- Revenue £7.2 million (2006: £0.8 million)
- Research & development costs increased 13% to £22.1 million (2006: £19.5 million)
- Loss for the year decreased 13% to £15.3 million (2006: £17.6 million)
- Positive operational cash flow £5.9 million (2006: Cash burn £15.9 million)
- Year end cash, cash equivalents and current asset investments £38.1 million (2006: £28.5 million)

## FINANCIAL OVERVIEW

The TroVax collaboration with sanofi-aventis has transformed the Group's finances. A total of £25.8 million cash was received in 2007 from sanofi-aventis. Of this amount, £7.0 million was recognised as revenue in 2007 and £18.8 million is classified as deferred income. In addition, the acquisition of Oxxon Therapeutics Limited (Oxxon) in March 2007 for £16.0 million, which was satisfied by Oxford BioMedica shares, brought with it cash and cash equivalents of £3.8 million. Overall, there was a net increase in cash, cash equivalents and current asset investments in the year of £9.6 million.

## REVENUE £7,219,000 (2006: £760,000)

| Analysis of revenue | 2007 £'000 | 2006 £'000 | 2005 £'000 | 2004 £'000 | 2003 £'000 |
|---|---|---|---|---|---|
| TroVax and other 5T4-based collaborations | 6,970 | - | - | - | 287 |
| Gene delivery licences | 249 | 516 | 679 | 192 | - |
| LentiVector licence for transgenics | - | 191 | 145 | 217 | 56 |
| Other revenue | - | 53 | - | 93 | 31 |
| **Total revenue** | **7,219** | **760** | **824** | **502** | **374** |

The TroVax collaboration with sanofi-aventis accounts for the majority of revenue in 2007. A total of £25.8 million cash was received in 2007, comprising an initial payment of £19.7 million (€29 million) on commencement in March 2007 and the first development milestone payment of £6.1 million (€9 million) in September 2007. Revenue from these payments is being recognised on a straight-line basis over the period to certain clinical events, which are anticipated in 2009 and 2010. £7.0 million was recognised as revenue in the 2007 income statement. The remaining £18.8 million is classified as deferred income.

Revenue from technology licensing in 2007 amounted to £0.2 million compared to £0.8 million in the previous year. Licences that provide access to our technology for research use generate minimal revenue but potentially facilitate collaborations for product development. Several leading pharmaceutical and biotechnology companies are using our LentiVector technology for research. During the year, Oxford BioMedica and our partner, Sigma-Aldrich, secured another major company as a research licensee to our LentiVector technology. Also in 2007, our collaboration with Viragen in the field of avian transgenics was terminated, as Viragen streamlined its expenditure, and therefore no revenue was recognised from this collaboration (2006: £0.2 million).

# COST OF SALES £449,000 (2006: £80,000 INCLUDED IN OPERATING EXPENSES)

| Cost of sales | 2007 £'000 | 2006 £'000 | 2005 £'000 | 2004 £'000 | 2003 £'000 |
|---|---|---|---|---|---|
| Royalty payable on third party licences | 449 | - | - | - | - |

We have licensed a number of third-party technologies to expand our activities and to ensure that we have freedom to operate. Most licences include royalties payable on sales, and some include royalties payable on licensing income, including up-front and milestone income. In 2007, £0.4 million of royalties were recognised in cost of sales in the Group's income statement. The amounts of royalty payable on revenue in previous years were lower, and were included in operating expenses.

# OPERATING EXPENSES £26,759,000 (2006: £22,222,000)

| Operating expenses | 2007 £'000 | 2006 £'000 | 2005 £'000 | 2004 £'000 | 2003 £'000 |
|---|---|---|---|---|---|
| Research and development costs | 22,142 | 19,523 | 9,327 | 9,013 | 10,773 |
| Administration expenses excluding reorganisation | 4,282 | 2,699 | 2,865 | 2,791 | 2,922 |
| Exceptional administration expenses | 335 | - | - | 1,568 | - |
| **Total operating expenses** | **26,759** | **22,222** | **12,192** | **13,372** | **13,695** |

Operating expenses increased by 20% in 2007 to £26.8 million, reflecting increased employee costs, the acquisition of Oxxon and higher legal and professional expenses associated with our patent estate and the licensing of TroVax.

# RESEARCH & DEVELOPMENT COSTS £22,142,000 (2006: £19,523,000)

| Research and development costs | 2007 £'000 | 2006 £'000 | 2005 £'000 | 2004 £'000 | 2003 £'000 |
|---|---|---|---|---|---|
| External preclinical & clinical costs | 11,833 | 11,153 | 1,730 | 1,961 | 2,386 |
| In-house R&D costs UK | 9,848 | 7,983 | 7,310 | 6,647 | 6,357 |
| In-house R&D costs USA | 461 | 387 | 287 | 405 | 2,030 |
| **Total research & development cost** | **22,142** | **19,523** | **9,327** | **9,013** | **10,773** |

R&D costs increased by 13% in 2007 to £22.1 million. Our R&D expenditure comprises in-house costs (staff, R&D consumables, intellectual property, facilities and depreciation of R&D assets) and external costs (preclinical studies, GMP manufacturing, regulatory affairs, and clinical trials). In 2007, as in 2006, external preclinical and clinical costs were the largest contributors to R&D spend. The year was also impacted by the addition of £0.3 million in R&D costs associated with Oxxon.

# ADMINISTRATIVE EXPENSES £4,617,000 (2006: £2,699,000)

| Administrative expenses | 2007 £'000 | 2006 £'000 | 2005 £'000 | 2004 £'000 | 2003 £'000 |
|---|---|---|---|---|---|
| Administrative expenses before exceptional expenses | 4,282 | 2,699 | 2,865 | 2,791 | 2,922 |
| Exceptional administrative expenses | 335 | - | - | 1,568 | - |
| **Total administrative expenses** | **4,617** | **2,699** | **2,865** | **4,359** | **2,922** |

Administrative expenses were £4.6 million, compared to £2.7 million in 2006. The increase was partly due to the acquisition of Oxxon and increased legal and professional costs. In 2007, there was a charge of £0.3 million for exceptional closure and reorganisation of Oxxon, and £0.1 million for non-exceptional administrative expenses during the close-down period. Legal and professional costs related to the collaboration with sanofi-aventis and other negotiations were £0.4 million.

# HEADCOUNT

| Analysis of headcount | 2007 Number | 2006 Number | 2005 Number | 2004 Number | 2003 Number |
|---|---|---|---|---|---|
| R&D headcount UK at period end | 67 | 61 | 59 | 55 | 43 |
| R&D headcount USA at period end | 2 | 2 | 2 | 1 | 6 |
| Administration headcount UK & USA at period end | 13 | 10 | 10 | 10 | 12 |
| **Total headcount at period end** | **82** | **73** | **71** | **66** | **61** |
| | | | | | |
| R&D headcount UK average | 66 | 60 | 58 | 50 | 45 |
| R&D headcount USA average | 2 | 2 | 1 | 2 | 14 |
| Administration headcount UK & USA average | 12 | 10 | 10 | 10 | 13 |
| **Total headcount average** | **80** | **72** | **69** | **62** | **72** |

Average headcount increased by 11% in 2007. At the end of the year our total headcount was 82. The majority of our staff is based at our offices and laboratories, which are located at The Oxford Science Park, UK, and three employees are based at the offices of our wholly owned subsidiary, BioMedica Inc, in San Diego, USA.

# FINANCE INCOME £2,087,000 (2006: £1,714,000)

| Finance income | 2007 £'000 | 2006 £'000 | 2005 £'000 | 2004 £'000 | 2003 £'000 |
|---|---|---|---|---|---|
| Interest receivable – bank | 2,113 | 1,743 | 955 | 1,171 | 711 |
| Other interest receivable | 4 | - | 14 | - | - |
| Interest payable – discount on provisions | (30) | (29) | (20) | (13) | - |
| Interest payable on overdue tax | - | - | (11) | - | - |
| **Total net finance income** | **2,087** | **1,714** | **938** | **1,158** | **711** |
| | | | | | |
| Average balance on deposit in the year | 37,731 | 37,689 | 19,955 | 26,570 | 19,118 |
| Average interest on deposits | 5.58% | 4.62% | 4.77% | 4.40% | 3.62% |

The Group places its cash in bank deposits for periods of up to 12 months and generates interest on those deposits. The maturity profile of deposits is intended to match planned patterns of expenditure. The average balance on deposit in 2007 was approximately the same as in 2006 at £37.7 million. However, due to higher interest rates in 2007, net interest receivable was up by 22%.

The Group has no debt, but is recognising as a finance expense the discount on a lease provision and a dilapidation provision.

# TAXATION

| Tax credit | 2007 £'000 | 2006 £'000 | 2005 £'000 | 2004 £'000 | 2003 £'000 |
|---|---|---|---|---|---|
| UK R&D tax credit – current year | 2,526 | 1,709 | 1,175 | 1,000 | 1,200 |
| UK R&D tax credit – prior year adjustment | - | 75 | 101 | (115) | (3) |
| Overseas tax payable – current year | (60) | (38) | (43) | (1) | - |
| Overseas tax payable – prior year adjustment | (14) | 16 | (23) | - | - |
| Deferred tax | - | - | - | - | 6 |
| **Net tax credit** | **2,452** | **1,762** | **1,210** | **884** | **1,203** |
| | | | | | |
| Debtor for R&D tax credit | 2,623 | 2,309 | 1,175 | 1,685 | 1,200 |

Our UK operating subsidiaries are entitled to claim R&D tax credit. The credit is based on certain eligible expenses, to which a 50% mark-up and a tax rate of 16% are applied. Under the prevailing rules, the R&D tax credit cannot exceed the total amount of UK payroll tax (Income Tax and National Insurance) paid in the year. In 2007, our R&D tax credit increased 48% to £2.5 million, due to higher employee benefit expenses during the year. The year-end debtor for R&D tax credit of £2.6 million represents the estimated tax credit for the current year, including £0.1 million that is attributable to Oxxon in the period prior to our acquisition.

The Group's US subsidiary supplies services to the UK subsidiary subject to a 5% mark-up, generating a low level of taxable income in the US. The US tax charge has increased, largely due to reduced access to carry-forward losses.

## LOSS FOR THE FINANCIAL YEAR £15,289,000 (2006: £17,626,000)

The Group's loss for the year narrowed to £15.3 million from £17.6 million despite higher operating expenses in 2007.

## INTANGIBLE ASSETS £14,910,000 (2006: £1,665,000)

The Oxxon acquisition has resulted in a significant increase in intangible assets. The principal acquired intangibles were in-process research and development on the melanoma vaccine Hi-8 MEL, and the PrimeBoost patent portfolio. The fair value of these assets was £13.1 million. In addition, purchased intellectual property rights of £0.2 million were capitalised.

## TRADE AND OTHER RECEIVABLES £4,672,000 (2006: £2,202,000)

| Trade and other receivables | 2007 £'000 | 2006 £'000 | 2005 £'000 | 2004 £'000 | 2003 £'000 |
|---|---|---|---|---|---|
| Trade receivables | 91 | 241 | 119 | 162 | - |
| Accrued income | 34 | 223 | 93 | - | - |
| Other receivables | 1,129 | 765 | 676 | 619 | 374 |
| Prepaid clinical trial expenses | 969 | - | - | - | - |
| Prepayments | 1,917 | 603 | 442 | 499 | 442 |
| Other tax receivable (VAT) | 414 | 220 | 242 | 124 | 107 |
| Rent deposit on US lease | 118 | 150 | 205 | 214 | 263 |
| **Total trade and other receivables** | **4,672** | **2,202** | **1,777** | **1,618** | **1,186** |

Trade and other receivables (debtors) were £2.5 million higher in 2007 than in the previous year. The increase in other receivables is principally due to higher bank interest fixed-term deposits. Prepaid clinical trial expenses are materials for clinical trials not yet shipped to site, and advance payments to clinical sites.

## TRADE AND OTHER PAYABLES £9,557,000 (2006: £4,671,000)

| Trade and other payables | 2007 £'000 | 2006 £'000 | 2005 £'000 | 2004 £'000 | 2003 £'000 |
|---|---|---|---|---|---|
| Trade payables | 2,948 | 1,579 | 397 | 351 | 310 |
| Accruals – clinical & preclinical costs | 3,523 | 1,782 | 721 | 537 | 483 |
| Accruals – other | 2,668 | 995 | 694 | 553 | 513 |
| Other taxation and social security (mostly payroll taxes) | 418 | 315 | 263 | 219 | 195 |
| **Total trade and other payables** | **9,557** | **4,671** | **2,075** | **1,660** | **1,501** |

There was an increase in trade and other payables (creditors) in 2007 to £9.6 million from £4.7 million in the previous year. This increase was principally associated with our expanded clinical development activities.

# DEFERRED INCOME £18,913,000 (2006: £92,000)

| Deferred income | 2007 £'000 | 2006 £'000 | 2005 £'000 | 2004 £'000 | 2003 £'000 |
|---|---|---|---|---|---|
| TroVax deferred income (current) | 11,440 | – | – | – | – |
| Other deferred income (current) | 90 | 92 | 105 | 81 | – |
| TroVax deferred income (non-current) | 7,383 | – | – | – | – |
| **Total deferred income** | **18,913** | **92** | **105** | **81** | **–** |

The Group's deferred revenue at the end 2007 was boosted to £18.9 million. Deferred revenue reflects payments received under our licensing agreements that exceed the amount of recognised revenue. Receipts in 2007 from the TroVax collaboration with sanofi-aventis are being recognised as revenue over a two to three-year period. The amount expected to be recognised as revenue in 2008 is £11.4 million.

## SHARE ISSUES

At the end of 2007, the Group had 534,655,843 shares in issue. During the year, shares issued for cash raised £0.3 million before expenses from the exercise of share options and other subscriptions. A total of 31,771,246 shares with a value of £16.0 million were issued in the acquisition of Oxxon.

## CASH AND DEPOSITS £38,147,000 (2006: £28,543,000)

The total of cash, cash equivalents and current asset investments at the end of 2007 was £38.1 million, compared to £28.5 million in the previous year.

## OPERATIONAL CASH GENERATED £5,883,000 (2006: CASH BURN £15,876,000)

The format of the cash flow statement under IFRS does not make it easy to assess the overall level of operational cash flows that have traditionally been a key performance indicator for development-stage biotechnology companies. However, a useful measure can be calculated by taking the aggregate of cash from operating activities, proceeds of sale of property, plant and equipment and purchases of property, plant and equipment and intangible assets. On this measure, there was a positive operational cash flow of £5.9 million in 2007, in contrast to a (negative) cash burn in 2006 of £15.9 million. The key difference in 2007 was the receipt of £25.8 million from sanofi-aventis. In addition, cash and cash equivalents of £3.8 million were acquired with Oxxon.

## FINANCIAL OUTLOOK

In 2007, we conducted a strategic review of our development pipeline to enable us to focus investment on opportunities that could generate the greatest value. The present level of operational expenses is expected to be maintained through 2008 based on our current and planned development activities. We reached the second development milestone in our agreement with sanofi-aventis in February 2008, which triggered a payment of €10 million. We will continue to monitor the investment requirements for each of our programmes and will expand our internal operations as required to meet our objectives. Our financial goal is to be profitable within 12 months of registration of our first product, which could be in 2009 following a successful outcome from the Phase III TRIST study of TroVax in renal cancer.



25 July 2007

## TroVax

First successful DSMB review of
Phase III TRIST study in renal cancer

# Outlook

With a focused strategy and a strong financial position, we are well placed to deliver on our objectives for 2008. We are delighted to have recently triggered a further development milestone payment in our collaboration with sanofi-aventis, following the third successful review of the Phase III TRIST study by the DSMB. We expect shortly to complete recruitment for this trial. Over the next few years, sanofi-aventis is planning a significant investment in the TroVax programme. Our key goals for TroVax in 2008 include continued management of the TRIST study in renal cancer, and support for sanofi-aventis as it broadens the Phase III programme into colorectal cancer and prepares for the commercialisation of the product.

ProSavin, our novel treatment for Parkinson's disease is potentially the next blockbuster opportunity in our pipeline. The Phase I/II trial is underway and we aim to report preliminary safety and efficacy data from the study during this year. Also in 2008, we aim take RetinoStat towards clinical development in wet AMD.

As part of our strategy, we will continue to pursue collaboration opportunities for certain programmes. In 2008, we intend to move forward with our collaboration discussions for MetXia and its associated GDEPT technology for localised cancer therapy. Also, having secured a proprietary position in the field of therapeutic RNA interference, we plan to explore partnering opportunities that could provide additional near-term revenue.

In summary, we are looking forward to an exciting period for Oxford BioMedica, which could see both TroVax and ProSavin reach key inflexion points in their development. Both products address large markets and potentially provide patients with new safe and effective treatment options. Hence, in our view, both products present substantial value propositions.

Exhibit 1 - 46 of 102

Page 46



Exhibit 1 - 47 of 102
Page 47





11 September 2007

**TroVax**

First milestone under sanofi-aventis agreement achieved

BUSINESS REVIEW

# GOVERNANCE AND RESPONSIBILITY

47    Corporate Governance Statement
49    Corporate Social Responsibility

# Corporate Governance Statement

## APPLICATION OF THE PRINCIPLES IN THE FRC COMBINED CODE ON CORPORATE GOVERNANCE

The policy of the Board is to manage the affairs of Oxford BioMedica to the highest standards of corporate governance and in accordance with the principles of good governance and the code of best practice as set out in the FRC combined code on corporate governance issued in June 2006 (the 'Combined Code' (2006)).

The Board considers that it has complied throughout the year with the provisions for companies set out in Part 2 of the Combined Code, unless otherwise indicated below.

## COMPLIANCE WITH THE PROVISIONS OF THE COMBINED CODE

### THE BOARD

Oxford BioMedica is led and controlled by a Board consisting of three Non-Executive Directors and six Executive Directors. As set out in their biographies on pages 53 and 54, the Directors have significant experience of the management and development of a biopharmaceutical group and of pharmaceutical research and the new drug development process. There is a clear division of responsibilities, set out in writing, between the Chairman and Chief Executive Officer. The Board considers that the Non-Executive Directors, including the Chairman, are independent of management. Provision A2.2 of the Combined Code requires that the Chairman should meet the independence criteria on appointment. The Chairman was granted 200,000 share options shortly after his appointment as Chairman in 2001, which is contrary to the requirements for independence set out in provision A.3.1. The Board does not consider that this affects the Chairman's independence. Provision A.3.2 of the Combined Code requires a small company to have at least two independent Non-Executive Directors. The Company has fully met this requirement.

The Board meets regularly and at least eight times per year, with meeting dates agreed for each year in advance. There is a formal schedule of matters reserved to the Board for its decision. The schedule covers senior appointments, business strategy and budgets, substantial transactions, contracts and commitments, financing treasury and risk policies, and the approval of certain documents and announcements including the Annual Report. There is frequent contact between Executive and Non-Executive Directors, and each Director is supplied on a timely basis with financial and operational information sufficient for the Board to discharge its duties. All Directors have access, as required, to independent professional advice. During 2007 there were nine board meetings. The attendance of individual Directors at board meetings was: Mark Berninger six; Peter Johnson nine; Alan Kingsman eight; Susan Kingsman six; Mike McDonald seven; Peter Nolan six; Nick Rodgers nine; Andrew Wood nine; Nick Woolf nine.

As appropriate, the Board has delegated certain responsibilities to board committees, which operate within defined terms of reference and constitution. There is a Remuneration Committee, the report and membership of which is on pages 60 to 64. The Remuneration Committee met eight times in 2007. All meetings were attended by both members.

There is also an Audit Committee, which consists of two Non-Executive Directors: Dr Peter Johnson (chairman) and Nick Rodgers. Provision C.3.1 of the Combined Code requires the Audit Committee of a small company to have at least two members, both of whom are independent Non-Executive Directors. The Board considers this requirement to have been met, even though Dr Peter Johnson is also Chairman of the Company. We consider that both members of the Audit Committee possess recent and relevant financial experience. The Audit Committee has written terms of reference which have been published on the Company's web site. It monitors the integrity of the financial statements of Oxford BioMedica and any formal announcements relating to the Company's financial performance, reviewing significant financial reporting judgements contained in them. It reviews our internal financial controls and the internal control and risk management systems. It makes recommendations to the Board, for it to put to shareholders for their approval in general meeting, in relation to the appointment, re-appointment and removal of the external auditors, and approves the remuneration and terms of engagement of the external auditors.

The independent auditors continue to operate procedures to safeguard against the possibility that the auditors' objectivity and independence could be compromised. This includes the use of quality review partners, use of a technical review board (where appropriate) and annual independence procedures, including confirmations by all staff. The auditors report to the Audit Committee on matters including independence and non-audit fees on an annual basis. In addition, the role of the audit partner is rotated on a periodic basis. The Audit Committee reviews and monitors the external auditors' independence and objectivity and the effectiveness of the audit process, taking into consideration relevant

UK professional and regulatory requirements. The Audit Committee approves all non audit services provided by the Company's auditor. As part of this approval process, the Audit Committee ensures that the provision of non audit services will not impact the auditors' objectivity and independence. It reports to the Board, identifying matters in respect of which it considers that action or improvement is needed, making recommendations as to the steps to be taken.

Oxford BioMedica has a public interest disclosure policy, and the Audit Committee is responsible for reviewing arrangements by which our staff of may raise concerns about possible improprieties. It also reviews from time to time the need for an internal audit function. At the Committee's invitation or request, the Chief Executive Officer and other Directors may attend meetings of the Audit Committee. The Audit Committee met twice in 2007. Both meetings were attended by both members, with the Chief Financial Officer present at the Committee's invitation.

In December 2007 the Board agreed to form a Nomination Committee comprising Nick Rodgers (chairman), Dr Peter Johnson and Mark Berninger. Prior to that time, appointment of Directors was considered by the whole Board. No new Board appointments were made in 2007.

In accordance with the articles of association, at each annual meeting any Director who has served for three years, and one third of the other Directors (or if their number is not a multiple of three the number nearest to but not exceeding one third) must retire from office by rotation.

In accordance with provision A.6 of the Combined Code, the performance of the Board and the committees is reviewed annually, through the use of confidential questionnaires completed by all the Directors.

The Board retains overall responsibility for, and control of, the Company. Management

is conducted by the Chief Executive Officer and the Executive Directors who, together with other senior managers, form the senior management team. Executive Directors sit on the following committees and management groups: the senior management group, the executive research group, the clinical development group, the safety committee, the commercial development committee, the quality committee and the internal patent group. By this means, a direct and ongoing link exists between the determination of strategy by the Board and the execution of the Company's policies by our employees.

## SCIENTIFIC ADVISORY BOARD

The Scientific Advisory Board (SAB) is a body of independent experts comprising a multidisciplinary group of leading international scientists. Its role is to assist Oxford BioMedica with the assessment of our existing and potential research and development projects. The SAB provides access to a large academic and industrial network to add value to our projects, through collaboration where appropriate, and by evaluating new strategies and competitors. Biographical details of the SAB are on page 55.

## RELATIONS WITH SHAREHOLDERS

We attach a high priority to effective communication with both private and institutional shareholders. The Annual Report contains a detailed Business Review and a description of our candidate products and of our research and development portfolio. An Interim Business Review is also provided with the half-year report sent to all shareholders. With these documents and the Company's press releases, we seek to present a balanced and understandable assessment of Oxford BioMedica's position and prospects. Our website (www.oxfordbiomedica.co.uk) provides extensive other information about the Company.

The Annual General Meeting is the principal forum for dialogue with private shareholders. A business presentation is made by the Chief Executive Officer and there is an opportunity for shareholders to put questions to the Directors. We maintain regular contact with institutional shareholders through a programme of one-to-one visits and briefings.

## INTERNAL CONTROL

The Directors are responsible for Oxford BioMedica's system of internal control and for reviewing its effectiveness. Such a system is designed to manage, rather than eliminate, the risk of failure to achieve business objectives, and can only provide reasonable, and not absolute, assurance against material misstatement or loss. As described above, the active involvement of the Executive Directors in the our management committees allows the Board continually to monitor and assess significant business, operational, financial, compliance and other risks, and to review the effectiveness of internal control. This is reinforced by the provision to the Board by the Executive Directors of regular and detailed reports covering, *inter alia*, financing, investor relations, research and development, clinical development, financial performance, commercial interactions and intellectual property management. In addition the Board annually reviews the effectiveness of all significant aspects of internal control. The review in 2007 did not highlight any matters that require reporting to shareholders.

Oxford BioMedica has procedures in place which incorporate the recommendations on internal control: guidance for directors on the Combined Code (Turnbull).

## INTERNAL AUDIT

We do not consider that an internal audit function is appropriate given the current scale and structure of our operations. As required by the Combined Code, the Board reviews the need for an internal audit function from time to time.

Exhibit 1 - 50 of 102

Page 50

# Corporate Social Responsibility

## KEY HIGHLIGHTS

- Expanded staff count to 82 from 73
- Health and Safety Auditor concluded that our management system is robust
- MHRA GMP inspection identified no major or critical issues

## KEY OBJECTIVES

- Support initiative by The Oxford Science Park to gain ISO14001 certification
- Quantify the amount of cans and plastic bottles recycled

Corporate Social Responsibility (CSR) requires consideration of the economic, social and environmental impacts of our business activities. The Board recognises the potential benefits of CSR for the competitiveness of Oxford BioMedica and encourages a culture of continuous improvement in CSR-related issues. We have set specific policies and goals that cover key aspects of CSR and we strive to operate at the highest level of integrity.

The CSR report describes the working practices adopted by Oxford BioMedica that are relevant to our employees, health and safety in the workplace, our external relationships, the environment, and the community. We have also highlighted significant changes and new initiatives that have been implemented in 2007.

## EMPLOYEES

We recognise the importance of attracting, recruiting, motivating and retaining a highly skilled and diverse workforce and have employment policies that are designed to follow best employment practices and that recognise the rights of all employees. We aim to develop and maintain a motivated and professional workforce through career development, performance evaluation and feedback, training and promotion.

Training is given in a wide variety of ways including on-the-job coaching and in-house or external courses to meet current and future job requirements. Our staff appraisal process continues to function well, by providing a formal process for setting objectives in consultation with each individual, together with regular performance reviews throughout the year. This process enables staff at all levels to consider their training needs and to discuss new opportunities with their manager.

Our organisational structure is designed to promote internal communication through various forums. Research, clinical and corporate teams have regular meetings, which include members of senior management, enabling broad dissemination and discussion of relevant issues. Various team and company-wide social events and activities are organised throughout the year as part of our team-building programme.

We have policies covering maternity and paternity consistent with statutory requirements in the UK. Employees are eligible for a number of benefits as part of their employment, including a personal pension plan, a childcare voucher scheme, a health cash benefit plan and, for certain employees, a performance-related bonus. We aim to provide an appropriate work/life balance for employees, including flexible working practices, where this is practical and consistent with the Company's goals. In addition, we operate a Share Option scheme, and usually grant options to employees when they join and periodically thereafter. In early 2008, we introduced a new staff discount scheme for all employees at a wide range of retailers.

In 2007, we expanded our staff count to 82 from 73. Female employees represent 63% of all employees, and 43% of management. We continue to add to our team, as the Company moves towards commercialising our products and expanding our activities, to ensure that we have the appropriate skill base to address these challenges. We are committed to providing equal opportunities for all and do not discriminate against employees on the grounds of age, gender, sexual orientation, marital status, race, colour, ethnic or national origins, religion, creed or belief, responsibilities for dependants, disability or offending background.

## HEALTH AND SAFETY

Effective health and safety is integral to our business activities. We have strict policies to minimise the risk of accidents in the workplace or employment-related ill-health. These policies cover working practices for the operation of equipment and handling of biological, chemical and radioactive hazardous materials. The requirements for instruction and training, particularly for laboratory-based personnel are continuously under review. In August 2007, we invited an external Health and Safety Auditor to review the in-house Health and Safety Management System. The

TroVax

Second successful DSMB review of Phase III TRIST study in renal cancer

auditor's report concluded that, 'The Health and Safety Management System is robust and does not require any significant changes'. We have an excellent safety record and have never been required to report an accident to the UK Health and Safety Executive or its US equivalent. Given its importance to the Company, health and safety issues are represented at Board level.

Our internal health and safety representatives attend meetings and workshops on a regular basis, including those organised by the UK Government's Health and Safety Executive, to ensure that we remain up to date with changes to policies and regulations. Our Quality Management System ensures good practice for all of our laboratory-based activities, including research, development and manufacturing. As part of this system, the laboratories are audited routinely. A recent MHRA GMP inspection of the Company identified no major or critical issues.

## EXTERNAL RELATIONSHIPS

Our external stakeholders include suppliers, advisors, shareholders, patients, healthcare professionals, partners and licensees. These relationships are a fundamental aspect of our business activities. We are committed to interacting with these third parties in an ethical manner, and to ensuring that the relationships are maintained at a professional and appropriate level. Our internal procedures for dealing with third parties are reviewed annually by the Company's external auditors.

We have a policy for the management of clinical trials to ensure compliance with appropriate guidelines and legislation. Our websites (www.oxfordbiomedica.co.uk and www.trovax.co.uk) provide information on our ongoing clinical trials, and include contact details for the centres involved, and details of clinical results and scientific publications that relate to our products and technologies. We also list our US-based trials on a US government-sponsored website

(www.clinicaltrials.gov) that provides information about federally and privately supported clinical research in human volunteers.

The Chief Executive and Executive Directors have primary responsibility for communication with shareholders and related stakeholders. We also use the services of external financial and corporate communications agencies. The website includes news announcements and financial and share-related information. We use web-cast facilities to provide broad access to relevant presentations such as analyst briefings and investor conferences. We aim to disseminate information in a timely, reliable and comprehensive fashion, and comply with the rules and guidelines of the UK Listing Authority for a company on the Official List in relation to the release of price-sensitive news and other disclosures.

## ENVIRONMENT

We are committed to the protection of the environment. We regularly review our environmental policy, objectives and guidelines, which range from water and electricity consumption to recycling and waste management. In 2008, we plan to support an initiative by The Oxford Science Park to gain ISO14001 certification. ISO14001 is an internationally accepted standard that specifies the requirements for an organisation's Environmental Management System. It sets requirements for environmental policy, implementation and operation, checking and corrective action, and management review. Again, given its importance to the Company, environmental issues are represented at Board level.

We have updated our travel policy with the aim of reducing our travel-related carbon footprint. Under the revised policy, employees are encouraged to use public transport rather than their own vehicle and, where reasonably practicable, to use web-casts and video conferencing rather than travelling to external meetings.

In terms of recycling, we currently recycle the majority of our cardboard and over 75% of our office paper. In 2007, we recycled approximately five tonnes of cardboard and five tonnes of office paper. In 2008, we aim to quantify the amount of cans and plastic bottles recycled as part of The Oxford Science Park's initiative for ISO14001 certification. In terms of electricity usage, our policy encourages employees to turn off all non-essential equipment at the end of each working day.

We comply with all current regulations in our processing of laboratory waste, which includes the decontamination of all biological material on site to prevent accidental release into the environment. We use qualified licensed contractors for the collection and disposal of chemical and radioactive waste and decontaminated biological materials. No laboratory waste goes to landfill sites.

In summary, we regularly review and update our practices with the aim of reducing the Company's environmental impact. We adhere to published guidelines for best practice, including those published by the UK Government's Department for Environment, Food and Rural Affairs.

## COMMUNITY

We recognise our responsibility to and the benefits from supporting and participating in both the local and wider communities.

We work closely with several charitable and disease-specific patient organisations that are relevant to our development programmes. We use local suppliers, where practical, for maintenance, repairs and other services. We are an active member of the tenants' forum of The Oxford Science Park, and employees participate in social and leisure activities within The Oxford Science Park and the local community.

Exhibit 1 - 52 of 102

Page 52



Exhibit 1 - 53 of 102
Page 53

Business Review: Governance and Responsibility
Corporate Social Responsibility



13 December 2007

**ProSavin**

Clinical Trial Application approved for Phase I/II trial

# 6

# DIRECTORS' REPORTS

53   Board of Directors
55   Scientific Advisory Board
56   Directors' Report
60   Directors' Remuneration Report

# Board of Directors

### PETER JOHNSON PHD
### NON-EXECUTIVE CHAIRMAN

Dr Peter Johnson, age 71, has been a Non-Executive Director of Oxford BioMedica since 1999, and Non-Executive Chairman since January 2001. He has extensive R&D experience with Wellcome, Hoechst, SmithKline, Fisons and Astra. He was formerly Chairman and Managing Director of SmithKline and French Research Limited and Group Main Board Director of R&D worldwide for Fisons plc. A former Director of Quadrant Healthcare plc and Proteus Molecular Design Limited, he is currently a Non-Executive Director of CeNeS Pharmaceuticals plc. He is Chairman of Oxford BioMedica's Audit and Remuneration Committees.

### ALAN KINGSMAN MA PHD
### CHIEF EXECUTIVE OFFICER

Professor Alan Kingsman, age 57, is a co-founder of Oxford BioMedica and has been its Chief Executive Officer since 1996. He is an internationally recognised authority on gene expression and retrovirus research and has over 20 years' experience in this field, including 17 years as Co-Director (with Susan Kingsman) of the Retrovirus Molecular Biology Group within the Biochemistry department of the University of Oxford. He continues to hold the title of Professor of Biochemistry at Oxford University and is a former fellow of St Catherine's College, Oxford. He has published extensively in the field and is named inventor on numerous patent applications and issued patents. He has acted as an advisor or consultant to UK research councils, WHO and a number of UK and international companies.

### ANDREW WOOD
### CHIEF FINANCIAL OFFICER

Andrew Wood, age 49, has been a Director of Oxford BioMedica since 1996. He is a chartered accountant with wide experience of financial management in a number of industries. He also holds a first class degree in biochemistry from Oxford University. Before joining Oxford BioMedica he was Finance Director at the Yorkshire Cable Group (part of General Cable plc). Previously, he has held senior financial positions with subsidiaries of the Burton Group (now Arcadia plc), Associated Newspapers and Fenner plc.

### SUSAN KINGSMAN MA PHD
### EXECUTIVE DIRECTOR

Professor Susan Kingsman, age 55, is a co-founder of Oxford BioMedica, and has been a Director of the Company since 1996, and Chief Scientific Officer until December 2007. She has over 20 years' experience in virology, gene expression and retrovirus biology, including as Co-Director, with Alan Kingsman, of the Retrovirus Molecular Biology Group at Oxford University. She continues to hold the title of Professor of Molecular Genetics at Oxford University and is a former fellow of Trinity College, Oxford. She has published extensively in the field and is named inventor on numerous patent applications and issued patents. She advises research councils and research charity committees and has been a consultant for a number of pharmaceutical and biotechnology companies.






## MICHAEL MCDONALD
## MBCHB MRCP
### CHIEF MEDICAL OFFICER

Dr Mike McDonald, age 55, was appointed to the Board of Oxford BioMedica in February 2006, having joined the Company in September 2005. He has over 20 years of experience in clinical drug development and regulatory leadership. He was previously Chief Medical Officer at Seattle Genetics Inc and spent nine years with Eli Lilly serving as worldwide Vice President, Clinical Research and Medical Affairs. Before moving to the USA, he was Executive Director of Medical and Regulatory Affairs at Eli Lilly Europe, responsible for all the company's European regulatory submissions, clinical and health outcomes research and Lilly's European based pharmacovigilance group. He also spent seven years at SmithKline Beecham where he was involved in worldwide clinical development and regulatory management. He received his medical degree from Edinburgh University, is a member of the Royal College of Physicians in London, holds a Diploma in Pharmaceutical Medicine, and is a Fellow of the Faculty of Pharmaceutical Physicians.

## PETER NOLAN
### SENIOR VICE PRESIDENT: COMMERCIAL DEVELOPMENT

Peter Nolan, age 54, was appointed to the Board of Oxford BioMedica in May 2002, having been a senior member of the Company since its foundation. He is also a Director of the UK BioIndustry Association and is a past Chairman of the Oxfordshire Bioscience Network. He has broad experience and knowledge of the biotechnology sector. Prior to joining Oxford BioMedica, he was Head of the Biotechnology Unit at the UK Department of Trade & Industry for eight years. In that role he was responsible for establishing and managing complex collaborative research programmes involving industry, research councils and other Government departments. Previously he held senior positions in the Laboratory of the Government Chemist and also the Metropolitan Police Laboratory in London where he was a senior forensic scientist.

## NICK WOOLF
### SENIOR VICE PRESIDENT: CORPORATE STRATEGY

Nick Woolf, age 39, was appointed to the Board of Oxford BioMedica in March 2005, having joined the company in 2002. He was previously a top-rated equity analyst in the biotechnology and pharmaceutical industry and has been involved in all aspects of company financing, ranging from initial public offerings to major corporate deals. Prior to joining Oxford BioMedica, he served as Director and Head of European Biotechnology Research at ABN AMRO, where he was responsible for developing its industry coverage. Prior to that, he was Vice President and Senior Analyst at Robertson Stephens and was previously at both Nomura and SBC Warburg. He is a chartered certified accountant and holds a degree in chemistry from Oxford University.





## NICK RODGERS
### SENIOR INDEPENDENT DIRECTOR

Nick Rodgers, age 49, joined the Board of Oxford BioMedica in March 2004. He is a former investment banker with considerable experience in the life sciences sector having been Head of Life Sciences and joint Head of Corporate Finance at Evolution Beeson Gregory until December 2003. He is now Chief Executive of IPSO Ventures plc, an IP commercialisation company listed on AIM and a non-executive director of a number of private companies. Nick is a chartered accountant having qualified with Ernst & Young.



## MARK BERNINGER
### NON-EXECUTIVE DIRECTOR

Mark Berninger, age 59, joined the Board of Oxford BioMedica in 1999. He has wide experience in the biotechnology industry in the United States, including as Vice President of Business Development at Genetic Therapy Inc (GTI). Prior to joining GTI he held a similar position at Gen-Probe Inc and was Director of Intellectual Property and Technology Acquisition at Life Technologies Inc between 1989 and 1995.





Exhibit 1 - 56 of 102

Page 56

# Scientific Advisory Board

## PROFESSOR PATRICK AEBISCHER

Professor Aebischer is an MD by training and is presently Professor of Neurosciences and President at the Swiss Federal Institute of Technology in Lausanne, Switzerland. He is an internationally recognised leader in the area of gene therapy for neurodegenerative diseases. He has conducted gene therapy clinical trials for various neurological diseases and is currently focusing his interest on the application of lentiviral vectors for neurodegenerative diseases, including Parkinson's disease, Huntington's disease and motor neuron diseases. He advises Oxford BioMedica on the utilisation of EIAV vectors for application within the nervous system.

## DR KRYS BANKIEWICZ

Dr Bankiewicz is Professor of Neurological Surgery at the University of California and Scientist at Lawrence Berkeley National Laboratory, USA. Dr Bankiewicz is internationally recognised for his work on gene and cell delivery into the central nervous system. His main area of expertise focuses on *in vivo* models of Parkinson's disease, neuroimaging, the dopaminergic system and convection enhanced delivery of viral vectors in the brain. He advises the Company on preclinical aspects of gene transfer technology.

## DR J WILLIAM LANGSTON

Dr Langston is the founder, Scientific Director and Chief Operating Officer of the Parkinson's Institute in Sunnyvale, California, USA. He is internationally recognised for the discovery of the link between MPTP and parkinsonism, which has provided an entirely new tool to study neurodegeneration in Parkinson's disease and stimulated great interest in finding environmental factors that may cause the disease. His current research interests include the study of mechanisms of neuronal degeneration, the aetiology of Parkinson's disease, and the development of new strategies to slow or halt disease progression. Dr Langston serves on numerous editorial boards and advisory committees and is Chief Scientific Advisor for the Michael J Fox Foundation for Parkinson's Disease Research.

## PROFESSOR PETER STERN

Professor Stern is Head of the Cancer Research UK Department of Immunology at the Paterson Institute for Cancer Research. He is an expert in tumour immunology and is involved in numerous international collaborations in research and clinical oncology. He advises the company on tumour targeting technologies including those related to 5T4.

## PROFESSOR DAVID WAXMAN

Professor Waxman is Professor of Cell and Molecular Biology at Boston University and Professor of Medicine at Boston University, School of Medicine, Massachusetts, USA. He is a leading authority on cytochrome P450 enzymes and genes, and on their role in metabolism leading to bioactivation of anti-cancer drugs. He has made major contributions to the development of P450-based prodrug activation strategies for cancer gene therapy, and he is advising Oxford BioMedica on the application of P450-based technologies in the clinic.

Exhibit 1 - 57 of 102

Page 57

# Directors' Report

## for the year ended 31 December 2007

The Directors present their report and the audited financial statements for the year ended 31 December 2007.

## PRINCIPAL ACTIVITY

Oxford BioMedica (LSE: OXB) is a biopharmaceutical company specialising in cancer immunotherapy and gene-based therapies. The Company was established in 1995, as a spin-out from Oxford University, and is listed on the London Stock Exchange. In 2007 the Group was expanded by the acquisition of Oxxon Therapeutics Limited.

The Company has a platform of gene delivery technologies, which are based on highly engineered viral systems. Oxford BioMedica also has in-house clinical, regulatory and manufacturing know-how. The lead product candidate is TroVax®, an immunotherapy for multiple solid cancers, which is licensed to sanofi-aventis for global development and commercialisation. A Phase III trial of TroVax in renal cancer is ongoing and Phase III development in colorectal cancer is planned. Oxford BioMedica has three other products in clinical development, including ProSavin®, a novel gene-based treatment for Parkinson's disease, in a Phase I/II trial. The Company is underpinned by over 80 patent families, which represent one of the broadest patent estates in the field.

At 31 December 2007 the Group had a staff of 82, mainly based at its facility in Oxford. The Group also has a wholly owned subsidiary, BioMedica Inc, in San Diego, California. The business of Oxxon Therapeutics Limited, which was acquired in March 2007, has been integrated with that of Oxford BioMedica (UK) Limited, the principal operating subsidiary. Oxford BioMedica has corporate collaborations with sanofi-aventis, Wyeth, Sigma-Aldrich, MolMed and Virxsys. Technology licensees include Biogen Idec, Merck & Co, GlaxoSmithKline and Pfizer.

Oxford BioMedica plc is a public limited company incorporated in England and Wales. The Company is resident in England and the registered office is The Medawar Centre, Robert Robinson Avenue, The Oxford Science Park, Oxford OX4 4GA, United Kingdom.

Further information is available at www.oxfordbiomedica.co.uk

## REVIEW OF THE BUSINESS AND FUTURE DEVELOPMENTS

The consolidated income statement for the year is set out on page 69. A review of the Group's activities and future developments is contained within the Company Overview, Chairman's Statement and Business Review on pages 4 to 50 including the Financial Review on pages 38 to 43.

## SHARE CAPITAL

During 2007 the Company issued a total of 33,286,188 new ordinary shares: 31,771,246 on the acquisition of Oxxon Therapeutics Limited; 1,271,636 on the exercise of share options; and 243,306 in connection with the acquisition of intellectual property.

## DIVIDENDS

The Directors do not recommend payment of a dividend (2006: nil).

## GROUP RESEARCH AND DEVELOPMENT ACTIVITIES

During the year the Group incurred expenditure of £22,142,000 on research and development (2006: £19,523,000), all of which was written off to the profit and loss account.

## CHARITABLE DONATION

During the year the Group made a contribution of £1,500 (2006: nil) to Helen and Douglas House, a community-based charitable organisation in Oxford. It is the Group's policy to make a donation to charity rather than to send conventional cards at Christmas.

Exhibit 1 - 58 of 102

Page 58

# DIRECTORS

The Directors of the Company at 31 December 2007, who had been Directors for the whole of the year then ended were:

| | |
|---|---|
| Mark Berninger | Non-Executive Director, member Nomination Committee |
| Dr Peter Johnson | Non-Executive Chairman, Chairman of Audit and Remuneration Committees, member Nomination Committee |
| Professor Alan Kingsman | Chief Executive Officer |
| Professor Susan Kingsman | Chief Scientific Officer |
| Dr Michael McDonald | Chief Medical Officer |
| Peter Nolan | Senior Vice President: Commercial Development |
| Nicholas Rodgers | Senior Independent Director, Chairman of Nomination Committee, member of Audit and Remuneration Committees |
| Andrew Wood | Chief Financial Officer |
| Nicholas Woolf | Senior Vice President: Corporate Strategy |

All Directors are subject to election by shareholders at the first opportunity after their appointment, and to re-election thereafter at intervals of not more than three years. Any Non-Executive Director with a tenure of more than nine years require annual re-election. At the 2008 Annual General Meeting Dr Peter Johnson, Dr Michael McDonald and Nicholas Rodgers will retire in accordance with article 93 of the Company's articles of association and will offer themselves for re-election. Mark Berninger, who has now served nine years as a Non-Executive Director is also offering himself for re-election. The appointments of Dr Peter Johnson, Nicholas Rodgers and Mark Berninger are subject to three months' notice. The contract of employment of Dr Michael McDonald is subject to twelve months' notice.

Biographical details of all the Directors, including those submitted for re-election are given on pages 53 and 54.

From January 2008 Professor Susan Kingsman relinquished the position of Chief Scientific Officer but remains an Executive Director.

Dr Alex Lewis has agreed to join the Board as a Non-Executive Director and member of the Remuneration and Audit Committees on 3 April 2008

The interests of the Directors at 31 December 2007 in the share capital of the Company are disclosed in the Directors' Remuneration Report on pages 60 to 64.

# EMPLOYEES

The Group communicates and consults regularly with employees throughout the year. Employees' involvement in the Group's performance is encouraged, with all employees eligible to participate in the Share Incentive Plan and either the Share Option Scheme or the Long Term Incentive Plan. Certain employees participate in bonus schemes.

The Group's aim for all members of staff and applicants for employment is to fit the qualifications, aptitude and ability of each individual to the appropriate job, and to provide equal opportunity regardless of sex, religion or ethnic origin. The Group does all that is practicable to meet its responsibility towards the employment and training of disabled people.

Further details on employees, health and safety, environmental matters and corporate social responsibility are in the Corporate Social Responsibility Statement on pages 49 and 50.

# DIRECTORS' RESPONSIBILITIES

The Directors are responsible for preparing the Annual Report, the Directors' Remuneration Report and the Financial Statements in accordance with applicable law and regulations.

Company law requires the Directors to prepare financial statements for each financial year. Under that law the Directors have prepared the Group and parent company Financial Statements in accordance with International Financial Reporting Standards (IFRSs) as adopted by the European Union. In preparing these Financial Statements, the Directors have also elected to comply with IFRSs, issued by the International Accounting Standards Board (IASB). The Financial Statements are required by law to give a true and fair view of the state of affairs of the Company and the Group and of the profit or loss of the Group for that period.

In preparing these Financial Statements the Directors are required to:

- Select suitable accounting policies and then apply them consistently.
- Make judgements and estimates that are reasonable and prudent.
- Prepare the Financial Statements of the parent company and Group on the going concern basis, unless it is inappropriate to presume that the Group will continue in business, in which case there should be supporting assumptions or qualifications as necessary.

The Directors confirm that they have complied with the above requirements in preparing the Financial Statements.

Exhibit 1 - 59 of 102

Page 59

The Directors are responsible for keeping proper accounting records that disclose with reasonable accuracy at any time the financial position of the Company and the Group and to enable them to ensure that the Financial Statements and the Directors' Remuneration Report comply with the Companies Act 1985 and, as regards the Group Financial Statements, article 4 of the IAS Regulation. They are also responsible for safeguarding the assets of the Company and the Group and hence for taking reasonable steps for the prevention and detection of fraud and other irregularities.

The maintenance and integrity of the Group's website, www.oxfordbiomedica.co.uk, is the responsibility of the Directors. Legislation in the United Kingdom governing the preparation and dissemination of financial statements may differ from legislation in other jurisdictions.

# INFORMATION REQUIRED BY THE TAKEOVER DIRECTIVE

The Takeover Directive requires certain disclosures regarding share capital and other matters, and applies for financial years commencing on or after 20 May 2006.

## STRUCTURE OF THE COMPANY'S CAPITAL

The Company's share capital comprises a single class of 1p ordinary shares, each carrying one vote and all ranking equally with each other. At 7 March 2008 the authorised share capital was £6,500,000 comprising 650,000,000 1p ordinary shares. 537,074,316 1p ordinary shares were allotted and fully paid. There are no restrictions on the transfer of shares in the Company or on voting rights.

## RIGHTS TO ISSUE AND BUY BACK SHARES

Each year at the Annual General Meeting the Directors seek rights to allot shares. The authority, when granted lasts for 15 months or until the conclusion of the next Annual General Meeting if sooner. At the last Annual General Meeting held on 3 May 2007, authority was given to allot shares, subject to the normal pre-emption rights reserved to shareholders contained in the Companies Act 1985 up to the total authorised but not issued share capital of the Company. Authority was also given to waive pre-emption rights over up to 26,675,500 shares, being 5% of the shares then in issue. No rights have been granted to the Directors to buy back shares.

## SUBSTANTIAL SHAREHOLDINGS

At 4 March 2008, the latest practical date prior to approval of the directors' report, the Company had been notified of the following shareholdings amounting to 3% or more of the ordinary share capital of the Company.

| Shareholder | Number of ordinary shares | Percentage of issued share capital |
|---|---|---|
| M&G Investment Management Limited | 59,254,839 | 11.03% |
| Barclays plc | 32,369,578 | 6.03% |
| Cubana Investments Limited | 30,597,220 | 5.70% |
| GAM London Limited | 29,857,684 | 5.56% |
| Legal & General Group plc | 22,476,084 | 4.19% |
| TD Waterhouse (UK) | 22,888,696 | 4.26% |
| Sputnik Group [1] | 21,640,586 | 4.03% |
| Credit Agricole Cheuvreux Limited | 18,743,455 | 3.49% |
| Lloyds Registrars Sharedealing Service (UK) | 16,875,449 | 3.14% |

1 Aggregate interest of Sputnik Group Limited, Pogan Invest Corp. and Sulidad Invest & Trade Inc

No other person has reported an interest in the ordinary shares of the Company required to be notified to the Company.

No person holds shares carrying special rights with regard to control of the Company.

## EMPLOYEE SHARE SCHEMES

The Company has a Share Incentive Plan under which shares may be held in trust for employees. The trustees may only exercise the voting rights in respect of such shares in accordance with the employees' instructions. Currently there are no such shares held in trust.

## AGREEMENTS THAT TAKE EFFECT, ALTER OR TERMINATE BECAUSE OF A TAKEOVER BID OR ON CHANGE OF CONTROL

There are no such agreements that the Directors consider to be material. There are no agreements providing for compensation for loss of office for Directors or employees in the event of a takeover bid.

Exhibit 1 - 60 of 102

Page 60

# CREDITOR PAYMENT POLICY

The Company and its subsidiaries agree the terms of payment when agreeing the terms and conditions for their transactions with suppliers. Payment is made in compliance with those terms, subject to the terms and conditions of the relevant transaction having been met by the supplier. The Group's average creditor payment period at 31 December 2007 was 40 days (2006: 35 days). The Company has no trade creditors (2006: nil).

# GOING CONCERN

Oxford BioMedica plc is a research and development based business with no currently marketed products. It expects to incur significant further costs as it continues to develop its portfolio of candidate products and related technology. The Directors expect that these costs will be met from existing financial resources, the proceeds of licensing agreements, and ultimately the proceeds of sales of products. The collaboration with sanofi-aventis, signed in March 2007 provides the Group with additional resources, and the Directors believe that on a positive outcome of the TRIST phase III clinical trial in renal cancer, funds from this collaboration could sustain the Group for the foreseeable future. However, there is no certainty that adequate resources will be available on a timely basis, and the Group may require additional financing for the future operation of its business, including further equity funding as appropriate, before it reaches sustained profitability. Recent turbulence in credit markets has no material impact on the Group as it has no borrowings and no plans to issue debt instruments.

The Directors confirm that they have a reasonable expectation that the Group has adequate resources to continue in operational existence for the foreseeable future. For this reason, they have adopted the going concern basis in preparing the financial statements.

# BIA CODE

The UK BioIndustry Association ('BIA'), of which the Company is a member, adopted a code of best practice in 1999. The BIA code includes principles and provisions relating to corporate governance matters, access to external advice, confidentiality, dealings in the Company's shares, and standards of public announcements. It is intended to operate by reference to the particular circumstances of bioscience companies and in support of the Combined Code and the rules of the Financial Services Authority. Throughout 2007 the Company has complied with the relevant provisions of the BIA code.

# STATEMENT AS TO DISCLOSURE OF INFORMATION TO AUDITORS

So far as the Directors are aware, there is no relevant audit information (that is, information needed by the Company's auditors in connection with preparing their report) of which the Company's auditors are unaware. Furthermore, they have taken all the steps that they ought to have taken as Directors in order to make themselves aware of any relevant audit information and to establish that the Company's auditors are aware of that information.

# AUDITORS

The auditors, PricewaterhouseCoopers LLP, have indicated their willingness to continue in office and a resolution concerning their reappointment will be proposed at the Annual General Meeting.

By order of the Board

**Andrew Wood**
Company Secretary

Exhibit 1 - 61 of 102

Page 61

**Directors' Reports**
Directors' Report

Oxford BioMedica Annual Report & Accounts 2007  59

# Directors' remuneration report

Only paragraphs marked with '*' within this report have been audited.

The Remuneration Committee comprises two Non-Executive Directors: Dr Peter Johnson (Chairman) and Nick Rodgers. Provision B.2.1 of the Combined Code requires the Remuneration Committee of a small company to have at least two members, both of whom are independent Non-Executive Directors. The Board considers this requirement to have been met, even though Dr Peter Johnson is also Chairman of the Company. The Remuneration Committee determines, on behalf of the Board, the Company's policy for executive remuneration and the individual remuneration packages for the Executive Directors including awards under the Long Term Incentive Plan. At the Committee's invitation or request, the Chief Executive Officer and other Directors may be in attendance at the meetings of the Remuneration Committee. The Committee has access to professional advice, both inside and outside the Company as required. In 2007, the Committee received advice on remuneration and incentive arrangements from Halliwell Consulting, a specialist executive compensation and share scheme consultancy.

## REMUNERATION POLICY

The Company's policy on remuneration is to attract, retain and incentivise the best staff in a manner consistent with the goals of corporate governance. In setting the Company's remuneration policy, the Remuneration Committee considers a number of factors, including the basic salaries and benefits available to executive directors of comparable companies.

## REMUNERATION OF EXECUTIVE DIRECTORS

Consistent with this policy, the Company's remuneration packages awarded to Executive Directors are intended to be competitive and comprise a mix of performance-related and non-performance-related elements. There is a discretionary non-pensionable bonus scheme for Executive Directors, subject to the achievement of agreed goals and targets, that is designed to incentivise them to perform at the highest levels and to align their interests with those of the shareholders. In 2007, 90% of the performance-linked remuneration was assessed on overall measures of Group performance (2006: 75%). The measures of Group performance included commercial and clinical milestones for TroVax and regulatory and technical milestones for ProSavin. The balance of performance-linked remuneration was based on individual job-specific assessments. In addition to the annual bonus paid at the end of the year, a one-off discretionary bonus equal to 100% of normal bonus entitlement was paid in April 2007, following the TroVax licence with sanofi-aventis. The performance-linked remuneration of the Chief Executive Officer is determined by the average of the assessments for the other Executive Directors and certain senior staff. The targeted composition of each Director's remuneration in 2007 was as follows:

|  | Performance related |
| --- | --- |
| Professor Alan Kingsman | Up to 45% of base salary |
| Professor Susan Kingsman | Up to 30% of base salary |
| Dr Michael McDonald | Up to 30% of base salary |
| Peter Nolan | Up to 30% of base salary |
| Andrew Wood | Up to 30% of base salary |
| Nick Woolf | Up to 30% of base salary |

Including the one-off special bonus paid in April 2007, bonuses of between 60 per cent and 90 per cent of salary were paid to the Executive Directors in 2007.

Benefits, detailed in the table of Directors' emoluments, comprise healthcare insurance only.

The Company makes contributions to defined contribution personal pension schemes for the Executive Directors at 10% of salary. In 2007 it was agreed with Dr Michael McDonald that Company pension contributions would be stopped, and instead additional taxable salary equivalent in cost to the pension contribution would be paid.

In 2007 a share-based long term incentive plan (LTIP) for directors and senior managers was introduced, and was approved by shareholders on 1 February 2007. Details of the award made in 2007 under the LTIP are on page 64. Awards under the LTIP may be conditional shares or nil-cost options, the release of which will depend on the completion of a holding period of at least three years and the satisfaction of performance conditions. It is the intention of the Remuneration Committee to have one main performance condition attached to share awards granted under the LTIP, which is comparative Total Shareholder Return measured against the following a comparator group of companies which at inception comprised:

Acambis plc; Alizyme plc; Allergy Therapeutics plc; Antisoma plc; Ardana plc; Ark Therapeutics Group plc; Axis-Shield plc; Biocompatibles International plc; BioProgress plc (now Meldex International plc); BTG plc; Corin Group plc; Dechra Pharmaceuticals plc; Goldshield Group plc; Innovata plc; Isotron plc; Optos plc; ProStrakan Group plc; Proteome Sciences plc; Protherics plc; SkyePharma plc; VASTox plc (now Summit Corporation plc).

Exhibit 1 - 62 of 102

Page 62

No awards will be released for less than median performance at the testing date. Median performance will result in release of 25% of the shares. Upper quartile performance (i.e. greater than 75th percentile performance) will result in release of 100% of the shares, with straight line release between these points. If the performance conditions are not satisfied or partially satisfied at the end of the holding period, the LTIP award or the balance of the award (as appropriate) not released shall lapse. There will be no re-testing of the performance conditions.

The award to Executive Directors under the LTIP in 2007 was 150% of salary. The Committee intends that, subsequent to the initial award, annual awards to Executive Directors will not normally exceed 100% of salary. The higher initial award reflects a number of factors, but primarily the fact that for all but one Director the Company did not award any share options in 2006 under the previous share option scheme. The Company may issue up to 10% of its shares within a ten year period to satisfy awards to participants in the LTIP and any other share plan operated by the Company under which shares are issued.

Following the introduction of the LTIP, it is no longer the Group's policy to award share options to Executive directors. However, options will continue to be awarded to all other eligible employees. Alongside the introduction of the LTIP in 2007, a new employee share option scheme was introduced to replace the previous scheme, which had terminated in October 2006. Options granted under the predecessor scheme (the Oxford BioMedica 1996 (No.1) Share Option Scheme) remain in force, subject to the rules of that scheme. In prior years, share options have been awarded to Executive Directors and the Chairman, as a reward for past performance. The exercise price for these share options was the average mid-market price of the Company's ordinary shares for the three trading days prior to the date of grant. A summary of all share options outstanding at 31 December 2007 is given in note 22 to the financial statements. Full details of Directors' share options are on page 63. The share options held by Executive Directors at 31 December 2007 remain subject to the rules of the Oxford BioMedica 1996 (No.1) Share Option Scheme. These options become exercisable three years from the date of grant, and cease to be exercisable seven years from the date of grant. Under the scheme rules, the total value of options held by a Director (the exercise price multiplied by the number of options) may not exceed four times the amount of the Director's annual emoluments, excluding benefits in kind. The award of share options was at the discretion of the Remuneration Committee. Share options granted to Directors since April 2001 have been subject to a performance-based condition. Options granted prior to April 2001 were not subject to a performance-based condition, consistent with market practice at the time.

# REMUNERATION OF NON-EXECUTIVE DIRECTORS

The fees paid to the Chairman and Non-Executive Directors are determined by the Board. Non-Executive Directors do not receive pension contributions or a bonus. Generally, Non-Executive Directors do not participate in the Company's share option schemes. However, following his appointment as Chairman in 2001, Dr Peter Johnson was awarded 200,000 share options (increased by 5.55% in October 2003 following a rights issue). These options do not comply fully with requirements subsequently introduced by provision B.1.3 of the Combined Code requiring shareholder approval and a period of retention for shares acquired on the exercise of share options. The Company does not consider it appropriate to revise the terms of this share option retrospectively. This option will end on 17 April 2008.

The Chairman and other Non-Executive Directors have appointments that are for three years unless terminated by three months' written notice by either party. Non-Executive Directors' appointments may be renewed by mutual agreement. As recommended by Combined Code provision A.7.2, any term beyond six years for a Non-Executive Director is subject to considered review by the Board. The Company's policy on renewal after six years is to extend appointments by one year at a time.

Mark Berninger has now served nine years as a Non-Executive Director. After careful consideration the Board has asked Mark Berninger to continue to serve as a Director. On 28 January 2008 a further one-year extension, commencing 12 February 2008, was agreed.

Dr Peter Johnson has served on the Board for eight years, the last seven as Non-Executive Chairman. On 25 July 2007, the eighth anniversary of his initial appointment to the Board as a Non-Executive Director, his appointment was extended for a further year.

# DIRECTORS' SERVICE CONTRACTS

It is Oxford BioMedica plc's policy that Directors' service contracts should be no more than three years in duration, that they should have notice periods of not more than one year and that the contractual termination payments should not exceed the Director's current salary, benefits and bonus entitlement for the notice period.

The details of service contracts of those who served as Directors during the year are:

| | Contract date | Unexpired term at 31 December 2007 | Notice period | Contractual termination payments |
|---|---|---|---|---|
| Mark Berninger | 30 January 2007 | 1 month | 3 months | Notice period only |
| Dr Peter Johnson | 25 July 2007 | 7 months | 3 months | Notice period only |
| Professor Alan Kingsman | 2 January 2001 | Nil [1] | 12 months | Notice period only |
| Professor Susan Kingsman | 2 January 2001 | Nil [1] | 12 months | Notice period only |
| Dr Michael McDonald | 2 February 2006 | Nil [1] | 12 months | Notice period only |
| Peter Nolan | 1 May 2002 | Nil [1] | 12 months | Notice period only |
| Nick Rodgers | 2 March 2007 | 2 years 2 months | 3 months | Notice period only |
| Andrew Wood | 31 October 1996 | Nil [1] | 12 months | Notice period only |
| Nick Woolf | 3 March 2005 | Nil [1] | 12 months | Notice period only |

1 Executive Directors' contracts are for an initial term of 12 months and thereafter are subject to 12 months notice.

Exhibit 1 - 63 of 102

Page 63

# DIRECTORS' REMUNERATION *

Details of individual Directors' emoluments for the year are as follows:

| Name of Director | Salary and fees £ | Bonus £ | Benefits £ | 2007 total emoluments £ | 2007 pension £ | 2006 total emoluments £ | 2006 pension £ |
|---|---|---|---|---|---|---|---|
| **Executive** | | | | | | | |
| Professor Alan Kingsman | 221,886 | 199,698 | 1,700 | **423,284** | **22,189** | 278,166 | 18,953 |
| Professor Susan Kingsman | 181,812 | 110,088 | 1,700 | **293,600** | **18,181** | 210,649 | 15,530 |
| Dr Michael McDonald [1] | 250,814 | 130,828 | 2,833 | **384,475** | **(15,159)** | 226,423 | 16,675 |
| Peter Nolan | 165,300 | 99,180 | 3,399 | **267,879** | **16,530** | 189,961 | 14,119 |
| Andrew Wood | 209,471 | 125,763 | 2,235 | **337,469** | **20,974** | 239,593 | 17,640 |
| Nick Woolf | 168,982 | 101,390 | 1,706 | **272,078** | **16,898** | 191,395 | 14,098 |
| **Non-Executive** | | | | | | | |
| Mark Berninger [2,3] | 25,007 | - | - | **25,007** | - | 23,489 | - |
| Dr Peter Johnson [2] | 60,450 | - | - | **60,450** | - | 57,028 | - |
| Nick Rodgers [2] | 40,995 | - | - | **40,995** | - | 37,538 | - |
| Raj Uppal [4] | - | - | - | - | - | 6,393 | - |
| | 1,324,717 | 766,947 | 13,573 | 2,105,237 | 79,613 | 1,460,635 | 97,015 |

1 During 2007 the Company agreed to stop making pension contributions for Dr Michael McDonald, and instead to make a payment, included in salary, equivalent in cost to the Company when the effect of National Insurance is taken into account. The Company also recovered previously paid contributions from the pension fund. The net credit in 2007 of £15,159 reflects contributions from 2006 that were recovered by the Company. In 2007 payments of £32,769, included in salary in the table above, were paid in lieu of pension contributions.

2 These amounts represent amounts payable to third parties for the services of Non-Executive Directors.

3 Prior to 2007 Oxford BioMedica (UK) Limited entered into a consultancy agreement with Mark Berninger in connection with the Group's licensing strategy for the LentiVector technology. This agreement came to an end in 2007. In addition to the Directors' fees above, £783 (2006: £6,329) was paid in consultancy fees.

4 Raj Uppal resigned on 13 March 2006.

Retirement benefits are accruing to six Directors (2006: six) under Oxford BioMedica (UK) Limited's money purchase pension schemes. As described above, the Company agreed to make payments in lieu of pension for one Director in 2007.

# DIRECTORS' INTERESTS

## INTEREST IN SHARES

The interests of the Directors in the shares of the Company at 31 December 2007, together with their interests at 1 January 2007, were as follows:

| | Number of ordinary shares | |
|---|---|---|
| The Company – ordinary shares of 1p each | 31 December 2007 | 1 January 2007 |
| Dr Peter Johnson | **154,000** | 154,000 |
| Professor Alan Kingsman [1] | **8,603,451** | 8,603,451 |
| Professor Susan Kingsman [1] | **4,739,139** | 8,739,139 |
| Peter Nolan | **163,638** | 163,638 |
| Nick Rodgers | **52,000** | 42,000 |
| Andrew Wood | **205,067** | 205,067 |
| Nick Woolf | **195,000** | 165,000 |

1 Includes 210,000 (1 January 2007: 210,000) ordinary shares held jointly by Professor Alan Kingsman and Professor Susan Kingsman and 100,000 ordinary shares (1 January 2007: 100,000) held by the son of Professor Alan Kingsman and Professor Susan Kingsman.

2 Mark Berninger and Dr Michael McDonald did not have any interest in the Company's shares at 1 January or 31 December 2007.

## INTERESTS IN SHARE OPTIONS –*

The interests of the Directors in options over the ordinary shares of the Company were as follows:

| | Options over ordinary shares of 1p each | | | | | | | |
| | 1 January 2007 | Granted | Exercised | Lapsed | 31 December 2007 | Exercise price | Date from which exercisable | Expiry Date |
|---|---|---|---|---|---|---|---|---|
| Dr Peter Johnson | 211,100 | - | - | - | **211,100** | 53.0p | 17.04.04 | 17.04.08 |
| | | | | | | | | |
| Prof Alan Kingsman [1] | 180,000 | - | - | - | **180,000** | 19.25p | 27.10.06 | 27.10.10 |
| Prof Alan Kingsman [1] | 190,000 | - | - | - | **190,000** | 20.5p | 12.10.07 | 12.10.11 |
| Prof Alan Kingsman [1] | 208,000 | - | - | - | **208,000** | 29.0p | 15.12.08 | 15.12.12 |
| | 578,000 | - | - | - | **578,000** | | | |
| | | | | | | | | |
| Prof Susan Kingsman [1] | 150,000 | - | - | - | **150,000** | 19.25p | 27.10.06 | 27.10.10 |
| Prof Susan Kingsman [1] | 155,000 | - | - | - | **155,000** | 20.5p | 12.10.07 | 12.10.11 |
| Prof Susan Kingsman [1] | 170,000 | - | - | - | **170,000** | 29.0p | 15.12.08 | 15.12.12 |
| | 475,000 | - | - | - | **475,000** | | | |
| | | | | | | | | |
| Dr Michael McDonald | 379,500 | - | - | - | **379,500** | 42.75p | 27.09.08 | 27.09.12 |
| Dr Michael McDonald | 759,000 | - | - | - | **759,000** | 29.0p | 15.12.08 | 15.12.12 |
| Dr Michael McDonald | 209,000 | - | - | - | **209,000** | 31.0p | 06.09.09 | 06.09.13 |
| | 1,347,500 | - | - | - | **1,347,500** | | | |
| | | | | | | | | |
| Peter Nolan | 68,497 | - | - | (68,497) | - | 60.0p | 05.04.03 | 05.04.07 |
| Peter Nolan | 65,207 | - | - | (65,207) | - | 72.0p | 27.09.03 | 27.09.07 |
| Peter Nolan [1] | 132,000 | - | (132,000) | - | - | 19.25p | 27.10.06 | 27.10.10 |
| Peter Nolan [1] | 140,000 | - | - | - | **140,000** | 20.5p | 12.10.07 | 12.10.11 |
| Peter Nolan [1] | 153,000 | - | - | - | **153,000** | 29.0p | 15.12.08 | 15.12.12 |
| | 558,704 | - | (132,000) | (133,704) | **293,000** | | | |
| | | | | | | | | |
| Andrew Wood | 59,779 | - | - | (59,779) | - | 79.0p | 22.03.03 | 22.03.07 |
| Andrew Wood | 21,482 | - | - | (21,482) | - | 72.0p | 27.09.03 | 27.09.07 |
| Andrew Wood [1] | 167,000 | - | (167,000) | - | - | 19.25p | 27.10.06 | 27.10.10 |
| Andrew Wood [1] | 175,000 | - | - | - | **175,000** | 20.5p | 12.10.07 | 12.10.11 |
| Andrew Wood [1] | 193,000 | - | - | - | **193,000** | 29.0p | 15.12.08 | 15.12.12 |
| Andrew Wood [2] | 172,531 | - | - | - | **172,531** | 29.0p | 21.03.09 | 21.03.13 |
| Andrew Wood [2] | 172,531 | - | - | - | **172,531** | 31.0p | 06.09.09 | 06.09.13 |
| | 961,323 | - | (167,000) | (81,261) | **713,062** | | | |
| | | | | | | | | |
| Nick Woolf | 801,124 | - | - | - | **801,124** | 8.75p | 16.09.05 | 16.09.09 |
| Nick Woolf | 132,000 | - | - | - | **132,000** | 19.25p | 27.10.06 | 27.10.10 |
| Nick Woolf [1] | 153,000 | - | - | - | **153,000** | 29.0p | 15.12.08 | 15.12.12 |
| | 1,086,124 | - | - | - | **1,086,124** | | | |

1 A performance-based condition applies to these options. The options are exercisable only if at the time of exercise, or for a period of at least 12 months in aggregate in the three years before exercise, the percentage increase in Oxford BioMedica plc's total shareholder return since the grant of the option exceeds the percentage increase in the FTSE techMARK mediscience index. This target was chosen because the Directors believe that the FTSE techMARK mediscience index should be a benchmark that reflects the factors bearing on the UK biotechnology sector.

2 As part of Company-wide awards of share options to employees of Oxford BioMedica (UK) Limited, a total of 345,062 options have been awarded to Sharon Wood, wife of Andrew Wood, who is a Group employee.

Exhibit 1 - 65 of 102

Page 65

## LONG-TERM INCENTIVE PLAN *

Awards have been made to Executive Directors under the LTIP as follows:

|  | 1 January 2007 | Awarded [3] | Vested | Lapsed | 31 December 2007 | Award date | Vesting date |
|---|---|---|---|---|---|---|---|
| Prof Alan Kingsman | - | 735,533 | - | - | **735,533** | 03.04.07 | 03.04.10 |
| Prof Susan Kingsman | - | 602,691 | - | - | **602,691** | 03.04.07 | 03.04.10 |
| Dr Michael McDonald | - | 722,801 | - | - | **722,801** | 03.04.07 | 03.04.10 |
| Peter Nolan | - | 547,955 | - | - | **547,955** | 03.04.07 | 03.04.10 |
| Andrew Wood | - | 694,379 | - | - | **694,379** | 03.04.07 | 03.04.10 |
| Nick Woolf | - | 560,161 | - | - | **560,161** | 03.04.07 | 03.04.10 |

1 Awards made under the LTIP are nil-cost share options.

2 The performance condition for these awards compares the Company's TSR to the TSR of a chosen group of healthcare and biotechnology companies over a three year period. A median ranking must be achieved before any part of the award vests (25% of the award) and an upper quartile ranking must be achieved for the award to vest in full.

3 The initial awards under the LTIP were calculated using a price of 45.25p per share (the closing price on the day preceding the awards).

The following gains were made in 2007 on the exercise of share options:

|  | Date of exercise | Number of shares | Market price | Exercise price | Gain on exercise | ErNI paid [1] | Net gain |
|---|---|---|---|---|---|---|---|
| Peter Nolan | 27.04.07 | 132,000 | £0.4781 | £0.1925 | £37,696 | £4,825 | £32,871 |
| Andrew Wood | 27.04.07 | 167,000 | £0.4781 | £0.1925 | £47,691 | £6,104 | £41,587 |
| **Total** |  | **299,000** |  |  | **£85,387** | **£10,929** | **£74,458** |

1 The option agreements required the optionholder to meet any Employer National Insurance (ErNI) liability arising on exercise of these options.

The market value of ordinary shares as at 31 December 2007 was 25.5p (29 December 2006: 41.75p). The market value of ordinary shares during the year ranged from 19.75p to 53.50p.

Except as detailed above, no Directors had interests in shares or share options of the Company or any other Group company at 31 December 2007. There have been no changes in the interests of the Directors in ordinary shares of the Company between 31 December 2007 and the date of this report.

# COMPARISON OF FIVE YEAR TOTAL SHAREHOLDER RETURN



The chart shows the value at the end of each year of £100 invested on 31 December 2002 in Oxford BioMedica 1p ordinary shares, taking account of the rights issue in 2003, compared to the change in the FTSE all-share index and the FTSE techMARK mediscience index over the same period. As previously reported, the Company's share price tends to follow the broad market trends shown by the benchmark indices, but with significantly greater volatility. Following the severe conditions in 2002, in which the market was particularly harsh for Oxford BioMedica, there followed three years of growth in the market. Oxford BioMedica rose dramatically from 2003 to 2006, peaking in the first quarter of 2007. Through the rest of 2007, despite the clear progress the Company was making, in a deteriorating market the price fell, ending the year at less than 50% of the peak price.

Even taking account of the sharp reversal in 2007, over this five year period the Company's share price has outperformed the FTSE all-share index by 148% and the FTSE techMARK mediscience index by 142%. The Directors consider that this volatility is not unique to Oxford BioMedica, but is a feature shared by many high-tech companies whose valuations are significantly influenced by investor sentiment and attitude to risk

In the opinion of the Directors, the FTSE all-share index should be a reasonable index against which the total shareholder return of Oxford BioMedica plc may be measured over a five-year term, because it represents a broad-based, objective measure of investment return. The FTSE techMARK mediscience index, made up of emerging healthcare companies in the early stages of growth, provides a benchmark that should better reflect the factors bearing on the UK biotechnology sector.

**Dr Peter Johnson**
Chairman of the Remuneration Committee

Exhibit 1 - 66 of 102

Page 66

Exhibit 1 - 67 of 102

Page 67

**Director's Report**
Directors' Remuneration Report



**7**

**Technology**

Secured rights to therapeutic
RNA interference patents using
LentiVector® technology

# FINANCIAL STATEMENTS

67   Independent Auditors' Report
69   Consolidated Income Statement
70   Balance Sheets
71   Cash Flow Statements
72   Statement of Changes in Shareholders' Equity
74   Notes to the Consolidated Financial Statements
98   Advisors

Financial Statements

Exhibit 1 - 68 of 102
Page 68

# Independent Auditors' Report

## to the members of Oxford BioMedica plc

We have audited the Group and Parent Company Financial Statements (the "Financial Statements") of Oxford BioMedica plc for the year ended 31 December 2007 which comprise the Consolidated Income Statement, the Balance Sheets, the Cash Flow Statement, the Statements of Changes in Shareholders' Equity and the related notes. These Financial Statements have been prepared under the accounting policies set out therein. We have also audited the information in the Directors' Remuneration Report that is described as having been audited.

## RESPECTIVE RESPONSIBILITIES OF DIRECTORS AND AUDITORS

The Directors' responsibilities for preparing the Annual Report, the Directors' Remuneration Report and the Financial Statements in accordance with applicable law and International Financial Reporting Standards (IFRSs) as adopted by the European Union are set out in the Statement of Directors' Responsibilities.

Our responsibility is to audit the Financial Statements and the part of the Directors' Remuneration Report to be audited in accordance with relevant legal and regulatory requirements and International Standards on Auditing (UK and Ireland). This report, including the opinion, has been prepared for and only for the Company's members as a body in accordance with Section 235 of the Companies Act 1985 and for no other purpose. We do not, in giving this opinion, accept or assume responsibility for any other purpose or to any other person to whom this report is shown or into whose hands it may come save where expressly agreed by our prior consent in writing.

We report to you our opinion as to whether the Financial Statements give a true and fair view and whether the Financial Statements and the part of the Directors' Remuneration Report to be audited have been properly prepared in accordance with the Companies Act 1985 and Article 4 of the IAS Regulation. We also report to you if, in our opinion, the Directors' Report is not consistent with the Financial Statements.

In addition we report to you if, in our opinion, the Company has not kept proper accounting records, if we have not received all the information and explanations we require for our audit, or if information specified by law regarding Directors' remuneration and other transactions is not disclosed.

We review whether the Corporate Governance Statement reflects the Company's compliance with the nine provisions of the Combined Code 2006 specified for our review by the Listing Rules of the Financial Services Authority, and we report if it does not. We are not required to consider whether the Board's statements on internal control cover all risks and controls, or form an opinion on the effectiveness of the Group's corporate governance procedures or its risk and control procedures.

We read other information contained in the Annual Report and consider whether it is consistent with the audited Financial Statements. The other information comprises only the Directors' Report, the unaudited part of the Directors' Remuneration Report, the Corporate Mission, the Highlights, the Company Overview, the Chairman's Statement, the Business Review, the Corporate Social Responsibility statement, the Financial Review, the Corporate Governance Statement, and the biographies of the Directors and Scientific Advisory Board. We consider the implications for our report if we become aware of any apparent misstatements or material inconsistencies with the Financial Statements. Our responsibilities do not extend to any other information.

## BASIS OF AUDIT OPINION

We conducted our audit in accordance with International Standards on Auditing (UK and Ireland) issued by the Auditing Practices Board. An audit includes examination, on a test basis, of evidence relevant to the amounts and disclosures in the Financial Statements and the part of the Directors' Remuneration Report to be audited. It also includes an assessment of the significant estimates and judgments made by the Directors in the preparation of the Financial Statements, and of whether the accounting policies are appropriate to the Group's and Company's circumstances, consistently applied and adequately disclosed.

We planned and performed our audit so as to obtain all the information and explanations which we considered necessary in order to provide us with sufficient evidence to give reasonable assurance that the Financial Statements and the part of the Directors' Remuneration Report to be audited are free from material misstatement, whether caused by fraud or other irregularity or error. In forming our opinion we also evaluated the overall adequacy of the presentation of information in the Financial Statements and the part of the Directors' Remuneration Report to be audited.

# OPINION

In our opinion:

- the Group Financial Statements give a true and fair view, in accordance with IFRSs as adopted by the European Union, of the state of the Group's affairs as at 31 December 2007 and of its loss and cash flows for the year then ended; and

- the Parent Company Financial Statements give a true and fair view, in accordance with IFRSs as adopted by the European Union as applied in accordance with the provisions of the Companies Act 1985, of the state of the Parent Company's affairs as at 31 December 2007 and of the cash flows for the year then ended; and

- the Financial Statements and the part of the Directors' Remuneration Report to be audited have been properly prepared in accordance with the Companies Act 1985 and, as regards the Group Financial Statements, Article 4 of the IAS Regulation; and

- the information given in the Directors' Report is consistent with the Financial Statements.


PricewaterhouseCoopers LLP
Chartered Accountants and Registered Auditors
Reading
10 March 2008

Exhibit 1 - 70 of 102

Page 70

# Consolidated Income Statement

for the year ended 31 December 2007

| | Notes | 2007 £'000 | 2006 £'000 |
|---|---|---|---|
| Revenue | 3 | **7,219** | 760 |
| Cost of sales | | **(449)** | - |
| Research and development costs | | **(22,142)** | (19,523) |
| Administrative expenses | | **(4,617)** | (2,699) |
| | | | |
| Administrative expenses comprise: | | | |
| Administrative expenses before exceptionals | | **(4,282)** | (2,699) |
| Exceptional administrative expenses | 5 | **(335)** | - |
| Total administrative expenses | | **(4,617)** | (2,699) |
| | | | |
| Other operating income: grants receivable | | **161** | 360 |
| **Operating loss** | | **(19,828)** | (21,102) |
| | | | |
| Finance costs | 6 | **(30)** | (29) |
| Finance income | 6 | **2,117** | 1,743 |
| | | | |
| **Loss before tax** | 3 | **(17,741)** | (19,388) |
| Taxation | 8 | **2,452** | 1,762 |
| **Loss for the financial year** | 25 | **(15,289)** | (17,626) |
| Basic loss and diluted loss per ordinary share | 9 | **(2.9p)** | (3.5p) |

The results for the years above are derived entirely from continuing operations.

There is no difference between the loss before tax and the loss for the years stated above, and their historical cost equivalents.

Exhibit 1 - 71 of 102

Page 71

Financial Statements
Consolidated Income Statement

Oxford BioMedica Annual Report & Accounts 2007 **69**

# Balance Sheets

as at 31 December 2007

| | | Group | | Company | |
|---|---|---|---|---|---|
| | Notes | 2007 £'000 | 2006 £'000 | 2007 £'000 | 2006 £'000 |
| **Assets** | | | | | |
| **Non-current assets** | | | | | |
| Intangible assets | 11 | 14,910 | 1,665 | - | - |
| Property, plant and equipment | 12 | 810 | 819 | - | - |
| Financial assets: Investments in subsidiaries | 13 | - | - | 119,451 | 102,469 |
| | | 15,720 | 2,484 | 119,451 | 102,469 |
| **Current assets** | | | | | |
| Trade and other receivables | 14 | 4,672 | 2,202 | 2 | 50 |
| Current tax assets | | 2,623 | 2,309 | - | - |
| Financial assets: Available for sale investments | 15 | 27,185 | 20,500 | - | - |
| Cash and cash equivalents | 15 | 10,962 | 8,043 | - | - |
| | | 45,442 | 33,054 | 2 | 50 |
| **Current liabilities** | | | | | |
| Trade and other payables | 16 | 9,557 | 4,671 | 61 | 62 |
| Deferred income | 17 | 11,530 | 92 | - | - |
| Current tax liabilities | | 14 | - | - | - |
| Provisions | 18 | 60 | 58 | - | - |
| | | 21,161 | 4,821 | 61 | 62 |
| **Net current assets/(liabilities)** | | 24,281 | 28,233 | (59) | (12) |
| **Non-current liabilities** | | | | | |
| Other non-current liabilities | | 96 | - | - | - |
| Deferred income | 17 | 7,383 | - | - | - |
| Provisions | 18 | 590 | 627 | - | - |
| | | 8,069 | 627 | - | - |
| **Net assets** | | 31,932 | 30,090 | 119,392 | 102,457 |
| | | | | | |
| **Shareholders' equity** | | | | | |
| Ordinary shares | 21 | 5,347 | 5,014 | 5,347 | 5,014 |
| Share premium | 24 | 109,101 | 106,732 | 109,101 | 106,732 |
| Merger reserve | 26 | 14,310 | 711 | 13,599 | - |
| Other reserves | 26 | (625) | (627) | 1,685 | 857 |
| Losses | 25 | (96,201) | (81,740) | (10,340) | (10,146) |
| **Total equity** | | 31,932 | 30,090 | 119,392 | 102,457 |

The financial statements on pages 69 to 97 were approved by the Board of Directors on 7 March 2008 and were signed on its behalf by:

**Professor A J Kingsman**
Chief Executive Officer

Exhibit 1 - 72 of 102
Page 72

# Cash Flow Statements

for the year ended 31 December 2007

| | Notes | Group 2007 £'000 | Group 2006 £'000 | Company 2007 £'000 | Company 2006 £'000 |
|---|---|---|---|---|---|
| **Cash flows from operating activities** | | | | | |
| Cash generated by/(used in) operations | 27 | **2,307** | (17,726) | **(191)** | (147) |
| Interest received | | **1,567** | 1,440 | - | - |
| Tax credit received | | **2,480** | 650 | - | - |
| Overseas tax paid | | **(57)** | (25) | - | - |
| Net cash from operating activities | | **6,297** | (15,661) | **(191)** | (147) |
| | | | | | |
| **Cash flows from investing activities** | | | | | |
| Loan from/(to) subsidiary | | **-** | - | **228** | (483) |
| Proceeds from sale of property, plant and equipment | | **7** | 1 | - | - |
| Purchases of property, plant and equipment | | **(259)** | (192) | - | - |
| Purchases of intangible assets | | **(162)** | (24) | - | - |
| Net (purchase)/maturity of available for sale investments | | **(6,685)** | 3,000 | - | - |
| Cash and cash equivalents acquired with subsidiary | 31 | **3,759** | - | - | - |
| Acquisition costs | 31 | **(382)** | - | **(382)** | - |
| Net cash (used in)/generated by investing activities | | **(3,722)** | 2,785 | **(154)** | (483) |
| | | | | | |
| **Cash flows from financing activities** | | | | | |
| Net proceeds from issue of ordinary share capital | | **345** | 629 | **345** | 629 |
| | | | | | |
| Effects of exchange rate changes | | **(1)** | (27) | **-** | - |
| | | | | | |
| **Net increase/(decrease) in cash and cash equivalents** | | **2,919** | (12,274) | **-** | (1) |
| Cash and cash equivalents at 1 January | | **8,043** | 20,317 | **-** | 1 |
| **Cash and cash equivalents at 31 December** | 15 | **10,962** | 8,043 | **-** | - |

# Statement of Changes in Shareholders' Equity

for the year ended 31 December 2007

| Group | Notes | Share capital £'000 | Share premium £'000 | Merger reserve £'000 | Translation reserve £'000 | Losses £'000 | Total £'000 |
|---|---|---|---|---|---|---|---|
| At 1 January 2006 | | 4,984 | 106,097 | 711 | (627) | (64,565) | 46,600 |
| Loss for the year | | - | - | - | - | (17,626) | (17,626) |
| Total recognised expense for the year | | - | - | - | - | (17,626) | (17,626) |
| Share options: | | | | | | | |
| Proceeds from shares issued | 21, 24 | 25 | 441 | - | - | - | 466 |
| Value of employee services | 23 | - | - | - | - | 451 | 451 |
| Issue of shares excl. options | 21, 24 | 5 | 155 | - | - | - | 160 |
| Costs of share issues | 24 | - | (9) | - | - | - | (9) |
| Refund of VAT in respect of share issue expenses | 24 | - | 48 | - | - | - | 48 |
| At 31 December 2006 | | 5,014 | 106,732 | 711 | (627) | (81,740) | 30,090 |
| Exchange adjustments | | - | - | - | 2 | - | 2 |
| Loss for the year | | - | - | - | - | (15,289) | (15,289) |
| Total recognised expense for the year | | - | - | - | 2 | (15,289) | (15,287) |
| Shares issued in acquisition | | 318 | 2,083 | 13,599 | - | - | 16,000 |
| Share options: | | | | | | | |
| Proceeds from shares issued | 21, 24 | 13 | 199 | - | - | - | 212 |
| Value of employee services | 23 | - | - | - | - | 828 | 828 |
| Issue of shares excl. options | 21, 24 | 2 | 97 | - | - | - | 99 |
| Costs of share issues | 24 | - | (10) | - | - | - | (10) |
| At 31 December 2007 | | 5,347 | 109,101 | 14,310 | (625) | (96,201) | 31,932 |

| Company | Notes | Share capital £'000 | Share premium £'000 | Merger reserve £'000 | Other reserve £'000 | Losses £'000 | Total £'000 |
|---|---|---|---|---|---|---|---|
| At 1 January 2006 | | 4,984 | 106,097 | - | 406 | (9,983) | 101,504 |
| Loss for the year | | - | - | - | - | (163) | (163) |
| Total recognised expense for the year | | - | - | - | - | (163) | (163) |
| Share options: | | | | | | | |
| Proceeds from shares issued | 21, 24 | 25 | 441 | - | | - | 466 |
| Credit in relation to employee share schemes | 26 | - | - | - | 451 | - | 451 |
| Issue of shares excl. options | 21, 24 | 5 | 155 | - | - | - | 160 |
| Costs of share issues | 24 | - | (9) | - | - | - | (9) |
| Refund of VAT in respect of share issue expenses | 24 | - | 48 | - | - | - | 48 |
| At 31 December 2006 | | 5,014 | 106,732 | - | 857 | (10,146) | 102,457 |
| Loss for the year | | - | - | - | - | (194) | (194) |
| Total recognised expense for the year | | - | - | - | - | (194) | (194) |
| Shares issued in acquisition | | 318 | 2,083 | 13,599 | - | - | 16,000 |
| Share options: | | | | | | | |
| Proceeds from shares issued | 21, 24 | 13 | 199 | - | - | - | 212 |
| Credit in relation to employee share schemes | 26 | - | - | - | 828 | - | 828 |
| Issue of shares excl. options | 21, 24 | 2 | 97 | - | - | - | 99 |
| Costs of share issues | 24 | - | (10) | - | - | - | (10) |
| At 31 December 2007 | | 5,347 | 109,101 | 13,599 | 1,685 | (10,340) | 119,392 |

Exhibit 1 - 75 of 102

Page 75

Financial Statements
Statement of Changes in Shareholder's Equity

Oxford BioMedica Annual Report & Accounts 2007 **73**

# Notes to the Consolidated Financial Statements

for the year ended 31 December 2007

## 1   ACCOUNTING POLICIES

The principal accounting policies adopted in the preparation of these financial statements are set out below. These policies have been consistently applied to all the financial years presented, unless otherwise stated.

### BASIS OF PREPARATION

The financial statements have been prepared in accordance with International Financial Reporting Standards ('IFRS') as adopted by the European Union and International Financial Reporting Interpretations Committee ('IFRIC') interpretations endorsed by the European Union and with those parts of the Companies Act 1985 applicable to companies reporting under IFRS. The financial statements are prepared in accordance with the historical cost convention as modified by revaluation of available for sale investments.

*a) Standards, amendments and interpretations effective in 2007*

- IFRS 7, 'Financial instruments: Disclosures', and the complementary amendment to IAS 1,'Presentation of financial statements – Capital disclosures', introduces new disclosures relating to financial instruments and does not have any impact on the classification and valuation of the Group's financial instruments, or the disclosures relating to taxation and trade and other payables.

- IFRIC 8, 'Scope of IFRS 2', requires consideration of transactions involving the issuance of equity instruments, where the identifiable consideration received is less than the fair value of the equity instruments issued in order to establish whether or not they fall within the scope of IFRS 2. This standard does not have any impact on the Group's or the Company's financial statements.

- IFRIC 10, 'Interim financial reporting and impairment', prohibits the impairment losses recognised in an interim period on goodwill and investments in equity instruments and in financial assets carried at cost to be reversed at a subsequent balance sheet date. This standard does not have any impact on the Group's or the Company's financial statements.

- IFRIC 11, 'IFRS 2 – Group and treasury share transactions', was adopted early in 2007. IFRIC 11 provides guidance on whether share-based transactions involving treasury shares or involving group entities (for example, options over a parent's shares) should be accounted for as equity settled or cash-settled share-based payment transactions in the stand-alone accounts of the parent and group companies. This interpretation does not have an impact on the Group's or the Company's financial statements.

*(b) Standards, amendments and interpretations effective in 2007 but not relevant*

The following standards, amendments and interpretations to published standards are mandatory for accounting periods beginning on or after 1 January 2007 but they are not relevant to the Group's operations:

- IFRS 4, 'Insurance contracts';

- IFRIC 7, 'Applying the restatement approach under IAS 29, Financial reporting in hyperinflationary economies'; and

- IFRIC 9, 'Re-assessment of embedded derivatives'.

*(c) Standards, amendments and interpretations to existing standards that are not yet effective and have not been adopted early by the Group*

The following standards, amendments and interpretations to existing standards have been published and are mandatory for the Group's accounting periods beginning on or after 1 January 2008 or later periods, but the Group has not adopted them early:

- IAS 23 (Amendment), 'Borrowing costs' (effective from 1 January 2009). The amendment to the standard is still subject to endorsement by the European Union. It requires an entity to capitalise borrowing costs directly attributable to the acquisition, construction or production of a qualifying asset (one that takes a substantial period of time to get ready for use or sale) as part of the cost of that asset. The option of immediately expensing those borrowing costs will be removed. The Group will apply IAS 23 (Amended) from 1 January 2009 but it is currently not applicable as there are no qualifying assets.

- IFRS 8, 'Operating segments' (effective from 1 January 2009). IFRS 8 replaces IAS 14 and aligns segment reporting with the requirements of the US standard SFAS 131, 'Disclosures about segments of an enterprise and related information'. The new standard requires a 'management approach', under which segment information is presented on the same basis as that used for internal reporting purposes. The Group will apply IFRS 8 from 1 January 2009. The expected impact is still being assessed in detail by management, but it is possible that the number

Exhibit 1 - 76 of 102

Page 76

of reportable segments, as well as the manner in which the segments are reported, will change in a manner that is consistent with the internal reporting provided to the Board.

- IFRIC 14, 'IAS 19 – The limit on a defined benefit asset, minimum funding requirements and their interaction' (effective from 1 January 2008). The Group will apply IFRIC 14 from 1 January 2008, but it is not expected to have any impact on the Group's accounts.

- IFRS 3 (Revised) – 'Business combinations'. The IASB published a revised IFRS 3, 'Business combinations', on 10 January 2008. The standard continues to apply the acquisition method to business combinations, with some significant changes. The standard is applicable to business combinations occurring in accounting periods beginning on or after 1 July 2009, with earlier application permitted.

- IAS27 (Revised) – 'Consolidated and Separate Financial Statements'. The Standard addresses the accounting for subsidiaries in consolidated financial statements and in accounting for investments in the separate financial statements of a parent, venturer or investor. The amended Standard must be applied for annual periods beginning on or after 1 July 2009. Earlier application is permitted. However, an entity must not apply the amendments for annual periods beginning before 1 July 2009 unless it also applies IFRS 3 (as revised in 2008).

*(d) Interpretations to existing standards that are not yet effective and not relevant for the Group's operations*

The following interpretations to existing standards have been published and are mandatory for the Group's accounting periods beginning on or after 1 January 2008 or later periods but are not relevant for the Group's operations:

- IFRIC 12, 'Service concession arrangements' (effective from 1 January 2008).

- IFRIC 13, 'Customer loyalty programmes' (effective from 1 July 2008).

## USE OF ESTIMATES AND ASSUMPTIONS

The preparation of financial statements in conformity with IFRS requires the use of certain critical accounting estimates and assumptions that affect the reported amounts of assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Estimates and judgements are continually made and are based on historic experience and other factors, including expectations of future events that are believed to be reasonable in the circumstances.

*Critical accounting estimates and assumptions*
Where the Group makes estimates and assumptions concerning the future, the resulting accounting estimates will seldom exactly match actual results. Due to the amounts involved, the estimates and assumptions regarding revenue recognition and the amounts accrued for clinical trial costs have a greater risk of causing a material adjustment to the carrying amounts of assets and liabilities.

Revenue from payments in 2007 by sanofi-aventis under the TroVax collaboration is being recognised on a straight-line basis over the estimated period to specific milestone events in 2009 and 2010, based on management's estimates of the timing of these events. Should the timing of these events differ from management's estimates, there could be a material effect on the income statement and on the amount of deferred revenue in the balance sheet. If the revenue recognition period was extended by six months with all other variables held constant the amount of revenue recognised in 2007 would be reduced by £1,252,000 and the amount of deferred income increased by the same amount (2006: no change).

For clinical trial costs the Group uses a percentage-of-completion method to accrue for such costs. This method requires the Group to estimate the services performed by contractors to date as a proportion of total services to be performed. If the accruals calculated using this method were over/under estimated by 5% with all other variables held constant there would have been an increase/decrease in post-tax loss of £165,000 (2006: £88,000).

## BASIS OF CONSOLIDATION

The consolidated income statement and Group balance sheet include the accounts of the Company and its subsidiary undertakings made up to 31 December. Subsidiaries are consolidated from the date at which control is transferred to the Group.

Subsidiaries are entities that are directly or indirectly controlled by the Group. Control exists where the Group has the power to govern the financial and operating policies of the entity so as to obtain benefits from its activities. In assessing control, potential voting rights that are currently exercisable or convertible are taken into account.

The purchase method of accounting is used to account for the acquisition of subsidiaries by the Group. The cost of an acquisition is measured as the fair value of the assets given, equity instruments issued and liabilities incurred or assumed at the date of exchange, plus costs directly attributable to the acquisition. Identifiable assets acquired and liabilities and contingent liabilities assumed in a business combination are measured initially at their fair values at the acquisition date, irrespective of the extent of any minority interest. The excess of the cost of the acquisition over the fair value of the Group's share of the identifiable net assets acquired is recorded as goodwill. If the cost of acquisition is less than the fair value of the net assets of the subsidiary acquired, the difference is recognised directly in the income statement. Where necessary, adjustments are made to the financial statements of subsidiaries to bring accounting policies used into line with those of the Group.

Inter-company transactions, balances and unrealised gains on transactions between group companies are eliminated. Unrealised losses are also eliminated but considered an impairment indicator of the asset transferred. Accounting policies of subsidiaries have been changed where necessary to ensure consistency with the policies adopted by the Group.

The Group and Company have elected not to apply IFRS 3 'Business combinations' retrospectively to business combinations which took place prior to 1 January 2004, namely the acquisition in 1996 of 100% of the issued share capital of Oxford BioMedica (UK) Limited that has been accounted for by the merger accounting method.

## JOINT VENTURES

Unless the amounts are not material, entities that are jointly controlled are consolidated using the proportionate consolidation method on a line by line basis which combine's the Group's assets, liabilities, income and expenses with the Group's share of assets, liabilities, income and expenses of the joint venture in which the Group has an interest.

## REVENUE

The Group generates revenue as a result of product and technology licence transactions. Product licence transactions typically have an initial upfront non-refundable payment on execution of the licence, and the potential for further payments conditional on achieving specific milestones, plus royalties on product sales. Technology licence transactions typically have an initial upfront non-refundable payment on execution of the licence and the potential for further annual maintenance payments for the term specified in the licence. Where the initial fee paid is non-refundable and there are no ongoing commitments from the Group and the licence has no fixed end date, the Group recognises the element received up front as a payment in consideration of the granting of the licence on execution of the contract. Amounts receivable in respect of milestone payments are recognised as revenue when the specific conditions stipulated in the licence agreement have been met. Maintenance fees within the contracts are spread over the period to which they relate, usually a year. Otherwise, amounts receivable are recognised in the period in which related costs are incurred, or over the estimated period to completion of the relevant phase of development. Amounts recognised exclude value added tax. Differences between cash received and amounts recognised are included as deferred revenue where cash received exceeds revenue recognised and as accrued revenue where revenue has yet to be billed to the customer.

## COST OF SALES

The Group's products and technologies include technology elements that are licensed from third parties. Cost of sales is the royalty arising on such third party licenses. Where royalty due on revenue has not been paid it is included in accruals. Where revenue is spread over a number of accounting periods, the royalty attributable to the deferred revenue is included in prepayments.

## SEGMENTAL REPORTING

The Group has one single business segment based upon its proprietary technology, operated out of two geographical locations – Oxford (UK), which is the principal operating site, generating all the revenue, and San Diego (USA), which provides intellectual property management and business development services to the UK subsidiary. In prior years the Group also carried out laboratory-based research and development in San Diego. On termination of laboratory-based activities in San Diego the US subsidiary relocated to smaller premises. The redundant laboratory premises were sub-let to offset rental costs.

## CLINICAL TRIAL EXPENSES

Where advances are made to clinical trial sites, or stocks of materials for use of clinical trials are purchased and stored, the relevant costs are included in trade and other receivables as prepaid clinical trial expenses. Expenses are charged to the income statement as clinical trial services are carried out, or clinical trial materials are used.

## EXCEPTIONAL ITEMS

Exceptional items represent significant items of income and expense which due to their nature or the expected infrequency of the events giving rise to them, are presented separately on the face of the income statement to give a better understanding to shareholders of the elements of financial performance in the period, so as to facilitate comparison with prior periods and to better assess trends in financial performance. Exceptional items include non-recurring reorganisation costs.

## FINANCIAL INSTRUMENTS

The Group and Company's financial instruments comprise investments in subsidiaries and joint ventures, cash and cash equivalents, together with available for sale investments, debtors and creditors arising directly from operations and the onerous lease provision. Cash and cash equivalents comprise cash in hand and short term deposits which have an original maturity of three months or less and are readily convertible into known amounts of cash. Available-for-sale financial assets are non-derivatives that are either designated in this category or not classified in any of the other categories. They are included as non-current assets unless management intends to dispose of the investments within 12 months of the balance sheet date. Bank deposits with maturity of more than three months at the date of inception are included in the classification 'financial assets: available for sale investments', and are carried at their historic purchase price unless there is objective evidence of impairment, in which case they are written down to fair value. Such assets are classified as current where management intend to dispose of the asset within twelve months of the balance sheet date. Financial instruments are valued at fair value, subject to review for impairment at the balance sheet date. Charges or credits for impairment are passed through the income statement.

Other than short term currency options, the Group does not enter into derivative transactions, and it is the Group's policy not to undertake any trading in financial instruments. The Group does not have any committed borrowing facilities, as its cash, cash equivalents and available for sale investments are sufficient to finance its current operations. Cash balances are mainly held on short and medium term deposits with quality financial institutions with a credit rating of at least A, in line with the Group's policy to minimise the risk of loss. The main risks associated

Exhibit 1 - 78 of 102

Page 78

with the Group's financial instruments relate to interest rate risk and foreign currency risk. The Group's policy in relation to interest rate risk is to monitor short and medium term interest rates and to place cash on deposit for periods that optimise the amount of interest earned while maintaining access to sufficient funds to meet day to day cash requirements. In relation to foreign currency risk, the Group's policy is to hold the majority of its funds in Sterling, and to use short term currency options and interest-bearing foreign currency deposits to manage short term fluctuations in exchange rates. No other hedging of foreign currency cash outflows is undertaken.

## LEASES

Assets acquired under leases are reviewed to see if they are finance leases or operating leases, based on the following assumptions:

• If the leases transfer ownership of the assets at the end of the lease
• If they have a bargain purchase option
• If the lease term is for the major part of the economic life of the asset
• If the leased assets are specialised for the lease only

No leases have been classified as finance leases. Costs in respect of operating leases are charged on a straight line basis over the lease term.

## PROPERTY PLANT AND EQUIPMENT

Property, plant and equipment are carried at their historical purchase cost, together with any incidental expenses of acquisition less depreciation.

Depreciation is calculated so as to write off the cost of property, plant and equipment less their estimated residual values on a straight line basis over the expected useful economic lives of the assets concerned. The principal annual rates used for this purpose are:

|  | % |
|---|---|
| Short leasehold improvements | 20 or the remaining lease term if shorter |
| Computer equipment | 33 |
| Office and laboratory equipment, fixtures and fittings | 20 |

The assets' residual values and useful lives are reviewed, and adjusted if appropriate, at each balance sheet date.

## INTANGIBLE ASSETS

Intangible fixed assets, relating to intellectual property rights acquired through licensing or assigning patents and know-how are carried at historic cost, less accumulated amortisation, where the useful economic life of the asset is finite and the asset will probably generate economic benefits exceeding costs. Where a finite useful life of the acquired intangible asset cannot be determined, the asset is tested annually for impairment. Amortisation would commence when products underpinned by the intellectual property rights became available for commercial use. Amortisation would be calculated on a straight line basis over the shorter of the remaining useful life of the intellectual property or the estimated sales life of the products. No amortisation has been charged to date, as the products underpinned by the intellectual property rights are not yet available for commercial use.

Expenditure on product development is capitalised as an intangible asset and amortised over the expected useful economic life of the product concerned. Capitalisation commences from the point at which technical feasibility and commercial viability of the product can be demonstrated and the Group is satisfied that it is probable that future economic benefits will result from the product once completed. Capitalisation ceases when the product receives regulatory approval for launch. No such costs have been capitalised to date.

Expenditure on research and development activities that do not meet the above criteria, including ongoing costs associated with acquired intellectual property rights and intellectual property rights generated internally by the Group, is charged to the income statement as incurred. Intellectual property and in-process research and development from acquisitions are recognised as intangible assets at fair value. Any residual excess of consideration over the fair value of net assets in an acquisition is recognised as goodwill in the financial statements.

## IMPAIRMENT OF NON-FINANCIAL ASSETS

The carrying value of non-financial assets is reviewed annually for impairment and provision made where appropriate. Charges or credits for impairment are passed through the income statement.

## FINANCIAL ASSETS: INVESTMENTS

Financial assets: investments of the Group are carried at cost less any provision made for impairment.

## TRADE RECEIVABLES

Trade receivables are recognised initially at fair value and subsequently measured at amortised cost using the effective interest method, less provision for impairment. A provision for impairment of trade receivables is established when there is objective evidence that the Group will not be able to collect all amounts due according to the original terms of the receivables.

## CASH AND CASH EQUIVALENTS

Cash and cash equivalents include cash in hand, deposits held on call with banks, and other short term highly liquid investments with original maturities of three months or less. Bank deposits with original maturities between three months and twelve months are included in current assets and are classified as available for sale financial assets.

## PROVISIONS

Provisions are measured at the present value of the expenditure expected to be required to settle the obligation using a pre-tax rate that reflects current market assessments of the time value of money and the risks specific to the obligations. The increase in the provision due to the passage of time is recognised as interest expense.

When leasehold properties become redundant or excess space arises in those properties, the Group provides for all costs to the end of the lease or the anticipated date of surrender of the lease, net of anticipated income. Onerous lease provisions are discounted using the UK government zero-coupon bond yield applicable to the term of the cashflows.

The Group recognises dilapidations provisions when: property leases have a legal or constructive obligation to reinstate any alterations or to make good dilapidations at the end of the lease; it is probable that an outflow of resources will be required to settle the obligation; and the amount has been reliably estimated. Dilapidations provisions are discounted using the UK government zero-coupon bond yield applicable to the remaining term of the relevant leases.

## SHARE CAPITAL

Ordinary shares are classified as equity. Mandatorily redeemable preference shares would be classified as liabilities. Incremental costs directly attributable to the issue of new shares or options are shown in equity as a deduction, net of tax, from the proceeds.

## GOVERNMENT AND OTHER GRANTS

Income from Government and other grants is recognised over the period necessary to match them with the related costs which they are intended to compensate, on a systematic basis. This grant income is included as other operating income within the income statement, and the related costs are included within research and development costs and administrative expenses. Where the purchase of property, plant and equipment is supported by a grant, the relevant asset is included in the balance sheet at its full purchase price, and grant income is recognised over the useful life of the asset. The difference between grant income receivable and income recognised is included in accruals.

## RENTAL INCOME

Rental income from the Group's redundant former research and development facility in San Diego, USA is offset in the income statement against the rent payable under the head lease.

## EMPLOYEE BENEFIT COSTS

The Group operates defined contribution pension schemes for its Directors and employees. The assets of the schemes are held in independently administered funds. The pension cost charge recognised in the period represents amounts payable by the Group to the funds.

## SHARE BASED PAYMENT

Equity settled share based payments are measured at fair value at the date of grant and expensed on a straight-line basis over the vesting period of the award. At each balance sheet date, the Group revises its estimate of the number of options that are expected to become exercisable. The financial consequences of revisions to the original estimates, if any, are recognised in the income statement, with a corresponding adjustment to equity.

The fair value of share options is measured using a Black-Scholes option pricing model. Where complex market performance criteria exist, a Monte Carlo model has been used to establish the fair value on grant. When share options are exercised the proceeds received are credited to share capital (nominal value) and share premium.

## OTHER EMPLOYEE BENEFITS

The expected cost of compensated short term absence (e.g. holidays) is recognised when employees render services that increase their entitlement. Accrual is made for holidays earned but not taken, and prepayments recognised for holidays taken in excess of days earned.

## FOREIGN CURRENCY TRANSLATION

Items included in the financial statements of each of the Group's entities are measured using the currency of the primary economic environment in which the entity operates (the 'functional currency'). The consolidated financial statements are presented in Sterling, which is the Company's functional and presentational currency

Monetary assets and liabilities in foreign currencies are translated into the functional currency at the rates of exchange ruling at the end of the financial year. Transactions in foreign currencies are translated into the functional currency at the rates of exchange ruling at the date of the transaction. Foreign exchange differences are taken to the income statement in the year in which they arise.

Assets and liabilities of the Company's US subsidiary are translated to Sterling at the year-end exchange rate, whilst its statements of income and cash flows are translated at monthly average rates. Redundant assets at the US subsidiary's former laboratories have been written down to a book value of zero and have no impact on present or future exchange differences. Translation differences that arise are taken directly to a currency translation account within equity.

Exhibit 1 - 80 of 102

Page 80

## TAXATION INCLUDING DEFERRED TAX

The charge for current tax is based on the results for the year, adjusted for items which are non-assessable or disallowed. It is calculated using tax rates that have been enacted or substantially enacted at the balance sheet date.

Deferred tax is accounted for using the liability method in respect of temporary differences arising from differences between the carrying amount of assets and liabilities in the financial statements and the corresponding tax bases used in the computation of taxable profit. In principle, deferred tax liabilities are recognised for all taxable temporary differences and deferred tax assets are recognised to the extent that it is probable that taxable profits will be available against which deductible temporary differences can be utilised.

Deferred tax liabilities are recognised for taxable temporary differences arising on investments in subsidiaries and associates, and interests in joint ventures, except where the Group and Company are able to control the reversal of the temporary difference and it is probable that the temporary difference will not reverse in the foreseeable future.

Deferred tax is calculated at the average tax rates that are expected to apply to the period when the asset is realised or the liability is settled. Deferred tax is charged or credited in the income statement, except when it relates to items credited or charged directly to equity, in which case the deferred tax is also dealt with in equity.

# 2   FINANCIAL RISK MANAGEMENT

## FINANCIAL RISK FACTORS

The Group's relatively simple structure, principally operating in the United Kingdom, and the lack of debt financing reduces the range of financial risks to which it is exposed. Monitoring of financial risk is part of the Board's ongoing risk management, the effectiveness of which is reviewed annually. The Group's agreed policies are implemented by the Chief Financial Officer, who submits reports at each Board meeting. Other than short term currency options, the Group does not use financial derivatives, and it is the Group's policy not to undertake any trading in financial instruments.

### (a) Foreign exchange risk

The Group's revenues are receivable in Euros and United States Dollars, and certain of its expenditures are payable in Euros and United States Dollars. The majority of operating costs is denominated in Sterling. For the foreseeable future, the bulk of the Group's revenue will come from the collaboration with sanofi-aventis, denominated in Euros, which presents a possible source of foreign exchange risk in respect of future revenue. The majority of the revenue received from sanofi-aventis in 2007 was converted to Sterling on receipt and no longer represents a foreign exchange risk; the remaining Euros were placed on deposit and used to hedge short-term Euro denominated liabilities. The Group uses short term currency purchase options and interest-bearing deposits of United States Dollars and Euros to manage short term fluctuations in exchange rates.

Had the Euro been 5% stronger/weaker when the payments from sanofi-aventis were converted to Sterling, with all other variables held constant, revenue for 2007 would have been £348,000 higher/lower and the post tax loss £348,000 lower/higher (2006: no change). Deferred revenue at 31 December 2007 would have been £941,000 higher/lower (2006: no change).

At 31 December 2007, if the Euro had weakened/strengthened by 5% against Sterling with all other variables held constant, the post-tax loss for the year would have been £127,000 (2006: £47,000) lower/higher , mainly as a result of net foreign exchange gains/losses on translation of Euro-denominated payables. The sensitivity to Euro-Sterling exchange rate changes is greater in 2007 due to the higher level of net Euro-denominated liabilities in 2007. Sensitivity to the Dollar-Sterling exchange rate is somewhat lower. The impact on post-tax loss and equity at 31 December 2007 of a 5% weakening/strengthening of the US Dollar against Sterling with all other variables held constant would have been a decrease/increase in post-tax loss of £33,000 (2006: increase/decrease of £4,000) and an increase/decrease in equity of £41,000 (2006: decrease/increase £1,000).

### (b) Interest rate risk

The Group does not have any committed borrowing facilities, as its cash balances are sufficient to finance its current operations. Consequently, there is no material exposure to interest rate risk.

If interest rates had been 10 basis points higher/lower the impact on net loss in 2007 would have been a decrease/increase of £38,000 (2006: £38,000) due to changes in the amount of interest receivable.

### (c) Credit risks

The Group's policy is to place funds with financial institutions rated at least A. During 2007 the Group placed funds on deposit with two banks. One bank, however, dealt with 93% of all invested funds during the year (2006: 92%), and held all the invested funds at the year end (2006: 91%). The Group does not allocate a quota to individual institutions but seeks to diversify its investments, where this is consistent with achieving competitive rates of return.

### (d) Cash flow and liquidity risk

At the present time the collaboration with sanofi-aventis provides funding from milestone-based payments, which are significant in size but infrequent. Funds are generally placed on deposit, and day to day spending commitments are met out of invested funds. The maturity profile of investments is structured to ensure that sufficient liquid funds are available to meet operating requirements. The Directors do not consider that there is presently a material cash flow or liquidity risk.

### (e) Pricing risk

Currently revenue derives from collaboration milestones, which are not sensitive to pricing risk.

Exhibit 1 - 81 of 102

Page 81

**DERIVATIVE FINANCIAL INSTRUMENTS AND HEDGING**

There were no derivatives at 31 December 2007 or 31 December 2006, and hedge accounting has not been used.

**FAIR VALUE ESTIMATES**

The fair value of short term deposits with a maturity of one year or less is assumed to be the book value.

# 3    SEGMENTAL ANALYSIS

The Group's primary segment reporting is by geographical location of assets, with business sector as the secondary format. Revenue and loss on ordinary activities before taxation are derived entirely from the Group's one business segment, biotechnology research and development. All costs of acquisition of property, plant and equipment and intangible assets as well as depreciation expense borne by the Group relate to this one segment In addition, all other non-cash expenses incurred by the Group relate to this one segment. The two geographic locations comprise the Group's UK and US operations. The majority of the Group's activities take place in the United Kingdom, with the United States subsidiary providing intellectual property management and business development support to the United Kingdom operation. Purchases and sales between subsidiaries are eliminated on consolidation.

The segment results for the years ended 31 December 2007 and 31 December 2006 are as follows:

| | 2007 | | | 2006 | | |
| | United Kingdom £'000 | United States of America £'000 | Total £'000 | United Kingdom £'000 | United States of America £'000 | Total £'000 |
| Primary reporting format – geographic | | | | | | |
|---|---|---|---|---|---|---|
| **Revenue** | **7,219** | **-** | **7,219** | 760 | - | 760 |
| Segmental operating loss | **(19,258)** | **(570)** | **(19,828)** | (20,609) | (493) | (21,102) |
| Finance cost | | | **(30)** | | | (29) |
| Finance income | | | **2,117** | | | 1,743 |
| **Loss before tax** | | | **(17,741)** | | | (19,388) |
| Taxation credit | | | **2,452** | | | 1,762 |
| **Loss for the financial year** | | | **(15,289)** | | | (17,626) |

Other segmental items included in the income statement are:

| | 2007 | | | 2006 | | |
| | United Kingdom £'000 | United States of America £'000 | Total £'000 | United Kingdom £'000 | United States of America £'000 | Total £'000 |
| Primary reporting format – geographic | | | | | | |
|---|---|---|---|---|---|---|
| Depreciation | **312** | **2** | **314** | 535 | 2 | 537 |
| Loss/(profit) on disposal of property, plant and equipment | **77** | **-** | **77** | (1) | - | (1) |
| Employee share based payments | **823** | **5** | **828** | 451 | - | 451 |

The segment assets and liabilities at 31 December 2007 and 31 December 2006 and capital expenditure in the years then ended are as follows:

| | 2007 | | | 2006 | | |
|---|---|---|---|---|---|---|
| Primary reporting format – geographic | United Kingdom £'000 | United States of America £'000 | Total £'000 | United Kingdom £'000 | United States of America £'000 | Total £'000 |
| Segment assets | 22,815 | 200 | 23,015 | 6,760 | 235 | 6,995 |
| Unallocated assets: Cash, cash equivalents and short term deposits | | | 38,147 | | | 28,543 |
| Total liabilities | 28,769 | 461 | 29,230 | 5,058 | 390 | 5,448 |
| Capital expenditure | 284 | - | 284 | 532 | 1 | 533 |
| Purchase of intangibles | 167 | - | 167 | 24 | - | 24 |

The Group's revenue derives from assets located in the United Kingdom. By destination, revenue derives from the European Union and the United States of America.

| Revenue by destination | 2007 £'000 | 2006 £'000 |
|---|---|---|
| Europe | 7,021 | 56 |
| United States of America | 198 | 704 |
| Total revenue | 7,219 | 760 |

# 4    EMPLOYEES AND DIRECTORS

The average monthly number of persons (including Executive Directors) employed by the Group during the year was:

| By activity | 2007 Number | 2006 Number |
|---|---|---|
| Office and management | 12 | 10 |
| Research and development | 68 | 62 |
| Total | 80 | 72 |

| Employee benefit costs | 2007 £'000 | 2006 £'000 |
|---|---|---|
| Wages and salaries | 5,531 | 4,319 |
| Social security costs | 734 | 430 |
| Other pension costs | 269 | 261 |
| Share based payments (note 23) | 828 | 451 |
| Total employee benefit costs | 7,362 | 5,461 |

| Key management compensation | 2007 £'000 | 2006 £'000 |
|---|---|---|
| Salaries and short term employee benefits | 2,589 | 1,815 |
| Post-employment benefits | 93 | 114 |
| Share based payments | 492 | 172 |
| Total | 3,174 | 2,101 |

The key management figures above include Executive and Non-Executive Directors. In respect of Directors' remuneration, the Company has taken advantage of the permission in paragraph 1(6) of schedule 6 to the Companies Act 1985 to omit aggregate information that is capable of being ascertained from the detailed disclosures in the Directors' Remuneration Report on pages 60 to 64, which forms part of these financial statements.

The Company had no employees during the year (2006: nil).

# 5    EXCEPTIONAL ADMINISTRATIVE EXPENSES

Exceptional administrative expenses of £335,000 (2006: nil) were restructuring costs associated with the integration of Oxxon Therapeutics Limited ('Oxxon') and closure of the former Oxxon offices and laboratories following the acquisition of Oxxon in March 2007. Severance and related costs for former Oxxon employees were £247,000. Fixed asset write-offs (mostly leasehold improvements) were £73,000. Other expenses were £15,000. The cash outflow associated with the exceptional expenses was £262,000 (2006: nil).

# 6    FINANCE INCOME AND EXPENSE

|  | Group | | Company | |
|---|---|---|---|---|
|  | **2007** | 2006 | **2007** | 2006 |
|  | **£'000** | £'000 | **£'000** | £'000 |
| **Finance expense:** |  |  |  |  |
| Unwinding of discount in provisions (note 18) | **(30)** | (29) | - | - |
| **Total finance expense** | **(30)** | (29) | - | - |
| **Finance income:** |  |  |  |  |
| Bank interest receivable | **2,113** | 1,743 | - | - |
| Other interest receivable | **4** | - | - | - |
| **Total finance income** | **2,117** | 1,743 | - | - |
| **Net finance income** | **2,087** | 1,714 | - | - |

# 7    EXPENSES BY NATURE

|  | Group | | Company | |
|---|---|---|---|---|
|  | **2007** | 2006 | **2007** | 2006 |
|  | **£'000** | £'000 | **£'000** | £'000 |
| Royalties payable | **454** | 80 | - | - |
| Employee benefit costs (note 4) | **7,362** | 5,461 | - | - |
| Consumables used | **819** | 823 | - | - |
| Depreciation, amortisation and impairment charges (notes 11, 12) | **322** | 537 | - | - |
| Loss/(profit) on disposal of property, plant and equipment | **77** | (1) | - | - |
| Repairs and maintenance expenditure on property, plant and equipment | **213** | 209 | - | - |
| Operating lease payments (note 12) | **981** | 976 | - | - |
| Rental income from sublease (note 12) | **(330)** | (345) | - | - |
| Consultants and subcontracted research | **786** | 358 | - | - |
| Externally contracted clinical and preclinical development | **11,837** | 11,153 | - | - |
| Legal and professional fees including patent costs | **2,108** | 1,246 | **185** | 149 |
| Net loss on foreign exchange | **3** | 2 | - | - |
| Other expenses | **2,576** | 1,723 | **9** | 14 |
| **Total cost of sales, research and development and administrative expenses** | **27,208** | 22,222 | **194** | 163 |

During the year the Group (including its US subsidiary) obtained services from the Group's auditor as detailed below:

|  | Group | | Company | |
|---|---|---|---|---|
|  | **2007** | 2006 | **2007** | 2006 |
| **Services provided by the Group's auditor** | **£'000** | £'000 | **£'000** | £'000 |
| Audit services |  |  |  |  |
| Statutory audit | **71** | 57 | **33** | 31 |
| Other services |  |  |  |  |
| Financial reporting advice | **14** | 14 | **12** | 12 |
| Tax compliance and advisory services | **53** | 40 | - | - |
| Other | **6** | 4 | - | - |
| **Total** | **144** | 115 | **45** | 43 |

In addition fees of £3,000 (2006: nil) included in costs of acquisition were paid to PricewaterhouseCoopers LLP in relation to the acquisition of Oxxon Therapeutics Limited.

# 8    TAXATION

The Group is entitled to claim tax credits in the United Kingdom for certain research and development expenditure. The amount included in the financial statements for the year ended 31 December 2007 represents the credit receivable by the Group for the year and adjustments to prior periods. These amounts have not yet been agreed with the relevant tax authorities.

A number of changes to the UK Corporation tax system were announced in the March 2007 Budget Statement and are expected to be enacted in the 2007 and 2008 Finance Acts. The 2007 Finance Act was substantively enacted on 26 June 2007 and therefore the effects are included in tax disclosures in these financial statements. The 2008 Finance Act was not substantively enacted at balance sheet date and therefore the effects have not been included in tax disclosures in these financial statements.

The changes announced in the March 2007 Budget Statement and expected to be enacted in the 2008 Finance Act are not expected to have a material impact on the tax figures disclosed in these financial statements.

| | Group | | Company | |
|---|---|---|---|---|
| **Continuing operations** | **2007 £'000** | 2006 £'000 | **2007 £'000** | 2006 £'000 |
| **Current tax** | | | | |
| United Kingdom corporation tax research and development credit | **(2,526)** | (1,709) | - | - |
| Overseas taxation | **60** | 38 | - | - |
| | **(2,466)** | (1,671) | - | - |
| **Adjustments in respect of prior periods** | | | | |
| United Kingdom corporation tax research and development credit | **-** | (75) | - | - |
| Overseas taxation | **14** | (16) | - | - |
| **Taxation credit** | **(2,452)** | (1,762) | - | - |

The tax credit for the year is lower (2006: lower) than the standard rate of corporation tax in the UK (30%). The differences are explained below:

| | Group | | Company | |
|---|---|---|---|---|
| | **2007 £'000** | 2006 £'000 | **2007 £'000** | 2006 £'000 |
| Loss on ordinary activities before tax | **(17,741)** | (19,388) | **(194)** | (163) |
| Loss on ordinary activities before tax multiplied by the standard rate of corporation tax in the UK of 30% (2006: 30%) | **(5,322)** | (5,816) | **(58)** | (49) |
| Effects of: | | | | |
| Depreciation for the period in excess of capital allowances and other timing differences | **64** | 199 | - | - |
| Expenses not deductible for tax purposes (permanent differences) | **44** | 21 | **2** | 14 |
| R&D relief 50% mark-up on expenses | **(1,659)** | (1,726) | - | - |
| Difference in rate re R&D tax credits | **2,205** | 1,496 | - | - |
| Tax deduction for share options less than IFRS 2 charge | **131** | 63 | - | - |
| Overseas tax | **4** | 5 | - | - |
| Tax losses carried forward to future periods | **2,067** | 4,071 | **56** | 35 |
| Overseas tax rate differences | **-** | 16 | - | - |
| Adjustments in respect of prior periods | **14** | (91) | - | - |
| **Current tax credit for the year** | **(2,452)** | (1,762) | - | - |

At 31 December 2007, the Group had tax losses to be carried forward of approximately £76.7 million (2006: £56.3 million) of which £54 million has been agreed with the revenue authorities. Of the Group tax losses, £76.7 million (2006: £56.3 million) arose in the United Kingdom.

There is no deferred tax recognised (see note 20).

Exhibit 1 - 85 of 102

Page 85

# 9    BASIC LOSS AND DILUTED LOSS PER ORDINARY SHARE

The basic loss per share has been calculated by dividing the loss for the year by the weighted average number of shares of 528,024,022 in issue during the year ended 31 December 2007 (2006: 499,865,620).

The Company had no dilutive potential ordinary shares in either year which would serve to increase the loss per ordinary share. There is therefore no difference between the loss per ordinary share and the diluted loss per ordinary share.

# 10    LOSS FOR THE FINANCIAL YEAR

As permitted by section 230 of the Companies Act 1985, the Company's income statement has not been included in these financial statements. The Company's loss for the financial year was £194,000 (2006: £163,000).

# 11    INTANGIBLE ASSETS

| Group | In process R&D £'000 | Intellectual property rights £'000 | Total £'000 |
|---|---|---|---|
| **Cost** | | | |
| At 1 January 2007 | - | 1,927 | 1,927 |
| Additions – through business combination (note 31) | 10,400 | 2,686 | 13,086 |
| Additions | - | 167 | 167 |
| **At 31 December 2007** | **10,400** | **4,780** | **15,180** |
| **Accumulated amortisation and impairment** | | | |
| At 1 January 2007 | - | 262 | 262 |
| Impairment in the year | - | 8 | 8 |
| **At 31 December 2007** | **-** | **270** | **270** |
| | | | |
| **Net book amount at 31 December 2007** | **10,400** | **4,510** | **14,910** |
| | | | |
| **Cost** | | | |
| At 1 January 2006 | - | 1,920 | 1,920 |
| Additions | - | 24 | 24 |
| Disposals | - | (17) | (17) |
| **At 31 December 2006** | **-** | **1,927** | **1,927** |
| **Accumulated amortisation and impairment** | | | |
| At 1 January 2006 | - | 279 | 279 |
| Disposals | - | (17) | (17) |
| **At 31 December 2006** | **-** | **262** | **262** |
| | | | |
| **Net book amount at 31 December 2006** | **-** | **1,665** | **1,665** |

In-process research and development acquired in 2007 comprises the fair value of the Hi-8 MEL therapeutic vaccine for the treatment of melanoma. Intellectual property rights acquired through acquisition comprise the Oxxon Therapeutics patent portfolio covering therapeutic vaccines and PrimeBoost methods.

Impairment charges are included within research and development costs in the income statement.

The Company had no intangibles at 31 December 2007 or 31 December 2006.

# 12   PROPERTY, PLANT AND EQUIPMENT

| Group | Short leasehold improvements £'000 | Office equipment, fixtures and fittings £'000 | Computer equipment £'000 | Laboratory equipment £'000 | Total £'000 |
|---|---|---|---|---|---|
| **Cost** | | | | | |
| At 1 January 2007 | 2,608 | 87 | 281 | 2,670 | 5,646 |
| Exchange adjustments | (4) | - | - | - | (4) |
| Additions – through business combination (note 31) | 79 | 10 | 2 | 8 | 99 |
| Additions – separately | 20 | 7 | 75 | 174 | 276 |
| Dilapidation asset – effect of change in discount rate | 8 | - | - | - | 8 |
| Disposals | (79) | (9) | (63) | (26) | (177) |
| **At 31 December 2007** | **2,632** | **95** | **295** | **2,826** | **5,848** |
| **Accumulated depreciation** | | | | | |
| At 1 January 2007 | 2,267 | 81 | 224 | 2,255 | 4,827 |
| Exchange adjustments | (4) | - | - | - | (4) |
| Charge for the year | 93 | 6 | 41 | 174 | 314 |
| Disposals | (12) | (3) | (63) | (21) | (99) |
| **At 31 December 2007** | **2,344** | **84** | **202** | **2,408** | **5,038** |
| **Net book amount at 31 December 2007** | **288** | **11** | **93** | **418** | **810** |
| | | | | | |
| **Cost** | | | | | |
| At 1 January 2006 | 2,270 | 86 | 270 | 2,650 | 5,276 |
| Exchange adjustments | (47) | - | (2) | - | (49) |
| Additions at cost | 50 | 3 | 34 | 111 | 198 |
| Dilapidations asset recognised | 335 | - | - | - | 335 |
| Disposals | - | (2) | (21) | (91) | (114) |
| **At 31 December 2006** | **2,608** | **87** | **281** | **2,670** | **5,646** |
| **Accumulated depreciation** | | | | | |
| At 1 January 2006 | 2,093 | 74 | 212 | 2,066 | 4,445 |
| Exchange adjustments | (47) | - | (1) | - | (48) |
| Charge for the year | 221 | 9 | 34 | 273 | 537 |
| Disposals | - | (2) | (21) | (84) | (107) |
| **At 31 December 2006** | **2,267** | **81** | **224** | **2,255** | **4,827** |
| **Net book amount at 31 December 2006** | **341** | **6** | **57** | **415** | **819** |

The Company had no property, plant and equipment at 31 December 2007 or 31 December 2006.

Lease rentals amounting to £968,000 (2006: £962,000) and £13,000 (2006: £14,000) relating to the lease of property and machinery, respectively, and sublease income of £330,000 (2006: £345,000) are included in the income statement (note 7).

# 13  INVESTMENTS

| Fixed asset investments: Company | 2007 £'000 | 2006 £'000 |
|---|---|---|
| **Shares in group undertakings** | | |
| At 1 January | 2,476 | 2,476 |
| Additions in the year | 14,682 | - |
| **At 31 December** | 17,158 | 2,476 |
| | | |
| **Loans to group undertakings** | | |
| At 1 January | 108,251 | 107,768 |
| Addition through business combination | 1,700 | - |
| Loan (repaid)/advanced in the year | (228) | 483 |
| **At 31 December** | 109,723 | 108,251 |
| **Total investments in shares and loans to group undertakings** | 126,881 | 110,727 |
| | | |
| **Impairment** | | |
| **At 1 January and 31 December** | 9,115 | 9,115 |
| **Net book amount at 31 December** | 117,766 | 101,612 |
| | | |
| **Capital contribution in respect of employee share schemes (see note 26)** | | |
| At 1 January | 857 | 406 |
| Additions in the year | 828 | 451 |
| **At 31 December** | 1,685 | 857 |
| | | |
| **Total investments** | 119,451 | 102,469 |

The Group had no investments at 31 December 2007 (2006: nil). All the Company investments above are cancelled out in the consolidated balance sheet.

## INTERESTS IN SUBSIDIARY UNDERTAKINGS

| Name of undertaking | Country of incorporation | Description of shares held | Proportion of nominal value of issued shares held by the Group and Company | Nature of business |
|---|---|---|---|---|
| Oxford BioMedica (UK) Limited | Great Britain | 1p ordinary shares | 100% | Gene therapy research and development |
| BioMedica Inc | United States of America | $0.001 common stock | 100% | Gene therapy research and development |
| Oxxon Therapeutics Limited | Great Britain | 1p ordinary shares | 100% | Dormant |

All of the above subsidiaries have been consolidated in these financial statements.

At each year end the Directors review the carrying value of the Company's investment in subsidiaries, by reference to the Group's market capitalisation on the London Stock Exchange. Where there is a material and sustained shortfall, the Directors consider this to be a trigger of an impairment review as set out in IAS 36, and the carrying value of the Company's investments in subsidiaries is reduced. The Directors consider that reference to the market capitalisation of the Group is an appropriate external measure of the value of the Group. The Directors considered that no change was required to the impairment provision at 31 December 2007.

## INTERESTS IN JOINT VENTURES

The Company's subsidiary Oxford BioMedica (UK) Limited holds 10,000 ordinary shares of 5,000 Won each, representing 50% of the issued share capital of ViroTech Limited, a company incorporated in South Korea. ViroTech Limited's business is gene therapy research and development. To date, no significant level of transactions has been entered into. The accounting year-end for ViroTech Limited is 31 December. At 31 December 2007 the share capital and reserves of ViroTech Limited were approximately £72,000 (2006: £70,000). However, as there is currently no agreed business plan for ViroTech Limited, the Directors have written down the Group's investment to zero. Due to the immaterial size of the joint venture it had been included in the Group accounts as a fixed asset investment.

# 14    TRADE AND OTHER RECEIVABLES

|  | Group | | Company | |
|---|---|---|---|---|
|  | 2007 | 2006 | 2007 | 2006 |
|  | £'000 | £'000 | £'000 | £'000 |
| **Non-current** | | | | |
| Other receivables – rent deposit | 118 | 150 | - | - |
| **Current** | | | | |
| Trade receivables | 91 | 241 | - | - |
| Other receivables | 1,129 | 765 | - | - |
| Other tax receivable | 414 | 220 | - | 48 |
| Prepaid clinical trial expenses | 969 | - | - | - |
| Other prepayments | 1,917 | 603 | 2 | 2 |
| Accrued income | 34 | 223 | - | - |
|  | 4,554 | 2,052 | 2 | 50 |
| **Total trade and other receivables** | 4,672 | 2,202 | 2 | 50 |

The fair value of trade and other receivables are the current book values.

At 31 December 2007 and 31 December 2006 none of the trade receivables was aged over three months. No receivables were impaired. Non-current receivables are not discounted as the impact of discounting would not be material.

Prepaid clinical trial expenses comprise stocks of materials for use in clinical trials and advance payments to clinical trial sites.

The carrying amounts of the Group's trade and other receivables are denominated in the following currencies:

|  | 2007 | 2006 |
|---|---|---|
|  | £'000 | £'000 |
| Sterling | 3,686 | 1,259 |
| US Dollar | 334 | 943 |
| Euro | 652 | - |
|  | 4,672 | 2,202 |

The Company's receivables are all denominated in Sterling.

The maximum exposure to credit risk at the reporting date is the fair value of each class of receivable above. The Group does not hold any collateral as security.

# 15    CASH AND CASH EQUIVALENTS

|  | Group | | Company | |
|---|---|---|---|---|
|  | 2007 | 2006 | 2007 | 2006 |
|  | £'000 | £'000 | £'000 | £'000 |
| Cash at bank and in hand | 5,402 | 2,343 | | |
| Short term bank deposits | 5,560 | 5,700 | - | - |
| **Total cash and cash equivalents** | 10,962 | 8,043 | - | - |

In addition to the cash and cash equivalents described above, the Group held Sterling bank deposits of £27,185,000 (2006: £20,500,000) with an initial term to maturity between three and twelve months classified as available for sale investments. None of these deposits is past due or impaired.

The Company held no available for sale investments in 2007 or 2006.

Group cash at bank and in hand includes £76,000 (2006: £182,000) held in escrow for expenses of the TRIST Phase III clinical trial.

# 16   TRADE AND OTHER PAYABLES - CURRENT

| | Group | | Company | |
|---|---|---|---|---|
| | **2007** | 2006 | **2007** | 2006 |
| | **£'000** | £'000 | **£'000** | £'000 |
| Trade payables | **2,948** | 1,579 | **-** | - |
| Other taxation and social security | **418** | 315 | **-** | - |
| Accruals | **6,191** | 2,777 | **61** | 62 |
| **Total trade and other payables** | **9,557** | 4,671 | **61** | 62 |

# 17   DEFERRED INCOME

In 2007 non-refundable payments totalling €38,000,000 (£25,793,000) were received from sanofi-aventis under the TroVax licence agreement. These payments are being recognised as revenue over a period of 24 to 36 months. To date revenue recognised under the sanofi-aventis collaboration is £6,970,000.

At 31 December 2007 the Group had deferred income of £18,913,000 (2006: £92,000). £11,530,000 (2006: £92,000) is expected to be recognised as revenue within 12 months of the balance sheet date, and is classified as current; the remaining £7,383,000 (2006: nil) is classified as non-current.

# 18   PROVISIONS

| Group | Dilapidations<br>£'000 | Onerous lease<br>£'000 | Total<br>£'000 |
|---|---|---|---|
| At 1 January 2007 | 347 | 338 | **685** |
| Exchange adjustments | - | (5) | **(5)** |
| Utilised in the year | - | (71) | **(71)** |
| Amortisation of discount | 16 | 14 | **30** |
| Change of discount rate – charged to income statement | - | 3 | **3** |
| Change of discount rate – adjustment to recognised fixed asset | 8 | - | **8** |
| **At 31 December 2007** | **371** | **279** | **650** |
| | | | |
| At 1 January 2006 | - | 460 | **460** |
| Exchange adjustments | - | (52) | **(52)** |
| Tangible fixed asset recognised in the year | 335 | - | **335** |
| Utilised in the year | - | (79) | **(79)** |
| Amortisation of discount | 12 | 17 | **29** |
| Change of discount rate – charged to income statement | - | (8) | **(8)** |
| **At 31 December 2006** | **347** | **338** | **685** |

| | 2007<br>£'000 | 2006<br>£'000 |
|---|---|---|
| Current | **60** | 58 |
| Non-current | **590** | 627 |
| **Total provisions** | **650** | 685 |

The dilapidations provision relates to anticipated costs of restoring the leasehold property in Oxford, UK to its original condition at the end of the present leases in 2011, discounted at 4.32% per annum (2006: 4.96%). The provision will be utilised at the end of the leases if they are not renewed.

The onerous lease provision relates to the estimated rental shortfall in respect of a redundant property in San Diego, USA which has been sub-let for the remainder of the lease term until June 2012, discounted at 4.39% per annum (2006: 4.88% per annum). The provision will be utilised over the term of the lease.

The Company had no provisions at 31 December 2007 or 31 December 2006.

Exhibit 1 - 90 of 102

Page 90

# 19  FINANCIAL INSTRUMENTS

The Group's and Company's financial instruments comprise investments in subsidiaries and joint ventures, cash and cash equivalents, together with available for sale investments, trade and other receivables, trade and other payables and provisions. Additional disclosures are set out in the Corporate Governance Statement relating to risk management.

The Group had the following financial instruments at 31 December each year:

|  | Assets | | Liabilities | |
|---|---|---|---|---|
|  | **2007** | 2006 | **2007** | 2006 |
|  | **£'000** | £'000 | **£'000** | £'000 |
| Cash and cash equivalents | **10,962** | 8,043 | - | - |
| Available for sale investments | **27,185** | 20,500 | - | - |
| Trade and other receivables | **4,672** | 2,202 | - | - |
| Trade and other payables | - | - | **9,557** | 4,671 |
| Deferred income | - | - | **18,913** | 92 |
| Provisions | - | - | **650** | 685 |
|  | **42,819** | 30,745 | **29,210** | 5,448 |

All the available for sale investments held at 31 December 2007 and 31 December 2006 were denominated in Sterling.

The weighted average interest rates and average deposit terms for fixed rate deposits are shown below. Floating rate instant access deposits earned interest at prevailing bank rates.

|  | 2007 | | | 2006 | | |
|---|---|---|---|---|---|---|
|  | Year end deposits | | Yr. average | Year end deposits | | Yr. average |
|  | **Weighted average rate** | **Weighted average term** | **Weighted average rate** | Weighted average rate | Weighted average term | Weighted average rate |
| Sterling | **6.06%** | **229 days** | **5.67%** | 5.08% | 225 days | 4.64% |
| Euro | **4.93%** | **33 days** | **4.08%** | 3.45% | 41 days | 3.17% |
| US dollars | **5.25%** | **33 days** | **5.24%** | 5.32% | 33 days | 5.03% |

In accordance with IAS 39 'Financial instruments: Recognition and measurement' the Group has reviewed all contracts for embedded derivatives that are required to be separately accounted for if they do not meet certain requirements set out in the standard. There were no such derivatives identified at 31 December 2007 or 31 December 2006.

## FAIR VALUE

The Directors consider that the fair values of the Group's financial instruments do not differ significantly from their book values.

Exhibit 1 - 91 of 102

Page 91

# 20  DEFERRED TAXATION

Neither the Company nor the Group had any recognised deferred tax assets or liabilities at 31 December 2007 (2006: nil). In light of the Group's continuing losses, recovery of the deferred tax asset is not sufficiently certain, and therefore no asset has been recognised.

| Group<br>Deferred tax liabilities – not recognised | Accelerated tax<br>depreciation<br>£'000 |
|---|---|
| At 1 January 2007 | (856) |
| Origination and reversal of temporary differences | 98 |
| Acquisition of subsidiary | 3,673 |
| At 31 December 2007 | 2,915 |
| | |
| Liabilities due in less than 12 months | - |
| Liabilities due in 12 months or more | 2,915 |

| Group<br>Deferred tax assets – not recognised | Provisions<br>£'000 | Tax losses<br>£'000 | Share options<br>£'000 | Total<br>£'000 |
|---|---|---|---|---|
| At 1 January 2007 | (252) | (16,894) | (347) | (17,493) |
| Origination and reversal of temporary differences | 30 | (825) | 204 | (591) |
| Acquisition of subsidiary | - | (3,811) | - | (3,811) |
| At 31 December 2007 | (222) | (21,530) | (143) | (21,895) |
| | | | | |
| Assets receivable in less than 12 months | (22) | - | - | (22) |
| Assets receivable in 12 months or more | (200) | (21,530) | (143) | (21,873) |

# 21  CALLED-UP SHARE CAPITAL

| Group and Company<br>Authorised | 2007<br>£'000 | 2006<br>£'000 |
|---|---|---|
| 650,000,000 (2006: 650,000,000) ordinary shares of 1p each | 6,500 | 6,500 |

| Issued and fully paid | 2007<br>£'000 | 2006<br>£'000 |
|---|---|---|
| Ordinary shares of 1p each | | |
| At 1 January – 501,369,655 (2006: 498,438,210) shares | 5,014 | 4,984 |
| Issued as consideration for acquisition 31,771,246 shares | 318 | - |
| Allotted on exercise of share options – 1,271,636 (2006: 2,446,260) shares | 13 | 25 |
| Allotted for cash to licensors of patent rights - 243,306 shares | 2 | - |
| Subscription by collaborative partner in 2006 – 485,185 shares | - | 5 |
| At 31 December – 534,655,843 (2006: 501,369,655) shares | 5,347 | 5,014 |

Between 3 January 2007 and 24 August 2007 the Company issued 1,271,636 ordinary shares of 1p each on the exercise of share options under share option schemes for aggregate cash consideration of £212,000. There were no costs in respect of these share issues.

On 9 March 2007 the Company issued 31,771,246 ordinary shares of 1p each as consideration for the acquisition of Oxxon Therapeutics Limited. The issue price was 50.36p per share, being the average market price over the preceding 30 days. Costs of £11,000 in respect of the issue of these shares have been charged to the share premium account. Additional fees and expenses of £382,000 incurred in connection with the acquisition of Oxxon Therapeutics have been capitalised as part of the cost of investment.

On 4 July 2007 the Company issued 243,306 ordinary shares of 1p each to Children's Hospital Boston USA for cash at market value of 40.75p per share, raising proceeds of £99,000. At the same time, Oxford BioMedica (UK) Limited entered into a licence agreement to extend the Group's rights to the endostatin and angiostatin genes for use in gene therapy to treat cancer. Costs of £4,000 in respect of these share issues have been charged to the share premium account.

Exhibit 1 - 92 of 102

Page 92

# 22   OPTIONS OVER SHARES OF OXFORD BIOMEDICA PLC

The Company has issued share options under three unapproved share option schemes and under a long term incentive plan. Options have also been granted to a small number of individuals (mainly employees of the Company's US subsidiary BioMedica Inc) under individual option agreements. In October 2006 the Oxford BioMedica 1996 (No.1) Share Option Scheme and the Oxford BioMedica 1996 Share Option Plan ended. Subject to the scheme rules, options granted under these schemes remain in force. In February 2007 three new option schemes were approved by shareholders: a long term incentive plan (LTIP) for Executive Directors and senior executives, a share option scheme for other employees and an all-employee Share Incentive Plan (SIP).   No awards have yet been made under the SIP.

The total number of options over ordinary shares of 1p each that had been granted and had not been exercised or lapsed at 31 December 2007 was as follows:

## OPTIONS GRANTED TO EMPLOYEES (INCLUDING DIRECTORS) UNDER THE OXFORD BIOMEDICA 1996 (NO. 1) SHARE OPTION SCHEME

| 2007 Number of shares | 2006 Number of shares | Exercise price per share | Date from which exercisable | Expiry date |
|---|---|---|---|---|
| - | 960,003 | 60.0p to 79.0p | 22/03/03 to 04/12/03 | 22/03/07 to 04/12/07 |
| 559,735 | 647,622 | 24.0p to 72.0p | 05/02/04 to 19/11/04 | 05/02/08 to 19/11/08 |
| 1,033,405 | 1,268,679 | 8.75p to 39.0p | 14/01/05 to 16/09/05 | 14/01/09 to 16/09/09 |
| 928,579 | 1,743,872 | 7.0p to 19.25p | 07/03/06 to 27/10/06 | 07/03/10 to 27/10/10 |
| 2,603,061 | 2,756,156 | 16.5p to 23.0p | 26/03/07 to 29/11/07 | 26/03/11 to 29/11/11 |
| 3,490,679 | 3,637,304 | 20.25p to 43.25p | 01/04/08 to 15/12/08 | 01/04/12 to 15/12/12 |
| 1,963,970 | 2,379,148 | 28.25p to 31.0p | 21/03/09 to 06/09/09 | 21/03/13 to 06/09/13 |
| 10,579,429 | 13,392,784 | | | |

## OPTIONS GRANTED TO EMPLOYEES UNDER THE OXFORD BIOMEDICA SHARE OPTION SCHEME

| 2007 Number of shares | 2006 Number of shares | Exercise price per share | Date from which exercisable | Expiry date |
|---|---|---|---|---|
| 1,998,229 | - | 22.0p to 49.25p | 08/03/10 to 14/12/10 | 08/03/17 to 14/12/17 |

## OPTIONS GRANTED UNDER THE OXFORD BIOMEDICA LONG TERM INCENTIVE PLAN

| 2007 Number of shares | 2006 Number of shares | Exercise price per share | Date from which exercisable | Expiry date |
|---|---|---|---|---|
| 4,079,495 | - | 1p | 03/04/10 | 04/04/10 |

## OPTIONS GRANTED UNDER THE OXFORD BIOMEDICA 1996 SHARE OPTION PLAN

| 2007 Number of shares | 2006 Number of shares | Exercise price per share | Date from which exercisable | Expiry date |
|---|---|---|---|---|
| - | 26,387 | 78. 0p | 06/11/03 | 06/11/07 |
| 47,497 | 47,497 | 24.0p to 270p | 19/11/04 to 19/12/04 | 19/11/08 to 19/12/08 |
| 284,985 | 284,985 | 10.0p to 31.0p | 02/01/05 to 06/09/05 | 02/01/09 to 06/09/09 |
| 332,482 | 358,869 | | | |

## OPTIONS GRANTED UNDER INDIVIDUAL CONTRACTS

| 2007 Number of shares | 2006 Number of shares | Exercise price per share | Date from which exercisable | Expiry date |
|---|---|---|---|---|
| 3,362,034 | 3,362,034 | 51.0p | 25/05/02 | 25/05/11 |
| 661,485 | 661,485 | 34.0p to 43.0p | 25/06/02 to 20/08/02 | 25/06/11 to 20/08/11 |
| 211,100 | 211,100 | 53.0p | 17/04/04 | 17/04/08 |
| 87,500 | 87,500 | 29.25p | 06/06/07 | 06/06/16 |
| 4,322,119 | 4,322,119 | | | |
| 21,311,754 | 18,073,772 | | | |

Options granted to employees after 5 April 1999 could give rise to a National Insurance liability on exercise. For options granted under the Oxford BioMedica 1996 (No. 1) Share Option Scheme, the Company has obtained undertakings from the holders of all options that could trigger such a liability that the optionholder would pay any secondary National Insurance so arising. In respect of options (including LTIP awards) granted in 2007 a provision of £129,000 is included in accruals at December 2007 for the potential NI liability of relevant options that were above water based on the year-end share price of 25.5p per share.

# 23   SHARE BASED PAYMENTS

All eligible employees of the Group are awarded share options. Options granted to UK employees have been awarded under the Oxford BioMedica 1996 (No.1) Share Option Scheme ("the 1996 Scheme"), the Oxford BioMedica share Option Scheme ("the 2007 Scheme") and the long term incentive plan ("the LTIP"). It is the Company's policy to make at least six grants of options to UK employees, at approximately six-month intervals. Since the introduction of the LTIP in 2007 it is the Group's policy not to award share options to Directors.

Options granted under the 1996 Scheme have a fixed exercise price based on the market price at the date of grant. The contractual life of the options is seven years. Options cannot normally be exercised before the third anniversary of the date of grant. For options granted to Directors and certain other employees since 2001 under the 1996 Scheme, the options are exercisable only if at the time of exercise, or for at least 12 months in aggregate in the three years before exercise, the percentage increase in Oxford BioMedica plc's total shareholder return since the grant of the option exceeds the percentage increase in the FTSE techMARK mediscience index.

Options granted under the 2007 Scheme also have a fixed exercise price based on the market price at the time of grant. The contractual life of the options is ten years. Options cannot normally be exercised before the third anniversary of the date of grant.

Options granted to employees at the Group's US subsidiary are generally a single grant at the time of joining the subsidiary company, and have a contractual life of ten years. Twenty five percent of the total shares under option become exercisable twelve months after the date of grant, with the remainder becoming exercisable thereafter at the rate of 2.0834 percent per month.

LTIP awards made in 2007 were nil-cost options, exercisable at par on the third anniversary of grant. Release of the LTIP will depend on the satisfaction of a performance condition based on comparative Total Shareholder Return against a comparator group of companies.

Options excluding LTIP awards, were valued using the Black-Scholes option pricing model. The LTIP, which contains complex market-based conditions, was valued using a Monte Carlo model. For each relevant option grant, individual valuation assumptions were assessed based upon conditions at the date of grant. The range of assumptions in the calculation of share based payment in 2007 is as follows:

|  | Share options | Share options | Share options | Share options | |
|---|---|---|---|---|---|
|  | 26.03.04 | 01.04.05 | 21.03.06 | 08.03.07 | LTIP |
| Grant dates | to 29.11.04 | to 15.12.05 | to 06.09.06 | to 14.12.07 | 03.04.07 |
| Share price at grant date | 16.5p to 22.75p | 20.25p to 42.75p | 275p to 31.0p | 22.0p to 49.25p | 48.5p |
| Exercise price | 16.5p to 23.0p | 20.25p to 43.25p | 28.25p to 31.0p | 22.0p to 49.25p | 1.0p |
| Shares vesting in 1 year | - | - | 21,875 | - | - |
| Shares vesting between 1 and 2 years | - | - | 21,875 | - | - |
| Shares vesting between 2 and 3 years | 3,089,686 | 3,904,028 | 2,401,023 | 2,010,309 | 4,079,495 |
| Shares vesting between 3 and 4 years | - | - | 21,875 | - | - |
| Total number of shares under option | 3,089,686 | 3,904,028 | 2,466,648 | 2,010,309 | 4,079,495 |
| Expected volatility (weighted average) | 75.0% | 71.1% | 63.8% | 63.3% | 60.4% |
| Expected life (years, weighted average) | 5.98 | 5.33 | 5.90 | 5.70 | 3.00 |
| Risk free rate (weighted average) | 4.66% | 4.34% | 4.53% | 4.98% | 5.42% |
| Expected rate of forfeit before vesting (weighted average) | 10.8% | 16.9% | 18.5% | 15.7% | 0.0% |
| Expectation of meeting performance criteria | 100% | 100% | 100% | 100% | 66% |
| Fair value per option | 11.6p to 15.9p | 14.0p to 29.0p | 16.7p to 22.2p | 13.3p to 30.6p | 32.9p |

Expected volatility is based on historical volatility for a period the same length as the expected option life ending on the date of grant. The risk-free rate of return is the yield on zero-coupon UK government bonds of a term consistent with the expected option life.

Excluding the LTIP award, which is exercisable at par subject to satisfaction of the performance condition, the weighted average share price for options granted during the year was 41.7p (2006: 30.0p). The weighted average share price for options exercised during the year was 16.7p (2006: 19.0p). The total charge for the year relating to employee share based payment plans was £828,000 (2006: £451,000) all of which related to equity-settled share based payment transactions. A reconciliation of movements in all options over the year to 31 December 2007 and an analysis of options outstanding at the year end are shown below.

| | 2007 | | 2006 | |
| | Number | Weighted average exercise price | Number | Weighted average exercise price |
|---|---|---|---|---|
| Outstanding at 1 January | 18,073,772 | 33.3p | 18,977,043 | 32.2p |
| Granted | 2,010,309 | 41.7p | 2,466,648 | 30.0p |
| Expired | (1,006,303) | 66.2p | (280,100) | 64.4p |
| Forfeited | (573,883) | 31.3p | (643,559) | 28.5p |
| Exercised | (1,271,636) | 16.7p | (2,446,260) | 19.0p |
| Outstanding at 31 December | 17,232,259 | 33.6p | 18,073,772 | 33.3p |
| Exercisable at 31 December | 9,724,695 | 33.8p | 9,213,664 | 38.9p |
| Exercisable and where market price exceeds exercise price at 31 December | 4,630,909 | 17.2p | 3,783,505 | 16.9p |

In addition to the share options above, awards over 4,079,495 shares were made under the LTIP in 2007 (2006: nil).

| | 2007 | | | | 2006 | | | |
| Range of exercise prices | Weighted average exercise price | Number of shares | Weighted average remaining life (years) Expected | Contractual | Weighted average exercise price | Number of shares | Weighted average remaining life (years) Expected | Contractual |
|---|---|---|---|---|---|---|---|---|
| LTIP: Exercisable at par | 1.0p | 4,079,495 | 2.25 | 2.25 | - | - | - | - |
| Options: | | | | | | | | |
| Under 10p | 8.3p | 1,225,895 | 1.38 | 1.82 | 8.2p | 1,619,694 | 2.39 | 2.84 |
| 10p to 20p | 18.2p | 838,682 | 1.43 | 2.82 | 18.6p | 1,485,454 | 1.96 | 3.83 |
| 20p to 30p | 24.8p | 6,586,939 | 2.97 | 4.38 | 24.9p | 6,879,482 | 3.90 | 5.23 |
| 30p to 40p | 33.5p | 2,283,724 | 4.18 | 6.37 | 31.4p | 1,734,880 | 4.69 | 5.74 |
| 40p to 50p | 45.2p | 2,376,323 | 4.17 | 6.42 | 42.9p | 1,427,263 | 4.57 | 5.30 |
| 50p to 60p | 51.1p | 3,598,658 | 3.18 | 3.19 | 51.1p | 3,598,658 | 4.18 | 4.19 |
| Over 60p | 72.0p | 322,038 | 0.10 | 0.10 | 67.6p | 1,328,341 | 0.64 | 0.67 |
| Total including LTIP | | 21,311,754 | | | | 18,073,772 | | |

# 24   SHARE PREMIUM ACCOUNT

| Group and Company | 2007 £'000 | 2006 £'000 |
|---|---|---|
| At 1 January | 106,732 | 106,097 |
| Premium on shares issued in acquisition [1] | 2,083 | - |
| Premium on shares issued during the year under the share option schemes | 199 | 441 |
| Premium on shares issued in connection with intellectual property purchase | 97 | - |
| Subscription by collaborative partner | - | 155 |
| (Costs)/refund associated with issue of shares | (10) | 39 |
| At 31 December | 109,101 | 106,732 |

1 The premium of £13,599,000 on Oxford BioMedica plc shares issued to acquire the share capital of Oxxon Therapeutics Limited has been credited to Merger Reserve. The premium of £2,083,000 credited to the share premium account relates to shares issued to acquire a loan from certain former shareholders of Oxxon.

Exhibit 1 - 95 of 102

Page 95

# 25   LOSSES

|  | Group | | Company | |
|---|---|---|---|---|
|  | **2007**<br>**£'000** | 2006<br>£'000 | **2007**<br>**£'000** | 2006<br>£'000 |
| At 1 January (deficit) | **(81,740)** | (64,565) | **(10,146)** | (9,983) |
| Loss for the year | **(15,289)** | (17,626) | **(194)** | (163) |
| Share based payments (note 23) | **828** | 451 | **-** | - |
| **At 31 December (deficit)** | **(96,201)** | **(81,740)** | **(10,340)** | **(10,146)** |

At 31 December 2007 neither the Company nor its subsidiary undertakings had reserves available for distribution (2006: nil).

# 26   OTHER RESERVES

| Group | Translation<br>reserve<br>£'000 | Merger<br>reserve<br>£'000 | Total<br>£'000 |
|---|---|---|---|
| At 1 January 2007 | (627) | 711 | 84 |
| Exchange adjustments | 2 | - | 2 |
| Arising on the acquisition of Oxxon Therapeutics Limited [1] | - | 13,599 | 13,599 |
| **At 31 December 2007** | **(625)** | **14,310** | **13,685** |
|  |  |  |  |
| At 1 January 2006 | (627) | 711 | 84 |
| Exchange adjustments | - | - | - |
| **At 31 December 2006** | **(627)** | **711** | **84** |

The merger reserve at 1 January 2007 comprises £711,000 arising from consolidation of Oxford BioMedica (UK) Limited using the merger method of accounting. The additional amount in 2007 arises from the application of merger relief to the purchase of Oxxon Therapeutics Limited. The premium on 27,551,628 Oxford BioMedica shares issued to Oxxon shareholders for the entire share capital of Oxxon was £13,599,000.

| Company | Share<br>scheme<br>reserve<br>£'000 |
|---|---|
| At 1 January 2007 | 857 |
| Credit in relation to employee share schemes | 828 |
| **At 31 December 2007** | **1,685** |
|  |  |
| At 1 January 2006 | 406 |
| Credit in relation to employee share schemes | 451 |
| **At 31 December 2006** | **857** |

Options over the Company's shares have been awarded to employees of subsidiary companies. In accordance with IFRS 2 'Share-based Payment' the expense in respect of these awards is recognised in the subsidiaries' financial statements (see note 22). In accordance with IFRIC 11, the Company has treated the awards as a capital contribution to the subsidiaries, resulting in an increase in the cost of investment of £828,000 (2006: £451,000) (see note 10) and a corresponding credit to reserves.

Exhibit 1 - 96 of 102<br>Page 96

## 27 CASH FLOW FROM OPERATING ACTIVITIES
### Reconciliation of loss before tax to net cash from operations

| | Group 2007 £'000 | Group 2006 £'000 | Company 2007 £'000 | Company 2006 £'000 |
|---|---|---|---|---|
| **Continuing operations** | | | | |
| Loss before tax | **(17,741)** | (19,388) | **(194)** | (163) |
| Adjustment for: | | | | |
| Depreciation | **314** | 537 | - | - |
| Loss/(profit) on disposal of property, plant and equipment | **77** | (1) | - | - |
| Impairment of intangible assets | **8** | - | - | - |
| Finance income | **(2,117)** | (1,743) | - | - |
| Finance expense | **30** | 29 | - | - |
| Charge in relation to employee share schemes | **828** | 451 | - | - |
| | | | | |
| Changes in working capital: | | | | |
| (Increase)/decrease in trade and other receivables | **(1,880)** | (107) | - | 13 |
| Increase in payables | **4,036** | 2,596 | **3** | 3 |
| Increase/(decrease) in deferred income | **18,821** | (13) | - | - |
| (Decrease) in provisions | **(69)** | (87) | - | - |
| **Net cash generated by/(used in) operations** | **2,307** | (17,726) | **(191)** | (147) |

## 28 PENSION COMMITMENTS

The Group operates defined contribution pension schemes for its Directors and employees. The assets of the schemes are held in independently administered funds. The pension cost charge of £269,000 (2006: £261,000) represents amounts payable by the Group to the funds. Contributions of £30,000 (included in accruals) were payable to the funds at the year end (2006: £28,000).

## 29 OPERATING LEASE COMMITMENTS – MINIMUM LEASE PAYMENTS

The future aggregate minimum lease payments under non-cancellable operating leases are as follows:

| | 2007 Property £'000 | 2007 Plant and equipment £'000 | 2006 Property £'000 | 2006 Vehicles, plant and equipment £'000 |
|---|---|---|---|---|
| **Group** | | | | |
| Not later than one year | **1,039** | **9** | 1,031 | 11 |
| Later than one year and not later than five years | **2,909** | **7** | 3,666 | 16 |
| Later than five years | **-** | **-** | 234 | - |
| **Total lease commitments** | **3,948** | **16** | 4,931 | 27 |
| | | | | |
| **Total future minimum sublease payments receivable** | **1,671** | **-** | 2,029 | - |

The Group leases equipment under non-cancellable operating lease agreements. The Group also leases its laboratories and offices under non-cancellable operating lease agreements. The leases have various terms, escalation clauses and renewal rights. The figures for property leases include a redundant building in San Diego, USA which has been sub-let. A provision of £279,000 has been made (2006: £338,000) for the expected rental shortfall under this lease (see note 18).

The Company had no operating lease commitments during the year (2006: none).

# 30   CONTINGENT LIABILITIES AND CAPITAL COMMITMENTS

There were no contingent liabilities at 31 December 2007 or at 31 December 2006. The Group had commitments of £22,000 for capital expenditure for plant and equipment not provided in the financial statements at 31 December 2007 (2006: £8,000).

# 31   ACQUISITION OF OXXON THERAPEUTICS LIMITED

On 9 March 2007 the Company purchased the entire issued share capital including all voting rights of Oxxon Therapeutics Limited ('Oxxon'). In addition, a loan of £1.7 million to Oxxon from the former owners of Oxxon was acquired. The purchase has been accounted for as an acquisition. The assets acquired included cash and cash equivalents of £3.8 million. On 2 April 2007 in an internal reorganisation, the trade of Oxxon Therapeutics Limited together with all its assets and liabilities was sold to the Group's principal operating subsidiary Oxford BioMedica (UK) Limited, and Oxxon is now dormant.

The purchase consideration, including the acquisition of the loan was £16,000,000 which was satisfied by the issue of 31,771,246 new 1p ordinary shares at 50.36p per share (the average market price over the 30 days ended 8 March 2007).

From the date of acquisition to 2 April 2007 the net loss of Oxxon was £95,000. From 2 April 2007 the Oxxon business was integrated with that of Oxford BioMedica (UK) Limited, and the facilities formerly occupied by Oxxon were closed down. Since 2 April 2007 the net loss attributable to the Oxxon business was approximately £517,000 of which closure and severance costs of £335,000 were classified as exceptional administrative expenses. Had the acquisition taken place at the beginning of 2007 these amounts would not have been materially different.

All intangible assets have been recognised at their respective fair values. There was no residual excess of the consideration over the fair value of net assets acquired, so no goodwill has been recognised in the financial statements.

| Acquisition of Oxxon Therapeutics Limited | Carrying values pre acquisition £'000 | Fair value adjustment £'000 | Fair value £'000 |
|---|---|---|---|
| Intangible assets | 243 | 12,843 | 13,086 |
| Property, plant and equipment | 99 | - | 99 |
| Receivables | 100 | - | 100 |
| Payables | (930) | - | (930) |
| R&D tax credit receivable | 268 | - | 268 |
| Deferred tax liability on fair value of intangibles | - | (3,926) | (3,926) |
| Deferred tax asset – tax losses | - | 3,926 | 3,926 |
| Cash and cash equivalents | 3,759 | - | 3,759 |
| Loans | (1,700) | 1,700 | - |
| Net assets acquired | 1,839 | 14,543 | 16,382 |
| Goodwill | | | - |
| **Consideration** | | | **16,382** |
| Consideration satisfied by: | | | |
| Shares issued to acquire Oxxon share capital | | | 13,875 |
| Shares issued to acquire loan from former parent of Oxxon | | | 2,125 |
| Expenses of acquisition | | | 382 |
| | | | 16,382 |

The net inflow of cash and cash equivalents on the acquisition of Oxxon was:

| | £,000 |
|---|---|
| Cash and cash equivalents acquired | 3,759 |
| Cash costs of acquisition | (382) |
| | 3,377 |

The fair value of the intangibles acquired with Oxxon was:

| | £,000 |
|---|---|
| In-process R&D: Hi-8 MEL melanoma vaccine | 10,400 |
| Intellectual property rights: PrimeBoost technology | 2,686 |
| | 13,086 |

# 32   RELATED PARTY TRANSACTIONS

## IDENTITY OF RELATED PARTIES

The Group consists of a parent, Oxford BioMedica plc, two wholly-owned trading subsidiaries and one subsidiary (Oxxon Therapeutics Limited) which was acquired and became dormant in 2007. The main trading company is Oxford BioMedica (UK) Limited. The second trading subsidiary BioMedica Inc provides services in the USA to Oxford BioMedica (UK) Limited under a transfer pricing agreement.

The Parent Company is responsible for financing and setting Group strategy. Oxford BioMedica (UK) Limited carries out the Group strategy, employs all the UK staff including the Directors, and owns and manages all of the Group's intellectual property. The proceeds of the issue of shares by the parent are passed from Oxford BioMedica plc to Oxford BioMedica (UK) Limited as a loan, and Oxford BioMedica (UK) Limited manages Group funds and makes payments, including the expenses of the Parent Company. Subsequent to the acquisition of Oxxon Therapeutics Limited by Oxford BioMedica plc in 2007, Oxford BioMedica (UK) Limited acquired all the assets and liabilities of Oxxon, including an inter-group loan of £1,700,000.

| Company: transactions with subsidiaries | 2007 £'000 | 2006 £'000 |
|---|---|---|
| **Purchases**: | | |
| Parent Company expenses paid by subsidiary | **(540)** | (152) |
| | | |
| **Transactions involving Parent Company shares**: | | |
| Proceeds of Parent Company share issues received by subsidiary | **-** | 160 |
| Proceeds of subsidiary employee share sales received by parent | **(384)** | (232) |
| | | |
| **Cash management**: | | |
| Cash loaned by parent to subsidiary | **696** | 707 |
| | | |
| **Acquisition in the year**: | | |
| Loan to subsidiary acquired with Oxxon Therapeutics Limited | **1,700** | - |

The loan from Oxford BioMedica plc to Oxford BioMedica (UK) Limited is unsecured and interest free. The loan is not due for repayment within 12 months of the year end. The year end balance on the loan was:

| Company: year end balance of loan | 2007 £'000 | 2006 £'000 |
|---|---|---|
| **Loan to subsidiary** | **109,723** | 108,251 |

In addition to the transactions above, options over the Company's shares have been awarded to employees of subsidiary companies. In accordance with IFRIC 11, the Company has treated the awards as a capital contribution to the subsidiaries, resulting in an increase in the cost of investment of £1,685,000 (2006: £857,000).

There were no transactions (2006: none) with Oxxon Therapeutics Limited or with the dormant joint venture ViroTech Limited.

As described in the Directors' Remuneration Report, prior to 2007 Oxford BioMedica (UK) Limited entered into a consultancy agreement with Mark Berninger, a Non-Executive Director, in connection with the Group's licensing strategy for the LentiVector technology. This agreement came to an end in 2007. In addition to Directors' fees a total of £783 (2006: £6,329) was incurred in consultancy fees.

A close family member of Andrew Wood is employed by the Group and is paid at market rate. Total compensation cost comprising salary, national insurance and pension was £74,000 (2006: £62,000).

Exhibit 1 - 99 of 102

Page 99

# Advisors

**FINANCIAL ADVISOR**

**NM Rothschild & Sons Limited**
New Court
St Swithin's Lane
London EC4P 4LD

**FINANCIAL ADVISOR
AND BROKER**

**JP Morgan Cazenove Limited**
20 Moorgate
London EC2R 8DA

**REGISTERED AUDITORS**

**PricewaterhouseCoopers LLP**
9 Greyfriars Road
Reading RG1 1JG

**SOLICITORS**

**Morrison & Foerster MNP**
7th Floor CityPoint
One Ropemaker Street
London EC2Y 9AW

**REGISTRARS**

**Capita Registrars**
The Registry
34 Beckenham Road
Beckenham
Kent BR3 4TU

**COMPANY SECRETARY AND
REGISTERED OFFICE**

**Andrew Wood**
Medawar Centre
Robert Robinson Avenue
The Oxford Science Park
Oxford OX4 4GA



Exhibit 1 - 101 of 102

Page 101

12 March 2007

06 July 2007



## M&A

Acquisition of Oxxon Therapeutics for
£16 million in shares



## EndoAngio-GT

Licence secured from Children's
Hospital Boston to anti-angiogenic
genes for cancer

**Oxford BioMedica plc**
Medawar Centre, Robert Robinson Avenue
The Oxford Science Park, Oxford
OX4 4GA, United Kingdom

T: +44 (0) 1865 783 000
F: +44 (0) 1865 783 001

enquiries@oxfordbiomedica.co.uk
www.oxfordbiomedica.co.uk

Exhibit 1 - 102 of 102

Page 102

# EXHIBIT 2



Oxford BioMedica (UK) Limited : Medawar Centre,        : Telephone: +44 (0)1865 783000 ·
                                 Robert Robinson Avenue,  Facsimile: +44 (0)1865 783001
                                 The Oxford Science Park, Oxford
                                 OX4 4GA United Kingdom

<u>BY FACSIMILE: +45 33 26 83 80</u>

Dr Li Westerlund
Bavarian Nordic A/S
Bøgeskovvej 9
DK-3490 Kvistgård
Denmark
Tel: +45 3326 8383
Fax: +45 3326 8380

8 January 2007

*WITHOUT PREJUDICE*
*WITHOUT ADMISSION*
*WITHOUT ESTOPPEL*
*FOR PURPOSES OF SETTLEMENT*
*PURSUANT TO US FEDERAL RULES OF EVIDENCE, RULE 408*

Re:     Patent Family 1: Family of US Patents Nos. 6,761,893 & 6,913,752
        Patent Family 2: Family of US Patent No. 6,440,422, EP 0 836 648 B, etc.

Dear Dr. Westerlund:

Thank you for your 18 December 2006 letter to Professor Alan Kingsman. I can confirm that Oxford BioMedica (OBM) welcomes the opportunity for an open dialogue with Bavarian Nordic A/S (BN).

I would like to clarify what may be a misunderstanding with respect to Patent Family 2. The MVA in TroVax® and TroVax-Vet® (the TroVax® products) does not use deletion sites 1, 2, 4, 5, and 6. The exogenous DNA (cDNA encoding Tumour-Associated Antigen 5T4) in all the TroVax® products is inserted into deletion region 3 of the MVA. See Harrop et al., Clinical Cancer Research, Vol. 12, 3416-3424, June 1, 2006, *"Vaccination of Colorectal Cancer Patients with Modified Vaccinia Ankara Delivering the Tumor Antigen 5T4 (TroVax) Induces Immune Responses which Correlate with Disease Control: A Phase I/II Trial."*

Consequently, the MVA in the TroVax® products is as described in Harrop et al., not as described in Mulryan et al., Molecular Cancer Therapeutics, Vol. 1, 1129-1137, October 2002, *"Attenuated Recombinant Vaccinia Virus Expressing Oncofetal Antigen (Tumor-associated Antigen) 5T4 Induces Active Therapy of Established Tumors"* (cited in your letter).

Therefore, we respectfully do not see any of the TroVax® products as being within any claims of the above-referenced Patent Family 2.

cont'd... 2/

Registered Office as shown. Registered in England and Wales: No 3028927

Exhibit 2 - 1 of 2
Page 103

Dr. Li Westerlund
Director of Intellectual Property
Rights
Bavarian Nordic A/S
6 January 2007
Page 2 of 2

*WITHOUT PREJUDICE*
*WITHOUT ADMISSION*
*WITHOUT ESTOPPEL*
*FOR PURPOSES OF SETTLEMENT*
*PURSUANT TO US FEDERAL RULE OF EVIDENCE 408*

With respect to Patent Family 1, we could not locate any pending US patent application in Family 1 that has been allowed. Could you please provide us with a complete, true and unredacted copy of the prosecution history of the patent application that you report to be allowed?

We are also of the view that clinical activities are exempt activities. Moreover, it is our view that there are other issues that impact upon any application of patents in Patent Family 1 and Patent Family 2 to the TroVax® products, including the pending litigation at the U.S. International Trade Commission mentioned in your letter.

Nonetheless, in the spirit of open dialogue between our companies, after we have had the opportunity to review the prosecution history of the application you report to be allowed, and you have had the opportunity to review Harrop et al., we would like to have a meeting that includes representatives of and patent counsel for OBM and BN.

Therefore, we look forward to receiving the prosecution history of the patent application you report to be allowed, and to subsequently scheduling a meeting.

Yours sincerely,

Peter J Nolan
*Senior Vice President Commercial Development*

cc:    Jill Martin, Vice President Intellectual Property, BioMedica, Inc.
        Thomas J. Kowalski, Esq.
        James Marshall, Solicitor

Exhibit 2 - 2 of 2

# EXHIBIT 3



bioMedica OXFORD

| Oxford BioMedica (UK) Limited | Medawar Centre, | Telephone: +44 (0)1865 783000 |
Robert Robinson Avenue, | Facsimile: +44 (0)1865 783001
The Oxford Science Park, Oxford
OX4 4GA United Kingdom

**BY FACSIMILE: +45 33 26 83 80**

Dr. Li Westerlund
Bavarian Nordic A/S
Bøgeskovvej 9
DK-3490 Kvistgård
Denmark
Tel: +45 3326 8383
Fax: +45 3326 8380

12 February 2007

*WITHOUT PREJUDICE*
*WITH ADMISSION*
*WITHOUT ESTOPPEL*
*FOR PURPOSES OF SETTLEMENT*
*PURSUANT TO U.S. FEDERAL RULES OF EVIDENCE, RULE 408*

Re:    Patent Family 1: Family of US Patent Nos. 6,761,893 & 6,913,752
       Patent Family 2: Family of US Patent No. 6,440,422, EP 0 836 648, etc.

Dear Dr. Westerlund:

Thank you for your 9 January 2007 letter and accompanying documents.

We are in the process of reviewing U.S. application no. 10/440,073, as well as the patents involved in the International Trade Commission proceeding. We trust that you appreciate the time that is needed for these studies.

We expect to be better positioned in March to respond to you regarding a time and date for a meeting. With this in mind perhaps you could suggest some convenient dates for a meeting to be held in New York? We thank you for your understanding and look forward to hearing from you in due course.

Yours sincerely,

Peter J. Nolan
*Senior Vice President Commercial Development*

cc:    Jill Martin, Vice President Intellectual Property, BioMedica, Inc.
       Thomas J. Kowalski, Esq.
       James Marshall, Solicitor

| Registered Office as above. Registered in England and Wales: No 3028927

Exhibit 3 - 1 of 1
Page 105

EXHIBIT 4



Oxford BioMedica (UK) Limited | Medawar Centre,          | Telephone: +44 (0)1865 783000 |
                               | Robert Robinson Avenue,  | Facsimile:  +44 (0)1865 783001 |
                               | The Oxford Science Park, Oxford |
                               | OX4 4GA United Kingdom   |

**BY FACSIMILE: +45 33 26 83 80**

Dr. Li Westerlund
Bavarian Nordic A/S
Bøgeskovvej 9
DK-3490 Kvistgård
Denmark
Tel: +45 3326 8383
Fax: +45 3326 8380

9 August 2007

Dear Dr Westerlund

Thank you for your faxed letter dated 8 August 2007.

We will respond to your letter in due course; however due to the summer
vacation period, this will not be before 10 October 2007.

Yours sincerely,

Peter J. Nolan
*Senior Vice President Commercial Development*

cc:    Jill Martin, Vice President Intellectual Property, BioMedica, Inc.
       Thomas J. Kowalski, Esq. Frommer Lawrence & Haug LLP
       James Marshall Esq. Taylor Wessing
       Edward Pennington Esq. Bingham McCutchen LLP

Exhibit 4 - 1 of 1
Page 106

# EXHIBIT 5

10. Oct. 2007 14:14    Oxford BioMedica                    No. 4196    P. 2



Oxford BioMedica (UK) Limited     Medawar Centre,                    Telephone: +44 (0)1865 783000
                                   Robert Robinson Avenue,           Facsimile: +44 (0)1865 783001
                                   The Oxford Science Park, Oxford
                                   OX4 4GA United Kingdom

**BY FACSIMILE, & OVERNIGHT COURIER**

Dr. Li Westerlund
2900 K Street, NW, Suite 501
Harborside, South Building
Washington, DC 2007-5118
Fax: +1 202 536 1579

*CONFIDENTIAL*
*WITHOUT PREJUDICE*
*WITHOUT ADMISSION*
*WITHOUT ESTOPPEL*
*FOR PURPOSES OF SETTLEMENT*
*PURSUANT TO US FEDERAL RULES OF EVIDENCE, RULE 408*

10 October 2007

Dear Dr. Westerlund:

Re:   US Pats Nos. 7,189,536, 6,761,893, 6,913,752, USSN 11/198,557, EP 1335987

Thank you for your 8 August 2007 letter. As stated in our earlier communications, including during our March 20, 2007 meeting, Oxford BioMedica (OBM) welcomes an open dialogue with Bavarian Nordic A/S (BN).

We appreciate that BN has provided updates on its US and European patent portfolio as they occur, such as the recent issuance of a patent, or of a Notice of Allowance, as in your 8 August letter.

Our continuing view is that clinical activities are exempt activities, and that there are other significant issues that impact against any attempt to apply the above-referenced patents and patent application to the TroVax® products, including the issues we discussed when we met in March 2007.

In short, our view remains that we see no need for any license from BN under the above-referenced patents and patent application with respect to the TroVax® products and their use. If our position on taking a license from BN should change, we shall contact you to discuss this further.

With regard to the closing paragraph of your letter, we are unclear as to what sort of information you are seeking. It is a matter of public record that we have signed an agreement with sanofi-aventis, as announced to the London Stock Exchange on 28 March 2007. We trust you will understand that at this time we are not in a position to disclose any information concerning TroVax® that is not in the public domain.

Exhibit 5 - 1 of 2
Page 107

10. Oct. 2007 14:14     Oxford BioMedica                                    No. 4196    P. 3

Dr. Li Westerlund                                          *WITHOUT PREJUDICE*
Director of Intellectual Property                          *WITHOUT ADMISSION*
Rights                                                     *WITHOUT ESTOPPEL*
Bavarian Nordic A/S                               *FOR PURPOSES OF SETTLEMENT*
10 October 2007                        *PURSUANT TO US FEDERAL RULE OF EVIDENCE 408*
Page 2 of 2

Page 2.
10 October 2007

Nonetheless, in the spirit of the initially-stated open dialogue between our companies, and
because we remain interested in better understanding BN's views, we are amenable to
having a further meeting which could be held either at our patent counsel's NYC office or
alternatively in Oxford or Kvistgård.

Therefore, please feel free to communicate with me if you are interested in scheduling such
a meeting.

Yours sincerely,

Peter Nolan
*Senior Vice President Commercial Development*

cc:     Jill Martin, Vice President Intellectual Property, BioMedica, Inc.
        Thomas J. Kowalski, Esq. Frommer Lawrence & Haug LLP
        James Marshall, Taylor Wessing

Exhibit 5 - 2 of 2
Page 108

EXHIBIT 6



OXFORD

bioMedica

: Oxford BioMedica (UK) Limited    Medawar Centre,    Telephone: +44 (0)1865 783000 :
                                     Robert Robinson Avenue,    Facsimile: +44 (0)1865 783001
                                     The Oxford Science Park, Oxford
                                     OX4 4GA United Kingdom

**BY FACSIMILE: +45 33 26 83 80**

Dr. Li Westerlund
Bavarian Nordic A/S
Bøgeskovvej 9
DK-3490 Kvistgård
Denmark
Tel: +45 3326 8383
Fax: +45 3326 8380


26 November 2007


Dear Li

Thank you for your letter of 25 October 2007.

Please be advised that, due to other commitments, I intend to respond to your
letter in the next two weeks.


Yours sincerely,

Peter J. Nolan
*Senior Vice President Commercial Development*


cc:    Jill Martin, Vice President Intellectual Property, BioMedica, Inc.
       Thomas J. Kowalski, Esq. Frommer Lawrence & Haug LLP
       James Marshall, Solicitor, Taylor Wessing


: Registered Office as above. Registered in England and Wales. No 3028927

Exhibit 6 - 1 of 1
Page 109

# EXHIBIT 7

20. Dec. 2007 16:26    Oxford BioMedica                              No. 4784    P. 2



bioMedica    · Oxford BioMedica (UK) Limited  ·  Medawar Centre,    Telephone: +44 (0)1865 783000
                                                 Robert Robinson Avenue,    Facsimile:  +44 (0)1865 783001
                                                 The Oxford Science Park, Oxford
                                                 OX4 4GA United Kingdom


BY FACSIMILE, EMAIL & OVERNIGHT COURIER

Dr. Li Westerlund
VP Global IP
Bavarian Nordic Inc
2900 K Street, NW, Suite 501
Harborside, South Building
Washington, DC 2007-5118
Fax: +1 202 536 1579


                                                       *CONFIDENTIAL*
                                                 *WITHOUT PREJUDICE*
                                                 *WITHOUT ADMISSION*
                                                 *WITHOUT ESTOPPEL*
                                          *FOR PURPOSES OF SETTLEMENT*
                                 *PURSUANT TO US FEDERAL RULES OF EVIDENCE, RULE 408*


20 December 2007


Dear Dr. Westerlund:

Thank you for your 25 October 2007 letter.

Thank you as well for keeping me updated concerning the recent Notice of Allowance
regarding US Patent Application Serial No 11/508,797.

You referred to our announcement on 11 September 2007 concerning the receipt of a
milestone payment under our collaboration with Sanofi Aventis and requested an
explanation of why we believe that this revenue would not "constitute a commercial use of
TroVax®." On this point, our 28 March 2007 press release states that the collaboration and
license is "to develop and commercialize TroVax® for the treatment and prevention of
cancers". TroVax® is in clinical development and has yet to secure a (commercialization)
license from the FDA or other equivalent regulatory agency.   As I have previously stated,
such clinical activities are exempt activities, and there would anyway be fundamental issues
that would impact upon any attempt to apply the cited Bavarian Nordic patents to the
TroVax® products.

As to your second request, the biological properties of TroVax® have been characterized to
the extent required to satisfy the appropriate regulatory agencies. Those parts of this data
that are not in the public domain remain confidential, as would any other internal data of our
company.

Registered Office as above. Registered in England and Wales: No 3028927

Exhibit 7 - 1 of 2

Page 110

Dr. Li Westerlund
·VP Global IP
Bavarian Nordic A/S
20 December 2007
Page 2 of 2

*WITHOUT PREJUDICE*
*WITHOUT ADMISSION*
*WITHOUT ESTOPPEL*
*FOR PURPOSES OF SETTLEMENT*
*PURSUANT TO US FEDERAL RULE OF EVIDENCE 408*

It may be more appropriate for these issues to be discussed at our next meeting. In this respect can I suggest that we could meet in the week commencing 28th January 2008 as I am already scheduled to attend a meeting in Washington DC that week?

Yours sincerely,

Peter Nolan
Senior Vice President Commercial Development


cc:    Jill Martin, Vice President Intellectual Property, BioMedica, Inc.
       Thomas J. Kowalski, Esq.
       James Marshall, Taylor Wessing

Exhibit 7 - 2 of 2

Page 111

# EXHIBIT 8

24. Jan. 2008 15:08     Oxford BioMedica                          No. 5085    P. 2



Oxford BioMedica (UK) Limited  |  Medawar Centre,              Telephone: +44 (0)1865 783000
                                  Robert Robinson Avenue,        Facsimile: +44 (0)1865 783001
                                  The Oxford Science Park, Oxford
                                  OX4 4GA United Kingdom

**BY FACSIMILE**

Dr. LI Westerlund
2900 K Street, NW, Suite 501
Harborside, South Building
Washington, DC 2007-5118
Fax: +1 202 536 1579

*CONFIDENTIAL*
*WITHOUT PREJUDICE*
*WITHOUT ADMISSION*
*WITHOUT ESTOPPEL*
*FOR PURPOSES OF SETTLEMENT*
*PURSUANT TO US FEDERAL RULES OF EVIDENCE, RULE 408*

24 January 2008

Dear Dr. Westerlund:

Thank you for your recent letter.

For our meeting on 31 January, I would propose the following agenda:

1. Introduction
2. Update on recent US patents (BN)
3. OXB TroVax update
4. Issues raised in letter from LW to PN dated 25 October, 2007
5. Any Other Business

I believe this highlights the areas we need to cover; please revise accordingly if you want to
add further items for discussion.

Yours sincerely,

Peter Nolan
*Senior Vice President Commercial Development*

cc:    Jill Martin, Vice President Intellectual Property, BioMedica, Inc.
       Thomas J. Kowalski, Esq. Frommer Lawrence & Haug LLP
       James Marshall, Taylor Wessing

Registered Office as shown. Registered in England and Wales: No 3028927

Exhibit 8 - 1 of 1
Page 112

1

## PROOF OF SERVICE

2

3    BAVARIAN NORDIC A/S v. OXFORD BIOMEDICA, et al.
     UNITED STATES DISTRICT COURT Case No. 08cv1156-L-RBB

4

5        I, the undersigned, declare: That I am, and was at the time of service of the
     papers herein referred to, over the age of eighteen years, and not a party to the
     action; and I am employed in the County of San Diego, California.  My business

6    address is 350 Tenth Avenue, Suite 1300, San Diego, California 92101-8700.

7        On September 4, 2008, at San Diego, California, I served the following
     document(s) described as

8

9        **PLAINTIFF BAVARIAN NORDIC A/S' EX PARTE MOTION FOR LEAVE TO
     CONDUCT DISCOVERY RELATED TO DEFENDANTS' MOTIONS TO DISMISS;**

10       **PLAINTIFF BAVARIAN NORDIC A/S' MEMORANDUM OF POINTS AND
     AUTHORITIES IN SUPPORT OF EX PARTE MOTION FOR LEAVE TO CONDUCT**

11   **DISCOVERY RELATED TO DEFENDANTS' MOTIONS TO DISMISS**

12       **DECLARATION OF MICHAEL L. KIRBY IN SUPPORT OF PLAINTIFF
     BAVARIAN NORDIC A/S' EX PARTE MOTION FOR LEAVE TO CONDUCT**

13   **DISCOVERY RELATED TO DEFENDANTS' MOTIONS TO DISMISS**

14       **DECLARATION OF THEODORE J. FOLKMAN IN SUPPORT OF PLAINTIFF
     BAVARIAN NORDIC A/S' EX PARTE MOTION FOR LEAVE TO CONDUCT**

15   **DISCOVERY RELATED TO DEFENDANTS' MOTIONS TO DISMISS**

16       **[PROPOSED] ORDER GRANTING PLAINTIFF BAVARIAN NORDIC A/S' EX
     PARTE MOTION FOR LEAVE TO CONDUCT DISCOVERY RELATED TO**

17   **DEFENDANTS' MOTIONS TO DISMISS**

18       on the parties in said action as follows:

19                           **SEE ATTACHED LIST**

20   ☒   **ELECTRONIC TRANSMISSION:** I filed the foregoing document with the Clerk
         of Court for the UNITED STATES DISTRICT COURT, using the Electronic

21       Case Filing ("ECF") system of the Court.  The attorney listed above has
         consented to receive service by electronic means and is registered with the

22       Court's ECF system and was served a "Notice of Electronic Filing" sent by ECF
         system.

23

24   ☒   **STATE COURT:** I declare under penalty of perjury under the laws of the State
         of California that the above is true and correct.

25       Executed on September 4, 2008, at San Diego, California.

26

27                                    /s/ Stacy L Ratti

28

| | |
|---|---|
| 1 | **SERVICE LIST** |
| 2 | Richard T. Mulloy | Attorneys for Defendants Oxford |
| 3 | DLA PIPER US LLP | BioMedica plc, BioMedica, Inc., and |
|   | 401 B Street, #1700 | Oxford BioMedica (UK) Ltd. |
|   | San Diego, CA  92101-3697 |
| 4 | Tel:  (619) 699-4787 |
|   | Fax:  (619) 699-2701 |
| 5 | richard.mulloy@dlapiper.com |
| 6 | Edgar H. Haug | Attorneys for Defendants Oxford |
|   | ehaug@flhlaw.com | BioMedica plc, BioMedica, Inc., and |
| 7 | Thomas J. Kowalski | Oxford BioMedica (UK) Ltd. |
|   | tkowalski@flhlaw.com |
| 8 | Vicki Franks |
|   | vfranks@flhlaw.com |
| 9 | Anne-Marie C. Yvon |
|   | ayvon@flhlaw.com |
| 10 | Gina M. Bassi |
|    | gbassi@flhlaw.com |
| 11 | FROMMER LAWRENCE & HAUG |
|    | 745 Fifth Avenue |
| 12 | New York, NY  10151 |
|    | Tel:  (212) 588-0800 |
| 13 | Fax:  (212) 588-0500 |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 26 | |
| 27 | |
| 28 | |

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California  92101-8700

KNLH\542314.1

-2-